**No. 24-2079**

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

_____

ISAIAH WILKINS, CAROL COE, NATALIE NOE, and MINORITY
VETERANS OF AMERICA
*Plaintiffs-Appellees,*

v.

PETE HEGSETH, in his official capacity as Secretary of Defense, and
DANIEL P. DRISCOLL, in his official capacity as Secretary of the Army
*Defendants-Appellants.*

_____

Appeal from the U.S. District Court for the Eastern District of Virginia,
Case No. 1:22-cv-1272 (LMB/IDD), Hon. Leonie M. Brinkema

_____

### BRIEF OF PLAINTIFFS-APPELLEES

_____

Peter E. Perkowski
Perkowski Legal, PC
515 S. Flower St.
Suite 1800
Los Angeles, CA 90071
peter@perkowskilegal.com
(213) 340-5796

Bryce A. Cooper
Winston & Strawn LLP
35 W. Wacker Dr.
Chicago, IL 60601
bcooper@winston.com
(312) 558-5600

ADDITIONAL COUNSEL ON NEXT PAGE

*Counsel for Plaintiffs-Appellees*

Scott A. Schoettes
Scott A. Schoettes, Esq.
275 Sandy Point Trail
Palm Springs, CA 92262
sschoettes@gmail.com
(773) 474-9250

Gregory R. Nevins
Lambda Legal Defense &
Education Defense Fund, Inc.
1 West Court Square
Suite 640
Decatur, GA 30030
gnevins@lambdalegal.org
(404) 897-1880

Nicholas J. Hite
Lambda Legal Defense &
Education Defense Fund, Inc.
3500 Oak Lawn Avenue
Suite 500
Dallas, TX 75219
nhite@lambdalegal.org
(214) 219-8585

Robert T. Vlasis, III
Hannah M. Shankman
Winston & Strawn LLP
1901 L. Street NW
Washington, DC 20036
rvlasis@winston.com
hshankman@winston.com
(202) 282-5644

Thanh D. Nguyen
Winston & Strawn LLP
2121 N. Pearl Street, 9th Floor
Dallas, TX 75201
tdnguyen@winston.com
(214) 296-9845

*Counsel for Plaintiffs-Appellees*

# UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

## DISCLOSURE STATEMENT

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. 24-2079     Caption: Isaiah Wilkins et al. v. Peter Hegseth et al.

Pursuant to FRAP 26.1 and Local Rule 26.1,

Isaiah Wilkins
(name of party/amicus)

who is _____ appellee _____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.  Is party/amicus a publicly held corporation or other publicly held entity?     ☐YES ☑NO

2.  Does party/amicus have any parent corporations?     ☐YES ☑NO
    If yes, identify all parent corporations, including all generations of parent corporations:

3.  Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?     ☐YES ☑NO
    If yes, identify all such owners:

4.  Is there any other publicly held corporation or other publicly held entity that has a direct
    financial interest in the outcome of the litigation?                    ☐YES ☑NO
    If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)      ☐YES ☑NO
    If yes, identify any publicly held member whose stock or equity value could be affected
    substantially by the outcome of the proceeding or whose claims the trade association is
    pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?                    ☐YES ☑NO
    If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a
    party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the
    caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held
    corporation that owns 10% or more of the stock of the debtor.

7.  Is this a criminal case in which there was an organizational victim?      ☐YES ☑NO
    If yes, the United States, absent good cause shown, must list (1) each organizational
    victim of the criminal activity and (2) if an organizational victim is a corporation, the
    parent corporation and any publicly held corporation that owns 10% or more of the stock
    of victim, to the extent that information can be obtained through due diligence.

Signature: Bryce Cooper                         Date:      July 14, 2025

Counsel for: Appellees

- 2 -

Print to PDF for Filing

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. 24-2079    Caption: Isaiah Wilkins et al. v. Peter Hegseth et al.

Pursuant to FRAP 26.1 and Local Rule 26.1,

Carol Coe
(name of party/amicus)

who is _____appellee_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity?    ☐YES ☑NO

2.    Does party/amicus have any parent corporations?    ☐YES ☑NO
      If yes, identify all parent corporations, including all generations of parent corporations:

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?    ☐YES ☑NO
      If yes, identify all such owners:

4. Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?  ☐YES ☑NO
If yes, identify entity and nature of interest:

5. Is party a trade association? (amici curiae do not complete this question)  ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6. Does this case arise out of a bankruptcy proceeding?  ☐YES ☑NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7. Is this a criminal case in which there was an organizational victim?  ☐YES ☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: Bryce Cooper                          Date: _____July 14, 2025_____

Counsel for: Appellees

- 2 -

[Print to PDF for Filing]

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.


No. __24-2079__        Caption: __Isaiah Wilkins et al. v. Peter Hegseth et al.__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__Natalie Noe__
(name of party/amicus)

_____

 who is _____appellee_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.    Is party/amicus a publicly held corporation or other publicly held entity?    ☐YES ☑NO


2.    Does party/amicus have any parent corporations?    ☐YES ☑NO
      If yes, identify all parent corporations, including all generations of parent corporations:




3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?    ☐YES ☑NO
      If yes, identify all such owners:

4.  Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?          ☐YES ☑NO
    If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)          ☐YES ☑NO
    If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?          ☐YES ☑NO
    If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.  Is this a criminal case in which there was an organizational victim?          ☐YES ☑NO
    If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: Bryce Cooper                              Date:      July 14, 2025

Counsel for: Appellees

Print to PDF for Filing

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. 24-2079          Caption: Isaiah Wilkins et al. v. Peter Hegseth et al.

Pursuant to FRAP 26.1 and Local Rule 26.1,

Minority Veterans of America
(name of party/amicus)

who is _____ appellee _____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.   Is party/amicus a publicly held corporation or other publicly held entity?   ☐YES ☑NO

2.   Does party/amicus have any parent corporations?                    ☐YES ☑NO
     If yes, identify all parent corporations, including all generations of parent corporations:

3.   Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                                    ☐YES ☑NO
     If yes, identify all such owners:

4.   Is there any other publicly held corporation or other publicly held entity that has a direct
     financial interest in the outcome of the litigation?                    ☐YES ☑NO
     If yes, identify entity and nature of interest:

5.   Is party a trade association? (amici curiae do not complete this question)     ☐YES ☑NO
     If yes, identify any publicly held member whose stock or equity value could be affected
     substantially by the outcome of the proceeding or whose claims the trade association is
     pursuing in a representative capacity, or state that there is no such member:

6.   Does this case arise out of a bankruptcy proceeding?                     ☐YES ☑NO
     If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a
     party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the
     caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held
     corporation that owns 10% or more of the stock of the debtor.

7.   Is this a criminal case in which there was an organizational victim?     ☐YES ☑NO
     If yes, the United States, absent good cause shown, must list (1) each organizational
     victim of the criminal activity and (2) if an organizational victim is a corporation, the
     parent corporation and any publicly held corporation that owns 10% or more of the stock
     of victim, to the extent that information can be obtained through due diligence.

Signature: Bryce Cooper                          Date:        July 14, 2025

Counsel for: Appellees

Print to PDF for Filing

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................1

STATEMENT OF ISSUES ..............................................................3

STATEMENT OF THE CASE ........................................................3

    A.    HIV Is a Highly Treatable Medical Condition. ......................3

    B.    Medical Accession Standards and HIV Policies ....................6

    C.    Procedural Background.............................................................8

        1.    Prior related cases.........................................................8

        2.    The proceedings below ...............................................13

STANDARD OF REVIEW................................................................17

SUMMARY OF ARGUMENT .........................................................18

ARGUMENT .....................................................................................21

I.    THE DISTRICT COURT CORRECTLY FOUND THE ENTRY BAR IRRATIONAL, ARBITRARY, AND CAPRICIOUS. ..............................................................................21

    A.    Appellants' Medical Justifications Do Not Provide a Rational Basis for the Entry Bar. .......................................23

        1.    The district court understood this Court's holdings in *Roe II* and properly applied them here.........................................................................25

        2.    Appellants' hypothetical concerns about the follow-on effects of affirmance do not justify reversal..........................................................................33

    B.    Appellants' Cost-Based Justifications Do Not Provide a Rational Basis for the Entry Bar. .......................................34

## TABLE OF CONTENTS (continued)

**Page**

      1.    Refusing to hire because of medical-cost justifications is irrational, flatly contrary to federal policy, and arbitrary. ....................................... 34

      2.    The district court properly excluded technical evidence offered by an unqualified witness................ 41

      3.    Hypothetical costs are not sufficient even under rational basis review..................................................... 47

  C.  "Diplomatic Deference" to Discriminatory Foreign Laws Does Not Provide a Rational Basis for the Entry Bar. ....................................................................... 50

II.  THE DISTRICT COURT'S REMEDIAL ORDER WAS PROPER AND WITHIN ITS AUTHORITY. ................................. 54

  A.  Relief Was Appropriately Tailored to the Controversy, Because It Afforded "Complete Relief" to MVA. .................. 56

  B.  Nationwide Relief Was Appropriate Because Appellees Prevailed Under the APA. ...................................... 59

CONCLUSION ..................................................................... 62

# TABLE OF AUTHORITIES

**Page(s)**

### Cases

*Anderson v. Westinghouse Savannah River Co.*,
　406 F.3d 248 (4th Cir. 2005)......................................................45, 47

*Armour v. City of Indianapolis*,
　566 U.S. 673 (2012)......................................................................48

*Bankers Life & Cas. Co. v. Crenshaw*,
　486 U.S. 71 (1988)..................................................................22, 37

*Bassett v. Snyder*,
　59 F. Supp. 3d 837 (E.D. Mich. 2014).........................................49

*Braidwood Mgmt., Inc. v. Becerra*,
　104 F.4th 930 (5th Cir. 2024), *rev'd on other grounds sub*
　*nom. Kennedy v. Braidwood Mgmt., Inc.*, 606 U.S. —,
　2025 WL 1773628 (June 27, 2025) .........................................56, 60

*Califano v. Yamasaki*,
　442 U.S. 682 (1979)......................................................................57

*Calloway v. Lokey*,
　948 F.3d 194 (4th Cir. 2020)........................................................17

*Chamber of Com. of U.S. v. SEC*,
　88 F.4th 1115 (5th Cir. 2023) ......................................................61

*City of Cleburne v. Cleburne Living Ctr., Inc.*,
　473 U.S. 432 (1985)..................................................................22, 37

*Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*,
　603 U.S. 799 (2024)......................................................................60

*Diaz v. Brewer*,
　656 F.3d 1008 (9th Cir. 2011)......................................................49

# TABLE OF AUTHORITIES (continued)

**Page(s)**

*Distaff, Inc. v. Springfield Contracting Corp.*,
  984 F.2d 108 (4th Cir. 1993)................................................ 46

*Donlin v. Philips Lighting N. Am. Corp.*,
  581 F.3d 73 (3d Cir. 2009) ................................................. 43

*Driftless Area Land Conservancy v. Valcq*,
  16 F.4th 508 (7th Cir. 2021) ............................................. 60

*E. Bay Sanctuary Covenant v. Biden*,
  993 F.3d 640 (9th Cir. 2021)........................................ 56, 60

*eBay Inc. v. MercExchange, LLC*,
  547 U.S. 388 (2006)....................................................... 18

*Ellis v. Int'l Playtex, Inc.*,
  745 F.2d 292 (4th Cir. 1984)............................................. 46

*Emory v. Sec'y of Navy*,
  819 F.2d 291 (D.C. Cir. 1987) ..................................... *passim*

*Ennis v. Nat'l Ass'n of Bus. & Educ. Radio, Inc.*,
  53 F.3d 55, 61 (4th Cir. 1995)........................................... 34

*Ergon-W. Va., Inc. v. Env't Prot. Agency*,
  896 F.3d 600,609 (4th Cir. 2018)...................................... 22

*F.C.C. v. Beach Commc'ns, Inc.*,
  508 U.S. 307 (1993).......................................................... 48

*Faust v. Comcast Cable Commc'ns, LLC*,
  2014 WL 3534008 (D. Md. July 15, 2014) ......................... 43

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC),
  Inc.*,
  528 U.S. 167 (2000).................................................... 57, 58

iv

## TABLE OF AUTHORITIES (continued)

**Page(s)**

*Harrison v. Austin,*
　597 F. Supp. 3d 884 (E.D. Va. 2022) ........................................ *passim*

*Heller v. Doe ex rel. Doe,*
　509 U.S. 312 (1993) .................................................................... 47, 48

*Hencely v. Fluor Corp.,*
　2021 WL 2328037 (D.S.C. June 8, 2021) ........................................ 45

*Hickerson v. Yamaha Motor Corp., U.S.A.,*
　882 F.3d 476 (4th Cir. 2018) ............................................................. 18

*Hill v. O'Brien,*
　387 F. App'x 396 (4th Cir. 2010) ...................................................... 63

*Hosp. Council of W. Pa. v. Pittsburgh,*
　949 F.2d 83 (3d. Cir. 1991) ............................................................... 59

*Hunt v. Wash. State Apple Adver. Comm'n,*
　432 U.S. 333 (1977) ........................................................................... 57

*Int'l Woodworkers of Am. v. Chesapeake Bay Plywood Corp.,*
　659 F.2d 1259 (4th Cir. 1981) ........................................................... 58

*Jimenez v. Weinberger,*
　417 U.S. 628 (1974) ........................................................................... 40

*Kadrmas v. Dickenson Pub. Schs.,*
　487 U.S. 450 (1988) ........................................................................... 48

*Kennedy v. Joy Techs., Inc.,*
　269 F. App'x 302 (4th Cir. 2008) ...................................................... 46

*Kumho Tire Co. v. Carmichael,*
　526 U.S. 137 (1999) ........................................................................... 18

*Lawrence v. Texas,*
　539 U.S. 558 (2003) ........................................................................... 52

# TABLE OF AUTHORITIES (continued)

**Page(s)**

*Le v. Applied Biosystems,*
  886 F. Supp. 717 (N.D. Cal. 1995) ..................................................... 35

*Lighting Lube, Inc. v. Witco Corp.,*
  4 F.3d 1153 (3d Cir. 1993) .................................................... 44

*Lord & Taylor, LLC v. White Flint, L.P.,*
  849 F.3d 567 (4th Cir. 2017) .................................................... 44

*Lujan v. Nat'l Wildlife Fed'n,*
  497 U.S. 871 (1990) ................................................................. 55

*Massachusetts v. U.S. Dep't of Health & Hum. Servs.,*
  682 F.3d 1 (1st Cir. 2012) ........................................................ 40, 49

*Mayor of Baltimore v. Azar,*
  973 F.3d 258 (4th Cir. 2020) (en banc) .............................................. 62

*MCI Telecomms. Corp. v. Wanzer,*
  897 F.2d 703 (4th Cir. 1990) .......................................................... 44

*Moss v. Ole S. Real Est., Inc.,*
  933 F.2d 1300 (5th Cir. 1991) ..................................................... 46

*Nat'l Cmty. Reinvestment Coal. v. Consumer Fin. Prot.
  Bureau,*
  2022 WL 4447293 (D.D.C. Sept. 23, 2022) ...................................... 50

*Nat'l Fed'n of the Blind of Va. v. Va. Dep't of Corr.,*
  2023 WL 6812061 (E.D. Va. Oct. 16, 2023) ...................................... 59

*Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs,*
  145 F.3d 1399 (D.C. Cir. 1998) ........................................................ 56

*Nat'l Shooting Sports Found., Inc. v. Jones,*
  716 F.3d 200 (D.C. Cir. 2013) ........................................................ 50

## TABLE OF AUTHORITIES (continued)

**Page(s)**

*New York v. DHS*,
  969 F.3d 42 (2d Cir. 2020) ................................................... 56

*Peacock Auto., LLC v. Granite State Ins. Co.*,
  2021 WL 3603048 (D.S.C. Mar. 16, 2021) ......................................... 46

*Pedersen v. Off. of Pers. Mgmt.*,
  881 F. Supp. 2d 294 (D. Conn. 2012) ................................................. 39

*Pennell v. City of San Jose*,
  485 U.S. 1 (1988) ...................................................................... 59

*Plyler v. Doe*,
  457 U.S. 202 (1982) ................................................................... 49

*Rambus, Inc. v. Infineon Techs. AG*,
  222 F.R.D. 101 (E.D. Va. 2004) ...................................................... 45

*Retail Indus. Leaders Ass'n v. Fielder*,
  475 F.3d 180 (4th Cir. 2007) ......................................................... 59

*Roe v. Dep't of Def.*,
  947 F.3d 207 (2020) ............................................................. *passim*

*Roe v. Shanahan*,
  359 F. Supp. 3d 382 (E.D. Va. 2019), *aff'd, Roe v. Dep't of
  Def.*, 947 F.3d 207 ............................................................ *passim*

*Romer v. Evans*,
  517 U.S. 620 (1996) ................................................................... 40

*Sorenson Commc'ns Inc. v. FCC*,
  755 F.3d 702 (D.C. Cir. 2014) ........................................................ 50

*St. Joseph Abbey v. Castillo*,
  712 F.3d 215 (5th Cir. 2013) ...................................................... 36, 37

vii

## TABLE OF AUTHORITIES (continued)

**Page(s)**

*Sun Yung Lee v. Clarendon,*
453 F. App'x 270 (4th Cir. 2011)........................................ 44

*Tennessee v. U.S. Dep't of Educ.,*
104 F.4th 577 (6th Cir. 2024) ............................................56

*Thigpen v. Roberts,*
468 U.S. 27 (1984)................................................................ 62

*Trump v. CASA, Inc.,*
606 U.S. —, 2025 WL 1773631 (June 27, 2025)........................ *passim*

*U.S. Dep't of Agric. v. Moreno,*
413 U.S. 528 (1973)................................................... 22, 40

*United States v. Figueroa-Lopez,*
125 F.3d 1241 (9th Cir. 1997) ............................................ 43

*United States v. Gray,*
852 F.2d 136 (4th Cir. 1988)............................................... 45

*United States v. Hunt,*
123 F.4th 697 (4th Cir. 2024) ............................................ 62

*United States v. Virginia,*
518 U.S. 515 (1996)............................................................... 23

*Va. Soc'y for Hum. Life, Inc. v. FEC,*
263 F.3d 379 (4th Cir. 2001), *overruled on other grounds
by The Real Truth About Abortion, Inc. v. FEC*, 681 F.3d
544 (4th Cir. 2012) ...................................................... 55, 62

*Williamson v. Lee Optical of Okla., Inc.,*
348 U.S. 483 (1955)............................................................ 48

*Winter v. Nat. Res. Def. Council,*
555 U.S. 7 (2008).................................................................. 22

# TABLE OF AUTHORITIES (continued)

**Page(s)**

**Statutes**

5 U.S.C. § 701 ........................................................................ 48

5 U.S.C. § 702 ........................................................................ 48

5 U.S.C. § 703 ........................................................................ 48

5 U.S.C. § 704 ........................................................................ 48

5 U.S.C. § 705 ........................................................................ 48

5 U.S.C. § 706 ............................................................... *passim*

**Other Authorities**

Ctrs. for Disease Control & Prevention, *Tips from Former Smokers – Military Service Members and Veterans* (Feb. 5, 2024), https://www.cdc.gov/tobacco/campaign/tips/groups/military.html .................................................................... 38

Off. of Disease Prevention & Health Promotion, *Tobacco Use*, https://odphp.health.gov/healthypeople/objectives-and-data/browse-objectives/tobacco-use (last visited July 13, 2025) ..................................................................................... 24

Fed. R. Evid. 701 ........................................................... 42, 43, 44

Fed. R. Evid. 702 ................................................................. 41, 42

Fed. R. Evid. 803 ....................................................... 42, 44, 45, 46

# GLOSSARY OF ABBREVIATIONS

| | |
|---|---|
| **AOB** | Appellants' Opening Brief |
| **AOB.pp** | Appellants' Opening Brief pin cite to page number(s) |
| **APA** | Administrative Procedure Act |
| **AR** | Army Regulation |
| **CENTCOM** | U.S. Central Command, a combatant command of DoD with an Area of Responsibility that includes the Middle East and parts of Central Asia |
| **DoD** | Department of Defense |
| **DoDI** | Department of Defense Instruction |
| **HIV** | Human Immunodeficiency Virus |
| **MVA** | Minority Veterans of America |
| **PLWH** | Person/people living with HIV |
| **SMLWH** | Service member/service members living with HIV |
| **USMAPS** | U.S. Military Academy Preparatory School |

**INTRODUCTION**

In defending their policy barring even people with well-managed HIV from entering military service, appellants wrongly frame the question as whether there is a rational basis for selecting "healthy" over "unhealthy" people. They then argue that front-loaded question under the presumption that all PLWH are "unhealthy." But the vague "healthy/unhealthy" distinction is nowhere to be found in the medical criteria for entry into the military. As the district court implicitly found, well-managed HIV is not an impediment to meeting those criteria. So, properly framed, the question is whether appellants have a rational basis for refusing entry to people with well-managed HIV. They do not.

This is not the first time the military's outdated policies on HIV have reached this Court. *Roe v. Dep't of Def. ("Roe II")*, 947 F.3d 207 (2020). The last time, using most of the same arguments it makes here, the government tried to justify the involuntary separation of certain Airmen based on the view that an HIV diagnosis made them nondeployable. A unanimous panel of this Court squarely rejected these arguments as "outmoded and at odds with current science." *Id.* at 228. Those repeated justifications fail here for the same reasons. Appellants'

only new justification—higher costs they say come with admitting PLWH—is unsupported by evidence, contradicts the government's own national HIV/AIDS policy, and arbitrarily is considered only with respect to PLWH.

To avoid *Roe II*'s impact, appellants mischaracterize the opinion, even suggesting its outcome or analysis favors their position here. They argue that this Court gave them permission to keep discriminating against SMLWH—including by not deploying them—so long as they do so case by case, and that this ongoing discrimination justifies the challenged entry bar. But these arguments find no support in the text of *Roe II* or any fair reading of it. The district court properly understood *Roe II* and applied it correctly.

In the court below, appellees showed that well-managed HIV does not affect a person's ability to perform all the duties of military service—including the ability to deploy anywhere—and that, when doing so, people with well-managed HIV present no real risk to themselves or others. This showing is consistent with this Court's prior ruling. *See id.* (quoting military amici). Appellants have no effective answer: Their justifications do not survive scrutiny, and the challenged

policy fails to satisfy rational basis review. The judgment should be affirmed.

## STATEMENT OF ISSUES

1. Whether the district court properly concluded that policies barring even people with well-managed HIV from entering military service violate equal protection and the APA.

2. Whether the district court abused its discretion in granting permanent injunctive relief to members of plaintiff MVA and other nonparties.

## STATEMENT OF THE CASE

### A.     HIV Is a Highly Treatable Medical Condition.

"In the early 1980s … [t]he people most frequently diagnosed with AIDS belonged to marginalized and stigmatized groups—gay men, intravenous drug users, Haitians, and hemophiliacs—and the disease acquired the colloquial moniker 'gay cancer.'" *Roe II*, 947 F.3d at 212. In 1984, researchers discovered that AIDS was caused by HIV, a virus that could take root in any person sufficiently exposed; however, "'by that time, many Americans already believed the cause of the disease to be a deviant lifestyle, a stigmatizing belief that … AIDS was a punishment from God.' Stigma, fear, and misinformation about HIV

persist today." *Id.* (citation omitted). PLWH have suffered for decades through a unique history of misinformation, stigma, ostracism, and discrimination, and continue to do so to this day. *Id.* at 212, 229, 233-34 (recognizing stigma).

In 1996, antiretroviral therapy ("ART") for HIV became widely available, and today there is "an effective treatment regimen for virtually every person living with HIV." *Id.* at 213. Some "75% to 80% of people living with HIV are on a one-tablet antiretroviral regimen, which combines the required medications into a single pill taken" once a day. *Id.* These "pills have no special handling or storage requirements," "tolerate extreme temperatures well," "have minimal side effects," and "impose no dietary restrictions." *Id.*

With adherence to treatment, the viral loads of PLWH become "suppressed" within several months and "undetectable" shortly thereafter, meaning there are fewer than 50 virus copies per millimeter of blood. *Id.* Testing is also done routinely to confirm viral loads, usually quarterly, until the patient reaches an undetectable viral load, at which point testing is reduced to three times a year. *Id.* Once the viral load is undetectable for two years, testing is reduced to a semiannual basis. *Id.*

Testing can be performed by any provider, and blood samples can be shipped to labs when on-site testing is unavailable. *Id.*

ART is effective for virtually every PLWH, and the virus develops resistance only when individuals fluctuate in their adherence to treatment. *Id.* Completely stopping treatment does not result in immediate adverse health consequences: It "often takes weeks for an individual's viral load to reach a level that would not be considered 'suppressed.' " *Id.* Sustained lack of treatment leads to a clinical latency period, which may last for years, during which the person may not have any symptoms or negative health outcomes. *Id.* But any negative health outcomes can be reversed by restarting treatment. *Id.*

People who adhere to their effective treatment regimen present zero risk of sexually transmitting the virus to an HIV-negative partner, and except possibly for blood transfusions, "risk of transmission from a person with an undetectable viral load through non-sexual means such as percutaneous needlestick injuries is very low, if such a risk exists at all." *Id.* at 213-14. The effectiveness and availability of modern ART means that an HIV infection, once considered invariably fatal, is now a "chronic, treatable condition," and individuals who are timely diagnosed

and treated "enjoy a life expectancy approaching that of those who do not have HIV." *Id.* at 214.

## B.    Medical Accession Standards and HIV Policies

DoD regulations set medical standards for individuals seeking to join the military. JA1035. Each service has its own regulation, treating DoD standards as a baseline. JA1035.

DoDI 6130.03 sets forth the DoD's "physical and medical standards for appointment, enlistment, or induction into the Military" and applies to both new enlistees and enlisted members seeking to commission. JA521, JA524-JA525. The instruction defines a physically and medically qualified person to be:

> (1) Free of contagious diseases that may endanger the health of other personnel[;]
>
> (2) Free of medical conditions or physical defects that may reasonably be expected to require excessive time lost from duty …[;]
>
> (3) Medically capable of satisfactorily completing required training and initial period of contracted service[;]
>
> (4) Medically adaptable to the military environment without geographical area limitations[; and]

(5) Medically capable of performing duties
without aggravating existing physical defects or
medical conditions.

JA524-JA525. Four of these criteria (1, 2, 4, and 5) are connected to a

service member's deployability. Another regulation, DoDI 6490.07,

provides guidance on medical conditions that limit deployment, but

these standards are less stringent overall than those for accession.

*Compare* JA591, *with* JA524-JA525. A person meeting the medical

criteria for accession thus would be worldwide deployable.

DoDI 6130.03 also includes a list of conditions "that do not meet

the standard," including a "history of disorders involving the immune

mechanism." JA533, JA563. After a permanent injunction entered in

prior litigation (discussed *infra*, pp. 12-13), DoD modified the regulation

to exempt from disqualification certain SMLWH seeking to commission,

if their HIV has been well managed. JA563, JA576 (defining "covered

personnel"). The revised regulation maintains the disqualification for

civilians seeking accession—the policy challenged here. Applicants "who

do not meet the physical and medical standards" of DoDI 6130.03 may

seek a waiver. JA525. But HIV is the only condition subject to a

separate regulation that makes it ineligible for such a waiver. JA580,

7

JA1037.

AR 600-110 is the Army's HIV regulation. JA614. It also imposes a blanket prohibition barring PLWH from enlistment and appointment. JA623-JA625, JA639. Like DoD's, the Army's prohibition "will not be waived" for PLWH seeking to join the military. JA1039. But unlike DoDI 6130.01, AR 600-110 was not updated in response to prior litigation. JA611 (dated 22 Apr. 2014).

## C.   Procedural Background

### 1.   Prior related cases

This case grows out of two prior suits challenging military policies that barred the worldwide deployment of SMLWH, prevented them from commissioning from enlisted ranks, and involuntarily separated some of them because of purported non-deployability. *See Harrison v. Austin*, 597 F. Supp. 3d 884 (E.D. Va. 2022); *Roe v. Shanahan ("Roe I")*, 359 F. Supp. 3d 382 (E.D. Va. 2019), *aff'd*, *Roe II*, 947 F.3d 207.

In *Harrison*, then-Sgt. Nicholas Harrison challenged as a violation of equal protection the DoD and Army accession policies that prevented him from commissioning as an officer. *Harrison*, 597 F. Supp. 3d at 889 & n.2. In *Roe*, two Airmen asserted equal protection and APA claims against DoD and Air Force policies that subjected them to discharge

because of their HIV status. *Roe I*, 359 F. Supp. 3d at 391. Among other things, the plaintiffs in both cases argued that the challenged policies were at odds with current medical science concerning HIV treatment and transmission and unsupported by any rational justification. *Harrison*, 597 F. Supp. 3d at 890; *Roe I*, 359 F. Supp. 3d at 391-92.

The *Roe* plaintiffs moved to preliminarily enjoin their imminent separation; the Air Force argued that the Airmen were "unfit" because they could not deploy due to their HIV status. *Roe I*, 359 F. Supp. 3d at 409, 417. The district court granted the injunction, preventing the Air Force from discharging them and similarly situated Airmen because of HIV status. *Id.* at 422-23. The district court found that defendants had "not offered any cogent response to plaintiffs' experienced medical experts, all of whom persuasively explain why the effectively categorical rule declaring all HIV-positive servicemembers ineligible for deployment … is inconsistent with the state of science and medicine and with the way the military treats other chronic but manageable conditions." *Id.* at 416. The *Roe* plaintiffs had "made a strong preliminary showing that the Air Force's approach to [SMLWH was]

irrational, inconsistent, and at variance with mode[rn] science." *Id.* at 423.

This Court unanimously affirmed the preliminary injunction after briefing and the submission of several amicus briefs, including one by former Secretaries of the Army, Air Force, and Navy supporting the Airmen. *Roe II*, 947 F.3d at 212; *id.* at 228 (quoting military amici with approval, who state, "[T]here is no legitimate reason to deny [SMLWH] the opportunity to deploy"); Br. of Former Mil. Officials as Amici Curiae Supporting Appellees, *Roe II*, 947 F.3d 207 (4th Cir. 2020), 2019 WL 3409758. Because of uncertainty as to whether the deployment bar allowed individualized assessments or was categorical, the panel addressed both scenarios. 947 F.3d at 222. If it was *not* a categorical bar, the Court held, defendants acted arbitrarily and capriciously by denying the Airmen individualized assessments of their fitness for continued service; if it *was*, that policy was unsupported by the record or contradicted by the science. *Id.* That is, none of the justifications for the deployment bar "account[ed] for the … persuasive and credible evidence … on HIV treatment and transmission risk." *Id.* at 228. The Court thus concluded that the "ban on deployment may have been

justified at a time when HIV treatment was less effective at managing the virus and reducing transmission risks. But any understanding of HIV that could justify this ban is outmoded and at odds with current science." *Id.*

After remand and completion of discovery, the parties cross-moved for summary judgment in the combined cases, and the district court granted summary judgment to plaintiffs in a single opinion. *Harrison*, 597 F. Supp. 3d at 889 & n.1. Now having a full record, the district court determined that both the deployment standards and the accession standards were categorical bars for PLWH. *Id.* at 890, 893-94, 900. At argument, the district court asked defendants to identify any evidence, not previously in the appellate record, that would refute this Court's conclusions on the purported medical justifications for barring the deployment of SMLWH. *Id.* at 908. But "[n]one of the evidence described in the government's answer to that question, and none of the limited evidence identified as new in the government's summary judgment briefing, justifie[d] reaching a different conclusion than that reached by the Fourth Circuit in *Roe*." *Id.*

The *Harrison* ruling noted that "the risk of HIV transmission to other service members" was the "primary justification for both [the accession and the retention] policies" *Id.* at 912. But that justification was "not rational given the current medical evidence concerning HIV treatment and transmission." *Id.* And it rejected defendants' additional arguments about medication side effects and comorbidities as "not supported by the record evidence" and contradicted by "the Fourth Circuit's observation in *Roe* that HIV is a chronic, treatable condition, the medications for which have minimal side effects, and that those who are timely diagnosed and treated experience few, if any, noticeable effects on their physical health." *Id.* at 913 (internal quotation marks omitted).

The district court acknowledged that "the military's accession standards," which applied to Sgt. Harrison, "are more restrictive than its retention standards," based on the "rationale" that the military has a greater return on investment for a fully trained and experienced service member. *Id.* at 912. But with respect to the medical justifications defendants offered, the district court found that "the Fourth Circuit's reasoning in *Roe* is equally applicable" to accessions. *Id.*

12

Concluding that none of defendants' justifications provided a rational basis for the HIV-related accessions bar and retention policy, the district court permanently enjoined defendants from the following actions based on HIV status: (1) categorically barring the worldwide deployment of service members with well-managed HIV; (2) denying applications by Harrison and any other service members with well-managed HIV to commission; and (3) discharging or otherwise separating plaintiffs and any other service members with well-managed HIV. *Id.* at 915. Defendants did not appeal the ruling, and as noted above, DoD modified its policies on accession and retention of SMLWH.

### 2.    The proceedings below

This suit followed. Plaintiffs are three people—Isaiah Wilkins and pseudonymous Carol Coe and Natalie Noe—and MVA, a nationwide advocacy organization whose membership includes PLWH who want to join or rejoin the armed forces. JA850, JA858-JA859, JA861-JA863, JA884, JA886. After testing positive for HIV, Wilkins was disenrolled from USMAPS and separated from the Army Reserves because appellants' policies prevent entry to West Point by PLWH. JA851-JA852. Coe and Noe were also denied accession because of their HIV

status. JA884-JA885, JA887-JA888. The suit challenged DoD and Army accessions policies that prohibited PLWH from joining the military. JA1032, JA1046-JA1047. Specifically, Count I invoked the Fifth Amendment's equal protection guarantee to assert a facial and as-applied challenge against the government's enlistment policies and practices. JA37-JA38. Counts II and III alleged that the government violated the APA when it promulgated the three regulations at issue in this case—DoDI 6485.01, DoDI 6130.03, and AR 600-110—and failed to update them in light of current HIV medical science. JA39-JA41.

After extensive briefing, the district court granted summary judgment, concluding that the challenged policies violated the Fifth Amendment's equal protection guarantee and the APA. In doing so, the court rejected each of three justifications appellants offered for the bar. JA1049-JA1065.

First, the district court rejected the medical rationales appellants offered, including that PLWH could purportedly (1) experience viral rebound based on an alleged increased risk of medication nonadherence; (2) transmit HIV through blood transfusions or battlefield injuries; and

(3) suffer from more comorbidities and side effects than others. JA1051-

JA1058. It held:

> These arguments, for which defendants fail to
> provide any new evidence or support, amount to
> the same set of justifications defendants offered
> in *Harrison* and *Roe* that this Court and the
> Fourth Circuit already found to be "obsolete" and
> insufficient "to justify a ban, even under a
> deferential standard of review and even according
> appropriate deference to the military's
> professional judgments."

JA1056.

The district court did not find persuasive the "modest factual

difference" that *Roe* and *Harrison* involved "service members in whom

the military had already 'invested' training resources," while plaintiffs

here sought to join the military. JA1056. It reasoned that appellants

had provided no persuasive evidence that the "exposure risks and

medical care" of PLWH seeking accession differed from those already in

service and subject to the same accession policy (such as Sgt. Harrison

and other enlisted seeking commissions). JA1057-JA1058.

Second, after previously excluding technical economic and data-

analysis evidence offered by an unqualified witness (JA738), the district

court rejected appellants' arguments related to allegedly higher costs

from admitting PLWH. JA1058-JA1061. It found that appellants did not provide "a scintilla of admissible evidence" to support their claim that an unknown number of PLWH "would produce 'disproportionately higher financial costs.'" JA1060. "More fatal" to appellants' costs concerns, according to the district court, was the fact that the military readily admits recruits who have dependents with HIV and provides for their care, making appellants' cost arguments a "non sequitur." JA1060-JA1061.

Third, the district court rejected appellants' reliance on "diplomatic deference" to foreign laws or restrictions barring the entry of PLWH. JA1061-JA1065. The court found no evidence that any service member had ever been removed by a host country based on HIV status. JA1061. It also recounted the litany of discriminatory foreign laws that appellants ignore when deploying service members worldwide. JA1062-JA1065. It therefore concluded: "That DoD does not employ 'long-standing' 'diplomatic deference' for any other minority group, makes it simply irrational for defendants to maintain that they must defer to host-nation laws only with regard to" SMLWH. JA1065.

As relevant to this appeal, the district court issued a permanent injunction enjoining appellants from (1) "denying [individual] plaintiffs …, and any other similarly situated asymptomatic HIV-positive individual with an undetectable viral load, accession into the United States military based on their HIV status;" and (2) "enforcing the HIV-specific provisions of their policies and regulations … barring asymptomatic HIV-positive individuals with undetectable viral loads from accession into the United States military."[1] JA1067; *see also* JA1070. Appellants did not seek a stay of the injunctions pending appeal, allowing PLWH to join the military over recent months.

## STANDARD OF REVIEW

This Court reviews a grant of summary judgment "de novo, applying the same standard that the district court was required to apply." *Calloway v. Lokey*, 948 F.3d 194, 201 (4th Cir. 2020).

The Court reviews the exclusion of expert testimony for abuse of discretion, bearing in mind that district courts enjoy "considerable

---

[1] The district court also provided Mr. Wilkins with specific relief. JA1071. Though appellees believe that the district court did not abuse its discretion in granting that relief, they do not defend that relief here, because Mr. Wilkins decided to seek accession by other means.

leeway" in excluding such evidence. *Hickerson v. Yamaha Motor Corp., U.S.A.*, 882 F.3d 476, 480 (4th Cir. 2018) (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999)).

"The decision to grant … permanent injunctive relief is an act of equitable discretion by the district court, reviewable on appeal for abuse of discretion." *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006).

## SUMMARY OF ARGUMENT

The district court correctly ruled that no rational basis exists for barring people with well-managed HIV from entering the military and that the challenged policy therefore violates equal protection and the APA. Appellants proffer three broad justifications for the policy— medical, financial, and diplomatic—all of which fail.

First, just as they were in *Roe II* and in *Harrison*, the medical justifications are all contradicted by science and unsupported by the record. Even though the district court had previously addressed and rejected these medical justifications as counterfactual or unmoored from reality, *see Harrison*, 597 F. Supp. 3d at 907-12, it reengaged on them. Finding nothing new to support these arguments, the court reached the

same conclusion it and this Court previously had—that the
justifications did not provide a rational basis for refusing to deploy
SMLWH and therefore did not justify barring them from entry.

Contrary to appellants' arguments, the district court considered
these purported medical justifications in light of the correct medical
accession standards and appropriately applied and logically extended
the holdings from *Roe II* to PLWH seeking to join the military.
Appellants' purported concerns about a crush of litigants with chronic
conditions seeking to override the medical standards are pure
hyperbole.

Second, as to appellants' contention that higher costs justify the
entry bar, the district court correctly held that this purported rationale
also failed. The higher-cost justification is not a legitimate interest
because it runs contrary to broader federal policy applicable to all
agencies, including DoD. It is also arbitrary, as appellants apply it only
to HIV, not any other condition, and it nonsensically fails to account for
the fact that appellants provide HIV-related care to the dependents of
service members, without inquiry into their HIV status or any impact on
the recruit's eligibility. Further, the court did not abuse its discretion in

excluding evidence offered by an unqualified witness, leaving appellants unable to substantiate this justification. Thus empty-handed, appellants pivot to arguing that "rational speculation" is sufficient to support the cost justification, but the legal authority they cite simply does not sustain the point.

Third, the district court correctly concluded that so-called diplomatic deference fails to justify the entry bar. In the earlier cases, the district court did not need to decide whether defendants' professed practice of deferring to host-nation restrictions applicable to civilians with HIV provided a rational basis for refusing to deploy SMLWH to such countries. But here, with additional information about the practice—including the fact that appellants apply it only to SMLWH and not any other country restrictions based on gender, sexual orientation, gender identity, and religious affiliation—the district court correctly held it was irrational to offer such deference only to restrictions based on HIV status.

Lastly, the district court did not err by issuing nationwide relief. That relief was appropriate to remedy harm to members of MVA, an advocacy organization with members across the country, including

20

members with HIV who want to join or rejoin the military. Moreover, as a statutory matter, the APA authorizes universal vacatur of unlawful agency action. Both the Supreme Court and this Circuit have long approved of this remedy.

## ARGUMENT

The district court properly concluded that the entry bar violated both the equal protection component of the Due Process Clause of the Fifth Amendment and the APA, and the remedies it crafted to address those violations were well within the court's authority.

## I. THE DISTRICT COURT CORRECTLY FOUND THE ENTRY BAR IRRATIONAL, ARBITRARY, AND CAPRICIOUS.

To withstand a challenge under rational basis review,[2] a law must bear a rational relationship to a legitimate government interest.[3] *E.g.*,

---

[2] The district court held that the analytical standards for APA and equal-protection claims are "fundamentally indistinguishable." JA1050. Appellants have neither disputed that conclusion nor argued a different standard.

[3] Appellees maintain that laws, regulations, and policies that classify based on HIV status should be subject to heightened scrutiny, and made that argument below. JA1049. But the district court concluded "that argument can be left for another day," because the entry bar failed under rational basis review. JA1049 (internal quotation marks omitted). Because PLWH are a discrete and insular minority with relatively little political power facing a history of stigma and

*U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528, 540 (1973). This standard "does not reduce judicial review to a rubber stamp of agency action." *Ergon-W. Va., Inc. v. Env't Prot. Agency*, 896 F.3d 600,609 (4th Cir. 2018) (internal quotation marks omitted). "[A]rbitrary and irrational discrimination violates the Equal Protection Clause," even under a rational basis standard. *Bankers Life & Cas. Co. v. Crenshaw*, 486 U.S. 71, 83 (1988). And the government "may not rely on a classification whose relationship to [its] asserted goal is so attenuated as to render the distinction arbitrary or irrational." *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 446 (1985).

While courts are reluctant "to interfere with the military's exercise of its discretion over internal management matters," they are not powerless to act. *Emory v. Sec'y of Navy*, 819 F.2d 291, 293-94 (D.C. Cir. 1987). This Court has likewise accepted that "military interests do not always trump other considerations." *Roe II*, 947 F.3d at 219 (citing *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 26 (2008)). Rather, "[t]he

---

discrimination based on an immutable trait (JA762), appellees still contend that PLWH possess all the characteristics that weigh in favor of heightened scrutiny. Nevertheless, appellees defend the district court's analysis on its own terms, using rational basis review.

military has not been exempted from constitutional provisions that protect the rights of individuals," and "[i]t is precisely the role of the courts to determine whether those rights have been violated." *Emory*, 819 F.2d at 294 (citations omitted). "Deference must never transform into abdication." JA1048 (citing *United States v. Virginia*, 518 U.S. 515, 531 (1996) (internal quotations omitted)).

Appellants argue here that a classification based on HIV status bears a rational relationship to their legitimate interest. Relying on an extensive record, the district court held that appellants' rationales proffered to justify the entry bar "do not bear a rational relationship to a legitimate governmental interest sufficient to withstand plaintiffs' constitutional and statutory challenges." JA1048. That ruling is correct and supported by the record.

### A. Appellants' Medical Justifications Do Not Provide a Rational Basis for the Entry Bar.

As laid out in the procedural history, appellants raised numerous medical justifications for the ban on PLWH entering service. The central legal question here is whether appellants have a rational basis for barring people with well-managed HIV from entering military service. JA1051. Appellees agree that "recruiting and retaining high

23

quality, physically fit, medically qualified soldiers who can deploy, fight, and win decisively on any current or future battlefield" (AOB.21) is a legitimate governmental interest. And as demonstrated in the court below, people with well-managed HIV fulfill all five physical and medical criteria for accession (JA524-JA525) and can be a part of that fighting force.

Appellants attempt to reframe the issue, asking the Court to consider whether there is a rational basis for selecting "healthy" over "unhealthy" people to join the military. AOB.21. This framing presents a false dichotomy in a transparent attempt to front-load the conclusion appellants would like this Court to reach. But the military does not base accession eligibility on the nebulous classification of "healthy" versus "unhealthy."[4] Rather, it has physical and medical standards,

---

[4] If it did, appellants surely would not admit smokers, for example. There are many known comorbidities associated with smoking, as well as an effect on oxygen exchange and exercise tolerance, *see* Off. of Disease Prevention & Health Promotion, *Tobacco Use*, https://odphp.health.gov/healthypeople/objectives-and-data/browse-objectives/tobacco-use (last visited July 13, 2025), that are important to a "healthy" and "physically fit" fighting force. In contrast to the well-documented evidence of smoking comorbidities, appellants' contentions regarding HIV-related comorbidities were squarely rejected. JA1055-JA1056.

which, again, people with well-managed HIV meet, making "healthy" versus "unhealthy" a meaningless metric. Appellants' reframing of the issue does not alter those medical criteria or appellees' qualification under them.

Appellants nevertheless offer several justifications for the entry bar supposedly rooted in medical or health concerns. None of them holds up to any level of scrutiny. As the district court correctly recognized, evaluation of the proffered medical justifications is controlled by *Roe II* or decided with only a modest extension of its reasoning. Even so, the court made the records in *Harrison* and *Roe I* part of the record here, Dkt.77; Dkt.78; Dkt.94; Dkt.116; Dkt.125.at.10-15, and reanalyzed the proffered justifications in the context of the entry bar. JA1033, JA1049-JA1065. Unsurprisingly, the court reached the same conclusion: None of the medical justifications provided a rational basis for the bar to entry. JA1051-JA1058.

### 1. The district court understood this Court's holdings in *Roe II* and properly applied them here.

On appeal, appellants offer two criticisms of the district court's analysis, both of which are unfounded.

a. First, appellants contend that the district court misapplied *Roe II*, either because its holdings are confined to the specific circumstances addressed in that case or—according to appellants— because this Court agreed that SMLWH have deployment limitations. AOB.37-45. Relying on these misinterpretations—which find no support in the text of the decision—appellants suggest that *Roe II* set parameters on actions the district court could take after remand and in related cases. AOB.39-40, 42-43. But appellants produced no new evidence to undermine the *Roe II* Court's conclusion that the medical justifications were contrary to science or unsupported by evidence, so the district court correctly relied on those holdings.

In support of this argument, appellants argue that the *Roe II* opinion was premised on a categorical bar to deployment. AOB.39-40. In fact, this Court evaluated the deployment bar under both scenarios: It was categorical, or it was not categorical. 947 F.3d at 219-22. In its analysis of the first scenario—the categorical bar—this Court analyzed the medical justifications and held that *all* were contradicted by science or unsupported in the record. *Id.* at 225-28.

In doing so, this Court made some definitive statements about the medical justifications. It did not merely hold that the explanations were not rationally related to the government interest; rather, it held that the justifications themselves were counterfactual, rendering decisions based on them irrational. *Id.* at 225. Each of the justifications considered—access to medication, testing requirements, blood donation, health and capabilities, HIV health visits, transmission through buddy aid or in healthcare settings, and treatment disruptions—was based on a false or flawed premise. *Id.* at 225-28. For example, as to transmission risk, this Court didn't say it would not be rational to limit deploying someone with a disease that could be transmitted on the battlefield; it held that PLWH *do not have* a disease that presents a risk of battlefield transmission. *Id.* at 227-28. That ruling (and others) contradict appellants' arguments here, that "at the accession stage the military may rationally prefer" people who do not "create risks of transmission to others" (AOB.44), because this Court already held that "[t]he record does not support the [g]overnment's arguments about the risk of transmission" through transfusion, blood splash, trauma care, "or other battlefield circumstances." *Roe II*, 947 F.3d at 227. In sum, since

27

appellants' justifications are counterfactual—contradicted most often by science, but also unsupported by evidence—they cannot provide a rational basis for decision-making in any context, including here.

The government offers only one medical justification that wasn't addressed in *Roe II*: alleged comorbidities associated with HIV, including neurocognitive impairments. AOB.23-22. Yet the district court squarely rejected this purported justification—here and in *Harrison*—both because it was unsupported by evidence and because it conflicted with *Roe II*'s holding that well-managed HIV has minimal side effects. JA1055-JA1056; *Harrison*, 597 F. Supp. 3d at 912-13. Appellants have no answer for that conclusion.

b.  Second, appellants contend that the district court mistakenly evaluated the medical justifications using retention and deployment standards rather than accession standards. AOB.37-41. Not true. The district court recognized that accession standards were more stringent but concluded that since the medical justifications were irrational, they were ineffective to uphold the entry bar.

In fact, the district court had already evaluated the accession standards: In *Harrison*, an enlisted soldier challenged those standards

because they prohibited him from commissioning. 597 F. Supp. 3d at 899, 912. Defendants there even offered the same medical justifications against Sgt. Harrison's appointment as an officer. *Id.* at 907-11. The district court properly applied *Roe II*'s holdings there and logically extended them here to the entry bar.

This logical extension of *Roe II* makes eminent sense. The prior cases hinged on whether SMLWH were deployable. *See Roe II*, 947 F.3d at 215, 221-22; *Harrison*, 597 F. Supp. 3d at 890 ("The restrictions on [accession] and [retention] … are grounded on the same underlying policy [of non-deployability]."); *id.* at 912. As appellants argue, and the district court recognized, this case does too. AOB.22; JA1038. Indeed, no fewer than three of five accessions criteria relate to deployment. JA524-JA525. For these additional reasons, this Court's prior holdings in *Roe II* are just as applicable here.

In sum, unlike appellants, the district court understood the ramifications of the *Roe II* opinion on the accession standards at issue below. The district court rejected the medical justifications as irrational—as this Court itself did—because they are still contradicted by science or unsupported by evidence. To avoid the consequences of

*Roe II*'s holdings, appellants needed to provide additional evidence or new science. They did not do so—neither in *Harrison* nor in this case. None of the repackaged justifications "justifies reaching a different conclusion" than this Court in *Roe II*. *Harrison*, 597 F. Supp. 3d at 908; JA1035 n.4. That failure is fatal to their arguments in defense of the challenged policy.

c.  Relatedly, it is not the district court but appellants who have a flawed understanding of the *Roe II* opinion. Their bewilderment is apparent in a single summary paragraph—devoid of citations—of imaginary propositions in *Roe II*. *See* AOB.43.

First, appellants state:

> *Roe* thus does not undermine the basic point that there are material differences between individuals with HIV and healthy individuals.

*Id.* Setting aside the false dichotomy of "healthy" versus "unhealthy," there is no dispute that there are minor differences between PLWH and people who don't have HIV. But appellants don't identify *any* material differences, and *Roe II* does not help them but in fact contradicts this proposition, holding that any differences are irrelevant to service members' ability to deploy. 947 F.3d at 228.

30

Next, appellants assert:

> *Roe* instead confirms that individuals with HIV
> do not meet the basic criteria the military has
> identified as essential to accession[:]

AOB.43. *Roe II* made no such holding on PLWH's ability to accede, but

it did clearly state that there were no valid reasons to preclude service

members with well-managed HIV from deploying. 947 F.3d at 228.

They continue on:

> that persons joining the military should be
> capable of unrestricted deployment worldwide[;]

AOB.43. *Roe II* held that SMLWH were likely to *succeed* on their claims

because a deployment bar was "outmoded and at odds with current

science." 947 F.3d at 228. Even the unexplained host-nation restrictions

did not support the deployment bar. *Id.* at 225-26.

Next:

> [that persons joining the military] do not have
> health conditions that may lead to a degraded
> ability to perform their duties[;]

AOB.43. Assuming appellants are referring to SMLWH's inability to

donate blood, the panel did *not* view that as a significant limitation on a

service member's ability to perform their duties. *Roe II*, 947 F.3d at

227-28. In fact, the Court cited with approval the district court's

conclusion that defendants' "outmoded policies related to HIV bear no relationship to [plaintiffs'] ability to perform their jobs." *Id.* at 229 (cleaned up) (citing *Harrison*, 359 F. Supp. 3d at 419-20).

And then:

> [that persons joining the military] contribute to a cost-effective fighting force[;]

AOB.43. The cost of caring for PLWH was neither raised in *Roe II* nor mentioned by this Court in its opinion. Appellants first raised this justification in *Harrison*, then here.

And finally:

> [that persons joining the military] be free of infectious diseases that could affect other soldiers.

*Id.* In fact, *Roe II* firmly rejected defendants' concerns over transmission risk, stating that the government had "failed to reconcile these concerns with the record evidence on HIV transmission." 947 F.3d at 227.

In sum, none of these bald assertions is supported by *Roe II*. Rather, as the district court held, the "Fourth Circuit's guidance could not be clearer: 'A ban on deployment may have been justified at a time when HIV treatment was less effective at managing the virus and reducing transmission risks,' but 'any understanding of HIV that could

32

justify this ban is outmoded and at odds with current science.'" JA1058

(citing *Roe II*, 947 F.3d at 228).

> ### 2. Appellants' hypothetical concerns about the follow-on effects of affirmance do not justify reversal.

In the face of *Roe II*'s holdings and the district court's ruling

below, appellants grasp at hyperbolic warnings about the repercussions

of an affirmance here. AOB.57-60. But this case is undoubtedly unique.

Very few, if any, medical conditions have engendered the type of

misconceptions, unwarranted fears, deeply entrenched stigma, and

discriminatory reactions that HIV has. *See Roe II*, 947 F.3d at 212

(noting that "[s]tigma, fear and misinformation about HIV persist

today"); JA762 (expert report on HIV stigma). Those factors have no

doubt motivated uniquely irrational decision-making applicable to HIV

that won't apply to other chronic conditions—unless the government is

consistently using bad science to make irrational policy choices.

That said, if people with other chronic but manageable conditions

can demonstrate—as appellees have here—that they can meet all the

medical criteria for accession, and the government has no rational basis

for barring them from service, then it is "precisely the role of the courts

to determine whether those rights have been violated." *Emory*, 819 F.2d at 293-94.

## B. Appellants' Cost-Based Justifications Do Not Provide a Rational Basis for the Entry Bar.

Appellants offer only one justification for the entry bar not previously rejected by this Court in *Roe II* or by *Harrison*: that admitting PLWH would lead to increased costs. This justification also fails.

### 1. Refusing to hire because of medical-cost justifications is irrational, flatly contrary to federal policy, and arbitrary.

Even if this Court accepts that costs would increase an indefinite, nonzero amount, it need not—and should not—hold that increased costs are a rational basis for the entry bar. Refusing to hire qualified people to save money is flatly contrary to actual federal government interests and is thus an illegitimate government interest.

a. Federal law contains a broad condemnation against employment discrimination based on healthcare costs. *E.g.*, *Ennis v. Nat'l Ass'n of Bus. & Educ. Radio, Inc.*, 53 F.3d 55, 61 (4th Cir. 1995) (describing successful ADA claim from employee terminated, in part, because employer expected "substantial medical expenses" from

34

employee's dependent with HIV).[5] The federal government even devotes

significant resources to enforcing such laws. JA138, JA143, JA152-

JA153. Appellees recognize that these laws do not apply to the military.

But that does not mean the miliary is free to cite otherwise-condemned

conduct as a legitimate government interest in litigation under the U.S.

Constitution and the APA. The government interest is in preventing the

prohibited conduct, not using it to justify actions under laws that

happen to not apply to one part of the military.

Confirmation that rejecting qualified PLWH is contrary to federal

policy is the National HIV/AIDS Strategy ("NHAS"). The NHAS tasks

many federal agencies, including DoD, with carrying out its goals,

which include (1) prevent the spread of HIV; (2) improve HIV-related

health outcomes for PLWH; (3) reduce HIV-related stigma and

discrimination; and (4) integrate all partners, including DoD, and

coordinate their efforts. *See* JA66. Allowing qualified PLWH to join the

---

[5] *E.g.*, *Le v. Applied Biosystems*, 886 F. Supp. 717, 720-21 (N.D. Cal. 1995) ("The language of the ADA, coupled with the explanatory provisions of the EEOC Technical Assistance Manual, clearly prohibit terminating an individual with a disability (or an individual with a family member with a disability) so as to avoid paying the increased costs of the individual's medical benefits.").

military helps accomplish all these strategic goals; barring their entry does the opposite. A ruling that allowed DoD to bypass national HIV/AIDS policy based on an assertion that it has a legitimate interest in singling out PLWH for a cost-cutting purpose would be a truly remarkable interpretation of "legitimate government interest." The Court should decline the invitation to so rule.

Indeed, the NHAS was promulgated with full recognition that its goals have costs; according to the Department of Health and Human Services, total federal spending on the domestic response to HIV is more than $28 billion annually. JA55. Yet the NHAS does not explicitly contemplate federal agencies opting out merely because implementation would be costly. Even if the NHAS doesn't expressly require appellants to allow people with well-managed HIV to enlist, their purported cost justification cannot be squared with the obligations imposed on them by the President through it. Because the cost justification conflicts with federal policy and appellants' obligations to advance the goals of the NHAS, it is not legitimate.[6] *See St. Joseph Abbey v. Castillo*, 712 F.3d

---

[6] If higher costs were a legitimate interest, one would have expected it to appear in DoD's 2018 Report to Congress, which set forth DoD's

36

215, 223 (5th Cir. 2013) (government's failure to satisfy rational basis

review is shown by "negat[ing] a seemingly plausible basis for a law by

adducing evidence of [its] irrationality").

b.  Even if the Court decides that saving money is a legitimate

interest here, the justification still fails. A challenged policy will not

survive rational basis review if the relationship between the

classification and an asserted goal "is so attenuated as to render the

distinction arbitrary or irrational." *City of Cleburne*, 473 U.S. at 446; *see*

*also Bankers Life*, 486 U.S. at 83 ("[A]rbitrary and irrational

discrimination violates [equal protection] under even our most

deferential standard of review."). Here, the cost justification fails

rational basis review because appellants arbitrarily apply it *solely* to

HIV.

---

justifications for the entry bar and other HIV policies. JA815. But costs
did not appear in that document. Rather, they first appeared in the
accessions standards on November 16, 2022. JA529 (including "cost
considerations" in a brand-new section outlining the purpose, goals, and
membership of the Accession and Retention Medical Standards
Working Group). The timing of this addition—two years after
appellants first attempted, in *Harrison*, to rely on higher costs as a
justification for HIV policies, five months after the district court noted
that higher costs was the only argument distinguishing new recruits
from the plaintiff, *see* 597 F. Supp. 3d at 913-14, and six days after this
case commenced—casts further doubt on the legitimacy of this interest.

Notwithstanding the recent change to accessions policies (*see supra* n.6)*,* appellants do not appear to base accession decisions on the cost of healthcare for recruits with any other condition, including chronic ones requiring ongoing management.[7] JA524-JA525 (listing physical and medical criteria). And while they point to purported comorbidities associated with HIV as an additional long-term cost, appellants readily enlist smokers despite the plethora of associated comorbidities and the attendant costs of treating them.[8] This reality firmly refutes appellants' cost-based arguments and renders them definitionally arbitrary and capricious.

To defend this arbitrary choice, appellants claim that the entry bar survives even if it is an "imperfect fit between means and ends," or is the result of line drawing "not made with mathematical nicety."

---

[7] While appellants once invoked healthcare costs as a basis for denying accession to transgender people—another group affected by "historic patterns of disadvantage"—that argument was subsequently dropped from official policy justifying their decision. JA1059 n.17.

[8] In 2014, the military spent around $1.8 *billion* in smoking-related medical and nonmedical costs. Ctrs. for Disease Control & Prevention, *Tips from Former Smokers – Military Service Members and Veterans*, (Feb. 5, 2024), https://www.cdc.gov/tobacco/campaign/tips/groups/military.html.

AOB.49. But this is not a situation where a legislature or agency is responding to a problem by addressing one aspect of it; it is simply a decision to exclude a specific, disadvantaged group of people. *E.g.*, *Pedersen v. Off. of Pers. Mgmt.*, 881 F. Supp. 2d 294, 338-39 (D. Conn. 2012) (statute that withheld marriage from same-sex couples but still allowed them to adopt children could not be justified by concern for child welfare). This effort to defend the policy therefore falls flat.

Appellants themselves deal the fatal blow to the cost justification by ignoring the costs of HIV-related care for dependents of new recruits. In return for service, appellants provide healthcare not only to service members but also to their dependents. JA751. While they claim to exclude candidates with HIV because of the higher cost of HIV-related care, they readily accept recruits without inquiring into the HIV status of their dependents, and they pay for the HIV-related care of any who need it. JA751. Denying a small number of recruits with HIV while accepting many more whose dependents may require HIV-related healthcare is irrational. *See Jimenez v. Weinberger*, 417 U.S. 628, 636 (1974) (classification failed rational basis review when statute's goal "is exactly the same as to both subclasses").

Even under rational basis review, courts can and do scrutinize over- and under-inclusiveness, unequal treatment, and lack of supporting evidence "where minorities are subject to discrepant treatment." *Massachusetts v. U.S. Dep't of Health & Hum. Servs.*, 682 F.3d 1, 10 (1st Cir. 2012) (discussing cases and explaining that under rational basis review, scrutiny is not "minimalist" and a court must consider the "case-specific nature of the discrepant treatment, the burden imposed, and the infirmities of the justifications offered"); *see also Romer v. Evans*, 517 U.S. 620, 635 (1996) (rejecting interest in conserving resources when the "breadth of the [challenged law] is so far removed from [that] justification[] that … it [is] impossible to credit them"); *Moreno*, 413 U.S. at 535-36 (invalidating differential treatment because the government's "assumptions" about households with nonfamilial cohabitants were "wholly unsubstantiated" and the differential treatment undermined a statute's overall purpose). Engaging in that inquiry here leads inexorably to the conclusion that the justification based on costs does not supply a rational basis for the bar to entry.

**2.    The district court properly excluded technical evidence offered by an unqualified witness.**

The cost justification is not just illegitimate and arbitrary, it is also unsupported. The district court did not abuse its discretion when it excluded the declaration of Dr. Paul Ciminera and materials he referenced,[9] which purported to estimate the relative costs of admitting PLWH to support the contention that they are an unacceptable financial burden. Educated and experienced in public health, not data analysis, Dr. Ciminera nevertheless offered evidence that interpreted, analyzed, and evaluated financial and economic data. The district court properly excluded the evidence under Federal Rule of Evidence 702, *see* JA938, and it is not otherwise admissible under Federal Rule of Evidence 701 or 803(8).

---

[9] JA310. The declaration references two reports. One is an Analysis to Inform Updates to DoD HIV Policy from the Office of the Assistant Secretary of Defense for Health Affairs for Health Services Policy and Oversight ("HSPO Report"). *See* JA330 (replicating table found in HSPO report); JA947 (actual HSPO Report). The second is a memo from the Medical Standards Analytics and Research ("MSAR"), Department of Statistics and Epidemiology at the Walter Reed Army Institute of Research (the "MSAR Report") (together, "Reports"). *See* JA323 (referencing MSAR Report); JA985 (actual MSAR Report).

a. First, Rule 702 applies to the evidence. Regardless of the witness, "*any part* of [their] testimony that is based upon scientific, technical, or other specialized knowledge … is governed by the standards of Rule 702." Fed. R. Evid. 701 advisory committee's note to the 2000 amendments (emphasis added). Data analysis is quintessentially scientific, technical, or specialized; Dr. Ciminera himself confirms as much. JA323 ¶43 (describing financial assessments "based on a literature review as well as quantitative and qualitative analysis informed both by current scientific and medical evidence"). To avoid Rule 702, appellants must show the evidence did not involve such specialized knowledge. But they did not even attempt to do so. Dr. Ciminera does not have the skills or training to present the results of data analysis, so the district court did not abuse its discretion when it excluded his declaration under Rule 702.

For similar reasons, Dr. Ciminera's testimony is not admissible as lay opinion testimony under Rule 701. A witness may provide lay opinion testimony only if it is "not based on scientific, technical, or other specialized knowledge." Fed. R. Evid. 701(c). By contrast, lay opinion testimony "must 'result[] from a process of reasoning familiar in

42

everyday life,' as opposed to a process 'which can be mastered only by specialists in the field.'" *Donlin v. Philips Lighting N. Am. Corp.*, 581 F.3d 73, 81 (3d Cir. 2009) (bracket in original) (quoting Fed. R. Evid. 701 advisory committee's note to 2000 amendments).

Appellants breeze by this limitation, failing even to mention it. Instead, they focus on how Dr. Ciminera became acquainted with the data and conclusions he recites by participating in the larger working group that compiled and analyzed them. AOB.55. But while percipient knowledge is necessary for Rule 701, it's not sufficient. *See, e.g.*, *United States v. Figueroa-Lopez*, 125 F.3d 1241, 1246 (9th Cir. 1997) (cited with approval in Rule 701 advisory committee notes to 2000 amendments); *Faust v. Comcast Cable Commc'ns, LLC*, 2014 WL 3534008, at *2-4 (D. Md. July 15, 2014) (rejecting declaration purporting to "summarize" data but in fact interpreting, analyzing, and evaluating it). By not addressing the point, appellants functionally concede that this evidence is based on scientific, technical, or other specialized knowledge. That alone should end the inquiry.[10]

---

[10] Appellants' cases are not to the contrary. All involve the long-standing exception for business executives estimating profits, which the

b. In addition, neither the tables attached to Dr. Ciminera's declaration nor the Reports they come from are separately admissible under the hearsay exception for public records. Fed. R. Evid. 803(8).[11] The exception is qualified: It does not apply if "the source of information or other circumstances indicate a lack of trustworthiness." Fed. R. Evid. 803(8)(B). The Reports here do not meet this standard.

First, the HSPO Report is explicitly labeled a "Draft" with "preliminary results." JA947. But internal drafts are not trustworthy. *See Anderson v. Westinghouse Savannah River Co.*, 406 F.3d 248, 264

---

advisory committee confirmed was a process of "reasoning familiar in everyday life." Fed. R. Evid. 701 advisory committee's note to 2000 amendments (explaining amendments "not intended to affect" cases that allowed a business owner to testify about projected profits); *see Lighting Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1175 (3d Cir. 1993); *MCI Telecomms. Corp. v. Wanzer*, 897 F.2d 703, 706 (4th Cir. 1990); *see also Lord & Taylor, LLC v. White Flint, L.P.*, 849 F.3d 567, 575-76 (4th Cir. 2017) (citing *MCI* and advisory committee's note on business projections).

[11] Defendants complain that the district court failed to address this argument when excluding the evidence. AOB.54. But in the trial court, their Rule 803(8) argument amounted to just one sentence and one cited case. Dkt.103.at.10. This passing shot was likely not even enough to preserve the public-records argument for appeal. *See Sun Yung Lee v. Clarendon*, 453 F. App'x 270, 276 (4th Cir. 2011) ("undeveloped argument" below not preserved).

(4th Cir. 2005); *United States v. Gray*, 852 F.2d 136, 139 (4th Cir. 1988) (no abuse of discretion in excluding "tentative internal report").

Second, both Reports are heavily redacted. Incomplete reports "inhibit[] a meaningful assessment of the trustworthiness" of the records, making the Rule 803(8) exception inapplicable. *Rambus, Inc. v. Infineon Techs. AG*, 222 F.R.D. 101, 109 (E.D. Va. 2004); *Hencely v. Fluor Corp.*, 2021 WL 2328037, at *3 (D.S.C. June 8, 2021) (rejecting public records under Rule 803(8) and "rule of completeness" of Fed. R. Evid. 106 because documents had "huge swathes" missing).

Third, both Reports are dated *after* litigation began. *See* JA21 (original complaint, filed in November 2022); JA947, JA985 (Reports, dated January and March 2023). Plus, the working group that produced them formed well after appellants were on notice of a legal challenge to the entry bar,[12] shortly after the district court declined to rule on the entry bar and any purported cost justification for it. *Harrison*, 597 F. Supp. 3d at 880 n.5. Self-serving documents prepared in anticipation of

---

[12] On May 30, 2018, the *Harrison* plaintiffs challenged the military's accession bar against PLWH, which encompassed appointment, enlistment, induction, and commissioning. *See* 597 F. Supp. 3d at 889 & n.2.

litigation are not trustworthy. *See Peacock Auto., LLC v. Granite State Ins. Co.*, 2021 WL 3603048, at *7 (D.S.C. Mar. 16, 2021); *see also Kennedy v. Joy Techs., Inc.*, 269 F. App'x 302, 309 (4th Cir. 2008) (trustworthiness inquiry considers "possible motivation problems").

Finally, the Reports lack trustworthiness because they were not "compiled or prepared in a way that indicates that [their] conclusions can be relied upon[.]" *Moss v. Ole S. Real Est., Inc.*, 933 F.2d 1300, 1307 (5th Cir. 1991). Rule 803(8) considers factors like "unreliability, inadequate investigation, [and] inadequate foundation," *Distaff, Inc. v. Springfield Contracting Corp.*, 984 F.2d 108, 111 (4th Cir. 1993), and evidence with enough "negative factors" "should not be admitted." *Ellis v. Int'l Playtex, Inc.*, 745 F.2d 292, 300 (4th Cir. 1984). Appellees below documented numerous reliability issues surrounding appellants' economic evidence: inadequate foundation, flawed methodology, and arbitrary, faulty, or flawed assumptions. JA889. Appellants have never addressed these deficiencies and even now have no effective response.

Since the proffered economic evidence has numerous markers of untrustworthiness—in draft form, heavily redacted, prepared under biased circumstances, scientifically unreliable—it was properly

46

excluded. *E.g.*, *Anderson*, 406 F.3d at 264 (affirming rejection of draft report with methodological flaws).

### 3. Hypothetical costs are not sufficient even under rational basis review.

With no evidence to support their cost justification, appellants argue that they don't need any and that "rational speculation" is sufficient, a standard they pluck from *Heller*. AOB.50 (quoting *Heller v. Doe ex rel. Doe*, 509 U.S. 312, 320-21 (1993)). But neither *Heller* nor any other authority supports the far-reaching proposition that appellants advance. The district court did not err in rejecting hypothetical costs.

*First*, the argument rests largely on selective quoting. In full, *Heller* states: "[A] *legislative* choice is not subject to courtroom factfinding and may be based on rational speculation unsupported by evidence or empirical data." 509 U.S. at 320 (emphasis added) (brackets in original) (quoting *F.C.C. v. Beach Commc'ns, Inc.*, 508 U.S. 307, 315 (1993)). This "paradigm of judicial restraint," *F.C.C.*, 508 U.S. at 314, is unique to legislative acts because courts "never require a legislature to articulate its reasons for enacting a statute," *id.* at 315; *see also Heller*, 509 U.S. at 320 (state "has no obligation to produce evidence to sustain the rationality of a *statutory* classification" (emphasis added)).

47

By contrast—likely because it involves action by a single branch of government—federal agencies are routinely subjected to more searching inquiry. *E.g.*, 5 U.S.C. §§ 701-706 (judicial review of final agency action). The cases appellants rely on all involve review of legislation. *Armour v. City of Indianapolis*, 566 U.S. 673, 675-79 (2012) (municipal ordinance); *F.C.C.*, 508 U.S. at 309-13 (federal statute); *Heller*, 509 U.S. at 315-18 (state statute); *Kadrmas v. Dickenson Pub. Schs.*, 487 U.S. 450, 453-56 (1988) (state statute); *Williamson v. Lee Optical of Okla., Inc.*, 348 U.S. 483, 484-86 (1955) (state statute). But this Court is reviewing agency action, and it should decline to extend the "rational speculation" doctrine to this context.

*Second*, the district court properly rejected the government's cost justification. As other courts have done, where the government suggests costs could justify a law, but that suggestion lacks substance, a court can validly find it does not survive rational basis review. *See Plyler v. Doe*, 457 U.S. 202, 228-30 (1982); *Diaz v. Brewer*, 656 F.3d 1008, 1013 (9th Cir. 2011); *Bassett v. Snyder*, 59 F. Supp. 3d 837, 851-52 (E.D. Mich. 2014). Relying on these authorities, the district court properly rejected the cost justification. This more searching inquiry, rather than blind acceptance,

48

is particularly appropriate in challenges to policies that are part of "historic patterns of disadvantage" affecting "disadvantaged or unpopular" groups where the justifications seem "thin, unsupported or impermissible." *Massachusetts*, 682 F.3d at 10-11. The entry bar is the continuation of a historic pattern of disadvantage affecting PLWH. *See* JA1068 (the entry bar "contribute[s] to the ongoing stigma" toward PLWH). Thus, the district court was right to reject appellants' purported concerns about cost.

*Third*, regardless of how it applies in the context of rational basis review, the "rational speculation" argument finds no purchase under the APA. A court "may not uphold agency action based on speculation" and "do[es] not defer to an agency's conclusory or unsupported suppositions." *Nat'l Shooting Sports Found., Inc. v. Jones*, 716 F.3d 200, 214 (D.C. Cir. 2013) (internal quotation marks omitted); *see also Sorenson Commc'ns Inc. v. FCC*, 755 F.3d 702, 708-09 (D.C. Cir. 2014) (deference to agency judgment "must be based on some logic and evidence, not sheer speculation"). Appellants' speculation about allegedly higher costs is not sufficient under the APA. *E.g.*, *Nat'l Cmty. Reinvestment Coal. v. Consumer Fin. Prot. Bureau*, 2022 WL 4447293,

at *22 n.17 (D.D.C. Sept. 23, 2022) (agency's reliance on "speculative" benefits was arbitrary and capricious).

### C. "Diplomatic Deference" to Discriminatory Foreign Laws Does Not Provide a Rational Basis for the Entry Bar.

This Court previously rejected reliance on foreign laws or restrictions barring the entry of PLWH as a justification for a categorical deployment bar, holding that the justification "fail[ed] to provide a rational connection between the facts found and the [policy] choice made." *Roe II*, 947 F.3d at 225-26 (internal quotation and citation omitted). Now refashioned as "diplomatic deference," this justification did not survive rational basis review in the district court, and this Court should affirm that well-reasoned holding.

*Roe II* reached its conclusion in part because the record did not establish whether the laws of host nations "appl[y] to both military servicemembers and civilians" or whether "the inability to enter one nation would preclude deployment" to a whole region. *Id.* at 225. The record here does not rectify that issue: Appellants still have not shown that foreign host-nation restrictions for civilians apply to members of the military, nor do they contend that PLWH are precluded from

50

deployment anywhere. In fact, there is still no record evidence that any host nation prohibits SMLWH from entering (JA1062 n.18); that any host nation has ever enforced its restrictions against SMLWH by detaining, questioning, denying entry or denying medical care to, or removing them (*see id.*); or even that any host nation—other than Kuwait—prohibits the entry of HIV-positive foreign civilians (JA436-JA437). Appellants nevertheless maintain that the entry bar is justified because they *choose* to defer to those restrictions. *See* AOB.35-36.

The district court rejected that argument, concluding that the asserted foreign-relations justification is "irrational." JA1065. Nothing in appellants' brief undermines that holding. Indeed, as the district court found, appellants have simply ignored host-nation restrictions on many other groups—people who are LGBTQ, female, transgender, and non-Muslim—and freely deploy service members, without special review or a waiver, to countries with restrictions on members of those groups. JA1062-JA1065. That practice, combined with the lack of evidence of any host-nation enforcement against military members, reveals that appellants' treatment of PLWH as compared to other groups is irrational, arbitrary, and capricious. JA1062-JA1065.

51

Appellants attempt to distinguish HIV-based host-nation restrictions from those based on other characteristics, arguing that host-nation laws restricting other groups target specific *behaviors*, not the presence of a person in the country. AOB.47. But that distinction is specious. Appellants cannot seriously contend that a person loses his identity as, for example, a gay man when not engaged in same-sex sexual activity. *See Lawrence v. Texas*, 539 U.S. 558, 575 (2003) (criminalization of "homosexual conduct" invited discrimination against "homosexual persons"). When the potential penalty for being "perceived" as same-sex attracted is *death*, as it is under Saudi law (JA1026-JA1027), that necessarily targets the "presence of an individual" in the country. Appellants' stigmatizing suggestion that restrictions against PLWH are based on *behavior* rather than *status* is as offensive as it is inaccurate.

Appellants also note that service members are instructed to "become familiar with and respect the laws, regulations, and customs of their host nation *to the extent host nation and local laws, regulations, and customs do not interfere with the execution of official duties*[.]" AOB.47.n.4 (emphasis added). But by stating that operational functions

52

take priority over host-nation and local laws, this point supports *appellees*, not appellants. Certainly, the official duties for SMLWH include being present in the country to which he or she is deployed.

At bottom, while the military is afforded discretion to manage military affairs, it "has not been exempted from constitutional provisions that protect the rights of individuals." *Emory*, 819 F.2d at 294. The district court correctly recognized that "DoD does not employ 'long-standing' 'diplomatic deference' for any other minority group," making it "simply irrational for defendants to maintain that they must defer to host-nation laws only with regard to asymptomatic HIV-positive individuals with undetectable viral loads."[13] JA1065.

---

[13] Citing only their own regulations and briefs as support, appellants appear to contend that they may still deny individual waiver requests from SMLWH using justifications that this Court and the district court have determined are not rational and violate equal protection and the APA. AOB.42. For medical justifications, this contention is based on a misunderstanding of the holding and consequences of *Roe II* and *Harrison*. And after the decision below, the "diplomatic deference" justification now fails as a rationale for treating SMLWH differently and, for almost a year since then, may no longer be used to deny deployment to any location.

## II.  THE DISTRICT COURT'S REMEDIAL ORDER WAS PROPER AND WITHIN ITS AUTHORITY.

Finally, the district court properly awarded nationwide relief. This litigation includes two avenues that remain viable for securing nationwide relief under the Supreme Court's recent decision in *Trump v. CASA, Inc.*, 606 U.S. —, 2025 WL 1773631 (June 27, 2025): an organizational plaintiff that has associational standing for members who live in all 50 states (JA854, JA857-JA858) and claims for relief under the APA. Indeed, *CASA* rejected the relevance of all of appellants' policy-laden arguments against nationwide injunctions. *See* 2025 WL 1773631, at *13. Instead, *CASA* based its ruling solely on the premise that under the Judiciary Act of 1789, courts are limited to ordering "complete relief" for the plaintiff, *id.* at *1, *12, which, for MVA, can only be accomplished if that relief applies everywhere.

In *CASA*, the Court held that universal injunctions typically fall outside a district court's equitable authority under the Judiciary Act of 1789. *Id.* at *6. The decision expressly did not disturb any other basis for granting nationwide relief, such as Article III itself or other federal statutes. *Id.* at *6 n.4, *8 n.10. In fact, the majority, concurring, and dissenting opinions in *CASA* reveal an unqualified endorsement that

54

the APA continues to be a proper vehicle to secure nationwide relief. *See, e.g., id.* at *8 n.10 (majority opinion, which declined to express an opinion on whether the APA authorized universal relief in the form of vacating agency action). The Supreme Court and this Circuit's prior approval of the APA as a vehicle for nationwide relief is explicitly preserved. *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 890 n.2 (1990) (explaining a successful APA challenge by one plaintiff could impact an entire agency program); *Va. Soc'y for Hum. Life, Inc. v. FEC*, 263 F.3d 379, 393 (4th Cir. 2001) (acknowledging nationwide relief is available in an APA case), *overruled on other grounds by The Real Truth About Abortion, Inc. v. FEC*, 681 F.3d 544 (4th Cir. 2012).[14] Because that remains the law, the district court did not err when it issued nationwide relief under the APA for a nationwide controversy.

---

[14] At least four other circuits agree. *See New York v. DHS*, 969 F.3d 42, 88 (2d Cir. 2020); *Braidwood Mgmt., Inc. v. Becerra*, 104 F.4th 930, 951-53 (5th Cir. 2024), *rev'd on other grounds sub nom. Kennedy v. Braidwood Mgmt., Inc.*, 606 U.S. —, 2025 WL 1773628 (June 27, 2025); *E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 680-81 (9th Cir. 2021); *Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1409 (D.C. Cir. 1998); *see also Tennessee v. U.S. Dep't of Educ.*, 104 F.4th 577, 614 (6th Cir. 2024) (acknowledging concerns about universal relief under the APA, but not foreclosing it).

At bottom, the district court fashioned appropriate relief that (1) rightly extends to the thousands of MVA members who live all over the country and (2) functionally sets aside agency rule under the APA. The Court should affirm.

### A. Relief Was Appropriately Tailored to the Controversy, Because It Afforded "Complete Relief" to MVA.

The district court appropriately fashioned nationwide relief for a nationwide controversy. Appellants argue that the district court "exceeded its authority" and provided relief that "cannot be squared" with Article III standing when it extended "its injunction beyond the plaintiffs in this suit." AOB.60, 64. Not so. The argument disregards plaintiff MVA, a nationwide organization. It is well established that associational standing comports with Article III standing requirements. *See Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 342-43 (1977). And as appellees acknowledge, injunctive relief should be "no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979). Here, complete relief *required* a remedy extending to "similarly situated asymptomatic HIV-positive individual[s] with an undetectable viral

load" because the MVA sued on behalf of its members across the nation. JA1070. Appellants fail to address this point.

The record shows that MVA has the requisite associational standing to seek relief on behalf of its members under the Fifth Amendment and the APA. "An association has standing to bring suit on behalf of its members when [(1)] its members would otherwise have standing to sue in their own right, [(2)] the interests at stake are germane to the organization's purpose, and [(3)] neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000). MVA satisfies each of these requirements, and nothing in appellants' brief suggests otherwise.

For the first prong, the record shows that MVA has nearly 3,000 members throughout the United States and in several countries. JA857-JA858. Wilkins and Coe—who have standing to sue in their own right— are also members. JA858. This is sufficient. *See Int'l Woodworkers of Am. v. Chesapeake Bay Plywood Corp.*, 659 F.2d 1259, 1266-67 (4th Cir. 1981) (sufficient to allege that "any one of" the members is suffering immediate or threatened injury). MVA's purpose is also "germane" to

57

the interests at stake, *Laidlaw*, 528 U.S. at 181, as its mission is "to advocate for equity and justice for the minority veteran community, [including] people living with HIV," JA1043, and its work involves advocating for HIV equity on behalf of PLWH, including those who are serving or want to serve in the military. JA855-JA857, JA861-JA863.

Finally, "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Laidlaw*, 528 U.S. at 181. MVA sought only declaratory and injunctive relief for its claims—not monetary damages. JA42-JA43. In such situations, courts do not require participation from the individual members. *See Pennell v. City of San Jose*, 485 U.S. 1, 7 n.3 (1988); *Retail Indus. Leaders Ass'n v. Fielder*, 475 F.3d 180, 187 (4th Cir. 2007). Rather, "the remedy is presumed to inure to the benefit of those members of the association actually injured such that associational standing is virtually always present." *Nat'l Fed'n of the Blind of Va. v. Va. Dep't of Corr.*, 2023 WL 6812061, at *8 (E.D. Va. Oct. 16, 2023) (internal quotation marks omitted); *see also Hosp. Council of W. Pa. v. Pittsburgh*, 949 F.2d 83, 89 (3d. Cir. 1991) ("The Supreme Court has repeatedly held that requests by an association for declaratory and

injunctive relief do not require participation by individual association members."). The district court's injunction should therefore at minimum run to the benefit of all MVA members, who live across the country.

### B. Nationwide Relief Was Appropriate Because Appellees Prevailed Under the APA.

Because the APA authorizes universal vacatur, the district court did not err when it granted universal relief under it.

Under the APA, a federal court can "set aside" agency actions on a nationwide basis when they are "contrary to constitutional right," arbitrary and capricious, "or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A)-(B). The availability of nationwide relief comes from the statute's plain language: To "set aside" a regulation means to "cancel, annul, or revoke" it. *See Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799, 829-30 (2024) (Kavanaugh, J., concurring) (collecting dictionary definitions). Likewise, to cancel, annul, or revoke a regulation means to treat the regulation as if it never existed. *See Driftless Area Land Conservancy v. Valcq*, 16 F.4th 508, 522 (7th Cir. 2021) (explaining vacatur "undoes or expunges" a prior act). Accordingly, when a district court vacates an agency action, it is treated as if it never existed at all, and thus cannot exist in other jurisdictions.

59

*See Braidwood*, 104 F.4th at 951 (explaining "setting aside agency action under § 706 has 'nationwide effect,' is 'not party-restricted,' and 'affects all persons in all judicial districts equally' "); *E. Bay Sanctuary*, 993 F.3d at 681 (explaining "the ordinary result" for a successful APA claim is vacatur, not prohibiting a regulation's application to individual participants).

Here, MVA challenged three regulations under the APA. JA39-JA40. Because the district court correctly found the regulations violated the Fifth Amendment's equal protection guarantee, the regulations necessarily were "contrary to constitutional right" and "not in accordance with law," and the district court could properly set aside the regulations on a universal basis under the APA. *See Chamber of Com. of U.S. v. SEC*, 88 F.4th 1115, 1118 (5th Cir. 2023) ("Under the APA, this court must set aside agency action found to be . . . contrary to constitutional right . . . ."). And so it did, by precluding "defendants from enforcing the HIV-specific provisions of their policies and regulations, including DoDI 6485.01 and 6130.03 and AR 600-110," that barred "asymptomatic HIV-positive individuals with undetectable viral loads from accession into the United States military" nationwide. JA1065,

JA1067. Because the district court issued this relief under the APA and MVA has members all over the country, the court acted within its discretion under the APA. *See* 5 U.S.C. § 706(2). The Court should thus affirm.

To be sure, when the district court rendered its judgment, it did not have the benefit of the Supreme Court's decision in *CASA*. But *CASA* limited its holding to the Judiciary Act and expressed no opinion on what remedies the APA conferred. *See* 2025 WL 1773631, at *6, *8 n.10. Thus, even in *CASA*'s wake, the law of this Circuit remains intact: District courts can not only vacate an agency act as to a party, but the remedy fashioned can extend beyond. *See Va. Soc'y*, 263 F.3d at 393 (acknowledging nationwide relief under the APA is available); *cf. Mayor of Baltimore v. Azar*, 973 F.3d 258, 293-94 (4th Cir. 2020) (en banc) (affirming statewide relief under the APA, even though only one city brought suit). Until the Supreme Court or an en banc panel of this Court expressly rules otherwise, this Court is bound by this reading of the APA. *United States v. Hunt*, 123 F.4th 697, 702 (4th Cir. 2024).

While the substance of the relief ordered by the district court is, if anything, bolstered by *CASA*, appellees acknowledge that the wording

61

is not what a court would use if it had the *CASA* ruling before it.
JA1070 (ordering an injunction, rather than vacatur).

But given that Counts II and III specifically invoked the APA,
JA39-JA41, granting nationwide relief was within the district court's
authority. Because this Court can affirm a district court's judgment "on
any ground that the law and the record permit and that will not expand
the relief below," it should do so here. *Thigpen v. Roberts*, 468 U.S. 27,
30 (1984). This course of action should not require remand of any
portion of the judgment. Alternatively, the Court could remand with
respect to the remedy on Count I while affirming the remedy under
Counts II and III, so the district court can reword its order or reconsider
its scope in light of *CASA*. *See Hill v. O'Brien*, 387 F. App'x 396, 399
(4th Cir. 2010) (remanding where district court "did not have the
benefit" of an intervening Supreme Court decision).

## CONCLUSION

For the reasons given, appellees respectfully ask that the
judgment of the district court be AFFIRMED.

Respectfully submitted,

/s/ *Bryce Cooper*

Scott A. Schoettes
Scott A. Schoettes, Esq.
275 Sandy Point Trail
Palm Springs, CA 92262
sschoettes@gmail.com
(773) 474-9250

Gregory R. Nevins
Lambda Legal Defense &
Education Defense Fund, Inc.
1 West Court Square
Suite 640
Decatur, GA 30030
gnevins@lambdalegal.org
(404) 897-1880

Nicholas J. Hite
Lambda Legal Defense &
Education Defense Fund, Inc.
3500 Oak Lawn Avenue
Suite 500
Dallas, TX 75219
nhite@lambdalegal.org
(214) 219-8585

Peter E. Perkowski
Perkowski Legal, PC
515 S. Flower St.
Suite 1800
Los Angeles, CA 90071
peter@perkowskilegal.com
(213) 340-5796

Bryce A. Cooper
Winston & Strawn LLP
35 W. Wacker Dr.
Chicago, IL 60601
bcooper@winston.com
(312) 558-5600

Robert T. Vlasis, III
Hannah M. Shankman
Winston & Strawn LLP
1901 L Street NW
Washington, DC 20036
rvlasis@winston.com
hshankman@winston.com
(202) 282-5644

Thanh D. Nguyen
Winston & Strawn LLP
2121 N. Pearl Street, 9th Floor
Dallas, TX 75201
tdnguyen@winston.com
(214) 296-9845

*Counsel for Plaintiffs-Appellees*

August 12, 2025

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limit of Federal Rule of

Appellate Procedure 32(a)(7)(B) because it contains 12,052 words. This

brief also complies with the typeface and type-style requirements of

Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was

prepared using Word for Microsoft 365 in Century Schoolbook 14-point

font, a proportionally spaced typeface.

/s/   *Bryce Cooper*
Bryce Cooper
*Counsel for Plaintiffs-Appellees*