**No. 24-2079**

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

———————

ISAIAH WILKINS, CAROL COE, NATALIE NOE, and MINORITY
VETERANS OF AMERICA

Plaintiffs-Appellees,

v.

PETE HEGSETH, in his official capacity as Secretary of Defense, and
DANIEL P. DRISCOLL, in his official capacity as Secretary of the Army

Defendants-Appellants.

———————

On Appeal from the United States District Court
for the Eastern District of Virginia

———————

## FINAL BRIEF FOR APPELLANTS

———————

BRETT A. SHUMATE
  *Assistant Attorney General*

ERIK S. SIEBERT
  *United States Attorney*

CHARLES W. SCARBOROUGH
BRAD HINSHELWOOD
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7256*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 514-7823*

## TABLE OF CONTENTS

**Page**

INTRODUCTION .................................................................................... 1

STATEMENT OF JURISDICTION ......................................................... 2

STATEMENT OF THE ISSUES ............................................................. 3

STATEMENT OF THE CASE ................................................................. 3

    A.     Factual and Statutory Background ........................................ 3

          1.     Human Immunodeficiency Virus (HIV) ...................... 4

          2.     Military Accession Standards ...................................... 7

    B.     Procedural Background ...................................................... 10

SUMMARY OF ARGUMENT ................................................................ 15

STANDARD OF REVIEW ..................................................................... 18

ARGUMENT ......................................................................................... 18

I.     The Military's Accession Policy Is Lawful Under Rational Basis Review ...................................................................................... 18

    A.     Denying Accession to Individuals With Disqualifying Medical Conditions, Including HIV, Rationally Advances Military Interests ................................................ 21

    B.     The District Court's Contrary Conclusion Was Erroneous ........................................................................... 36

          1.     This Court's decision in *Roe* underscores the error of the district court's analysis ....................................... 36

          2.     The district court erred in its treatment of issues not addressed in *Roe* .................................................. 45

II.   The District Court's Remedial Order Exceeded Its Authority ...... 59

A.   An Uncontested Statute Forecloses the Relief the
District Court Ordered as to Plaintiff Wilkins ..................... 59

B.   A Universal Injunction Extending Relief to Non-Parties
Was Improper ........................................................................ 63

CONCLUSION ........................................................................................ 70

CERTIFICATE OF COMPLIANCE

## TABLE OF AUTHORITIES

**Cases:**                                                                **Page(s)**

*Arizona v. Biden,*
   40 F.4th 375 (6th Cir. 2022) .............................................................. 65

*Armour v. City of Indianapolis,*
   566 U.S. 673 (2012) ........................................................................... 47

*Armstrong v. Exceptional Child Ctr., Inc.,*
   575 U.S. 320 (2015) ........................................................................... 60

*Califano v. Yamasaki,*
   442 U.S. 682 (1979) ........................................................................... 64

*Calloway v. Lokey,*
   948 F.3d 194 (4th Cir. 2020) ............................................................. 18

*CASA de Md., Inc. v. Trump,*
   971 F.3d 220 (4th Cir. 2020), *vacated for reh'g en banc,*
   981 F.3d 311 (4th Cir.) ................................................................ 67, 68

*Cox v. Schweiker,*
   684 F.2d 310 (5th Cir. Unit B 1982) .................................................. 62

*Dandridge v. Williams,*
   397 U.S. 471 (1970) ...................................................................... 20, 48

*Department of Homeland Sec. v. New York,*
   140 S. Ct. 599 (2020) ......................................................................... 65

*Doe v. University of Md. Med. Sys. Corp.,*
   50 F.3d 1261 (4th Cir. 1995) ........................................................ 19, 51

*Dorado-Ocasio v. Averill,*
   __ F.4th __, 2025 WL 478406 (4th Cir. 2025) .................................. 45

*Downey v. Bob's Disc. Furniture Holdings, Inc.,*
   633 F.3d 1 (1st Cir. 2011) .................................................................. 54

*Ely v. Saul,*
   572 F. Supp. 3d 751 (D. Ariz. 2020) .................................................. 62

*FCC v. Beach Commc'ns, Inc.*,
  508 U.S. 307 (1993) ........................................................................ 48

*Gill v. Whitford*,
  585 U.S. 48 (2018) ........................................................................... 63

*Gilligan v. Morgan*,
  413 U.S. 1 (1973) .............................................................. 20, 44, 59

*Goldman v. Weinberger*,
  475 U.S. 503 (1986) ........................................................................ 20

*Goodluck v. Biden*,
  104 F.4th 920 (D.C. Cir. 2024) ...................................................... 61

*Haig v. Agee*,
  453 U.S. 280 (1981) ........................................................................ 49

*Harisiades v. Shaughnessy*,
  342 U.S. 580 (1952) ........................................................................ 49

*Harrison v. Austin*,
  597 F.Supp.3d 884 (E.D. Va. 2022) ......................................... 12, 50

*Hedges v. Dixon County*,
  150 U.S. 182 (1893) ........................................................................ 61

*Heller v. Doe ex rel. Doe*,
  509 U.S. 312 (1993) ..................... 16, 19, 20, 24, 33, 36, 44, 48, 49, 50

*INS v. Pangilinan*,
  486 U.S. 875 (1988) ............................................................. 17, 60, 61

*Kadrmas v. Dickinson Pub. Schs.*,
  487 U.S. 450 (1988) ........................................................................ 51

*Labrador v. Poe ex rel. Poe*,
  144 S. Ct. 921 (2024) ................................................................. 66, 69

*Landbank Equity Corp., In re*,
  973 F.2d 265 (4th Cir. 1992) ..................................................... 60-61

*Lehnhausen v. Lake Shore Auto Parts Co.*,
  410 U.S. 356 (1973) ........................................................................ 19

*Lewis v. Casey*,
    518 U.S. 343 (1996) ............................................................ 63

*Lightning Lube, Inc. v. Witco Corp.*,
    4 F.3d 1153 (3d Cir. 1993) ................................................. 55

*Lord & Taylor, LLC v. White Flint, L.P.*,
    849 F.3d 567 (4th Cir. 2017) ............................................. 55

*MCI Telecomms. Corp. v. Wanzer*,
    897 F.2d 703 (4th Cir. 1990) ............................................. 55

*Plyler v. Doe*,
    457 U.S. 202 (1982) ............................................................ 50

*Roe v. Department of Def.*,
    947 F.3d 207 (4th Cir. 2020) ... 12, 16, 36, 37, 38, 39, 41, 43, 45, 67, 68

*Thornton v. Commissioner of Soc. Sec.*,
    570 F. Supp. 3d 1010 (W.D. Wash. 2020) ......................... 62

*United States v. Mendoza*,
    464 U.S. 154 (1984) ............................................................ 65

*United States v. Vidacak*,
    553 F.3d 344 (4th Cir. 2009) ............................................. 53

*U.S. R.R. Ret. Bd. v. Fritz*,
    449 U.S. 166 (1980) ............................................................ 48

*Virginia Soc'y for Human Life, Inc. v. Federal Election Comm'n*,
    263 F.3d 379 (4th Cir. 2001), *overruled on other grounds by*
    *The Real Truth About Abortion, Inc. v. Federal Election Comm'n*
    681 F.3d 544 (2012) ............................................................ 64

*Williamson v. Lee Optical of Okla., Inc.*,
    348 U.S. 483 (1955) ......................................................... 48-49

*Winter v. Natural Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) ................................................... 20, 44, 59

**Statutes:**

10 U.S.C. § 505(a) ................................................................. 7

10 U.S.C. § 532(a)(3) ............................................................ 7

10 U.S.C. § 7446(a) ................................................ 15, 17, 60, 62

28 U.S.C. § 1291 ................................................................... 2

28 U.S.C. § 1331 ................................................................... 2

**Rules:**

Fed. R. App. P. 4(a)(1)(B) ...................................................... 2

Fed. R. Civ. P. 23 ............................................................... 65

Fed. R. Evid. 602 .............................................................. 54

Fed. R. Evid. 701 .............................................................. 54

Fed. R. Evid. 803(8) ........................................................... 53

**Other Authorities:**

Department of Defense Instruction 6130.03, vol. 2,
  *Medical Standards for Military
  Service: Retention* (June 6, 2022) ........................................ 40

## INTRODUCTION

This case addresses the military's policies governing who can join the military.  The military generally seeks healthy individuals to join its ranks because such individuals present no special health-related complications to their deployment worldwide or to the roles they can perform in the military, as well as no known health risks to themselves or their fellow soldiers.  As a result, hundreds of different medical conditions—including high blood pressure, diabetes, asthma, limited motion in a joint, vision and hearing defects, peanut allergies, or communicable diseases like hepatitis—are disqualifying.

The military has long included Human Immunodeficiency Virus (HIV) in the list of disqualifying conditions.  HIV is an incurable and transmissible medical condition.  The medical needs of individuals with HIV limit their deployability and the tasks they can perform in military service, and they impose additional costs on the military above those incurred by healthy individuals.  Thus, at a minimum, there is a rational basis for the military to treat such individuals differently.  The district court here, however, held that the military's policy fails rational-basis review and the Constitution precludes the military from

treating HIV as a disqualifying medical condition for HIV-positive individuals who are asymptomatic and have low levels of the virus in their blood as a result of a continuing regimen of medication.

That holding violates fundamental premises of rational basis review, disregarding the military's legitimate interests in having healthy new servicemembers and the district court's particularly limited role in determining the proper composition of, and qualifications for joining, the military, which are judgments entrusted to the military itself. Moreover, that ruling calls into question the military's ability to consider as disqualifying numerous other chronic but treatable conditions. The district court's judgment should be reversed.

## STATEMENT OF JURISDICTION

Plaintiffs' complaint invoked the jurisdiction of the district court under 28 U.S.C. § 1331. JA25. The district court entered final judgment on August 20, 2024. JA1070-1071. Defendants filed a notice of appeal on October 18, 2024. JA1073; *see* Fed. R. App. P. 4(a)(1)(B) (60-day time limit). This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1.  Whether the district court erred in concluding that the military's treatment of HIV as a disqualifying medical condition for joining the military is unconstitutional under rational-basis review as applied to asymptomatic HIV-positive individuals with an undetectable viral load.

2.  Whether the district court erred in ordering the military to reconsider one plaintiff's application to the U.S. Military Academy Preparatory School even though that plaintiff exceeds the statutory maximum age for admission to the U.S. Military Academy.

3.  Whether the district court erred in extending permanent injunctive relief to non-parties where such relief was wholly unnecessary to remedy plaintiffs' injuries.

## STATEMENT OF THE CASE

### A.    Factual and Statutory Background

This case addresses military "accession"—the appointment, enlistment, or induction of an individual into military service. Candidates for accession must meet a host of requirements to be eligible for military service.  Plaintiffs challenge the military's policies generally barring the accession of individuals with HIV.

3

### 1.    Human Immunodeficiency Virus (HIV)

HIV is an incurable and transmissible condition that affects the body's immune system.  JA414.  HIV can be transmitted through sexual contact, blood transfusions or other blood-to-blood contact, and other means.  JA426.  If untreated, persons with HIV can develop Acquired Immunodeficiency Syndrome (AIDS), a serious condition in which the body's immune mechanism is compromised through the destruction of white blood cells that protect the body from infection.  JA414-415.

Although HIV cannot be cured, HIV infections can be managed through the use of antiretroviral medications.  JA418.  Such medications—commonly taken as a once-daily pill or pair of pills—are effective at reducing a patient's "viral load," which refers to the number of copies of the virus in a milliliter of blood.  JA414 n.2; JA797-798.  If taken consistently, antiretroviral medications can reduce a patient's viral load to achieve viral "suppression"—defined as under 200 copies of the virus per milliliter of blood.  JA45; JA418.  In many patients, consistent and effective antiretroviral treatment can render a patient's viral load "undetectable" on currently-available blood tests.  JA419-420; JA799-800.  After a patient achieves viral suppression, treatment

4

guidelines require viral load blood tests at regular intervals: initially every three to six months, and then at longer intervals of six or twelve months, depending on the patient's condition.  JA420; JA674.

Persons with HIV who achieve and maintain viral suppression pose essentially no risk of sexually transmitting HIV to another person, though transmission through other routes, such as blood transfusions or other blood-to-blood methods of transmission, remains possible.  JA426-427; JA45-46.  Thus, persons with an undetectable viral load remain forbidden from donating blood under guidance from the Food and Drug Administration (FDA).  JA427; JA398.  In addition, guidance from the Centers for Disease Control and Prevention (CDC) states that individuals exposed to potential blood-to-blood transmission from a person with an undetectable viral load, such as in a medical setting, should immediately begin a course of prophylactic medication and receive recurrent testing for a period of time thereafter.  JA699-700; JA428.

"Adherence to [medication] is paramount for persons who intend to prevent HIV transmission by achieving and maintaining a suppressed viral load."  JA683.  Patients who stop taking their

5

medication will experience "viral rebound," where their viral load increases until they are no longer virally suppressed.  JA424.  As guidance from the Department of Health and Human Services explains, "[v]iral rebound typically occurs within days to weeks after [medication] cessation and has been observed as early as 3 to 6 days after stopping treatment."  JA683; *see* JA424.

Antiretroviral medication also does not eliminate the possibility of developing comorbid conditions associated with HIV infection. Individuals with HIV remain at higher risk for conditions such as high blood pressure, heart attacks, liver and kidney disease, and various forms of cancer.  JA416.  In addition, some regimens of antiretroviral medication are associated with loss of bone mineral density, kidney dysfunction, weight gain, and increased lipid profiles, though the precise clinical implications of those associations are not yet known. JA417.  Finally, there is not presently evidence about how effectively antiretroviral medications work to maintain suppression under high-stress conditions, such as when a patient has limited water, sleep, or faces these and other stresses in combination.  JA425; JA322.

## 2.    Military Accession Standards

Individuals seeking to join the military—including the Army, the service at issue here—must meet a variety of requirements to be eligible for accession.  *See, e.g.*, Army Reg. 601-210, ch. 2, § 1 (describing, *inter alia*, age, education, and aptitude testing requirements).  General Department of Defense (DOD) policies set a variety of requirements for accession, and each service sets further requirements, treating DOD standards as a baseline.

Among those requirements are health standards.  To ensure the effectiveness of America's fighting forces, individuals seeking to join the military must generally meet physical fitness standards, including determining that the individual does not have various disqualifying medical conditions.  *See* JA524-525; *see also* 10 U.S.C. § 505(a) (providing for enlistment of "qualified, effective, and able-bodied persons" in the military services); *id.* § 532(a)(3) (providing for appointment of commissioned officers "physically qualified for active service").  These medical requirements are designed to "[e]nsure that individuals considered for appointment, enlistment, or induction into the Military Services are," *inter alia*, "[f]ree of contagious diseases that

7

may endanger the health of other personnel," "[f]ree of medical conditions or physical defects that may reasonably be expected to require excessive time lost from duty for necessary treatment or hospitalization, or may result in separation from the Military Service for medical unfitness," and "[m]edically adaptable to the military environment without geographical area limitations."  JA524-525.

Hundreds of medical conditions are considered disqualifying for accession.  *See* JA533-574.  For example, individuals are disqualified from accession if they require contact lenses or hearing aids to address vision or hearing issues, JA536, JA537, have had a heart valve surgically repaired, JA541, have a history of inflammatory bowel disease, JA545, have limited range of motion in a joint, JA555-556, JA557, have had psoriasis as an adult, JA561, have acute allergic reactions to fish, crustaceans, shellfish, peanuts, or tree nuts, JA563, have headaches severe enough to cause two missed days of work or other activities in the previous year, JA568, have sleep apnea, or forms of insomnia requiring medication, JA570, or have autism spectrum disorder, JA570.

8

The list of disqualifying conditions also includes communicable diseases, such as hepatitis, until a cure is documented.  *See, e.g.*, JA545-546, JA573.  And the list includes many chronic conditions that can be managed through regular medication, including asthma, JA540, high blood pressure (hypertension), JA559, diabetes, JA564, and Attention Deficit Hyperactivity Disorder (ADHD), JA570.

HIV is also a disqualifying condition.  "[I]mmunodeficiencies" generally are disqualifying, specifically including "HIV."  JA563.  In other policy documents, DOD has stated that its policy is to "[d]eny eligibility for military service to persons with laboratory evidence of HIV infection."  JA580.  Army regulations similarly make clear that HIV is a disqualifying condition.  JA1087 (Army regulation incorporating requirements of DOD policy); JA614 (Army regulation providing that "HIV infected personnel are not eligible for appointment or enlistment").

Individuals with a disqualifying medical condition may generally request a waiver under DOD and Army policy, *see* JA525; JA1086-1087. In light of the policies above, and Army policy providing that "standards regarding the immune mechanism including immunodeficiencies will

9

not be waived," JA1088; JA431-432, however, additional steps would be required before accession could occur.  An individual with HIV would be required to obtain exceptions to these general policies from the appropriate authorities, which are different from those authorized to approve a waiver.  JA338-339; *see, e.g.*, JA1081 (describing "exception authority" under Army regulation).  The military has not granted any such exceptions to policy or waivers to individuals with HIV seeking initial accession in the past.  *See* JA431-432.

## B.    Procedural Background

The plaintiffs in this suit are three individuals (Isaiah Wilkins, Carol Coe, and Natalie Noe) and one organization (Minority Veterans of America) of which Wilkins and Coe are members.[1]  JA23-24; JA849; JA858; JA883; JA886.  The three individuals assert that they are HIV-positive, but that with a daily single-tablet regimen of antiretroviral medication, they are asymptomatic and their viral loads are undetectable.  JA851; JA883; JA887-888.  Coe and Noe assert that they were denied accession when attempting to enlist (or, in Coe's case, re-enlist after a period out of the military), while Wilkins was disenrolled

---

[1] Coe and Noe are pseudonyms.

10

at the U.S. Military Academy Preparatory School (USMAPS)—an

institution that trains and prepares candidates for matriculation to the

U.S. Military Academy—after his medical exam during entry processing

revealed that he was HIV-positive.[2]  JA850-851; JA883-884; JA886-887.

Coe and Noe seek to enlist, while Wilkins seeks to attend the USMAPS.

JA850; JA884; JA888.

Plaintiffs filed suit in the Eastern District of Virginia, alleging

that the DOD and Army policies regarding accession of HIV-positive

individuals discussed above violate the Fifth Amendment's Equal

Protection Clause and are arbitrary and capricious under the

Administrative Procedure Act (APA).  JA37-41.  Plaintiffs designated

their case as related to two prior challenges to HIV-related military

policies by HIV-positive individuals with undetectable viral loads.  In

those cases—known as *Harrison* and *Roe*—the plaintiffs challenged

policies related to the deployment and retention of service members who

contract HIV while already in military service.  The district court

granted summary judgment to the plaintiffs in each of those cases in a

---

[2] Wilkins was previously a member of the Georgia National
Guard, but separated from the National Guard after his initial
acceptance to USMAPS.  JA849-850.

single opinion, holding in both cases that the policies at issue were
unconstitutional under rational basis review and holding in *Roe* that
the policies were arbitrary and capricious under the APA.  *See Harrison
v. Austin*, 597 F.Supp.3d 884 (E.D. Va. 2022); *see also Roe v.
Department of Def.*, 947 F.3d 207 (4th Cir. 2020) (affirming preliminary
injunction issued in the *Roe* litigation on APA grounds).  After judgment
was entered, DOD and the military services changed their policies on
deployment and retention of individuals with HIV to comply with the
injunctive relief ordered.

The district court here—which had also adjudicated *Harrison* and
*Roe*—granted summary judgment to plaintiffs in this suit.  The district
court framed this case as an extension of *Harrison* and *Roe* that sought
"to eliminate the last major barrier to the full military service of
asymptomatic HIV-positive individuals with undetectable viral loads,"
JA1032, and stated "that the records from both *Harrison* and *Roe* are to
some degree, the law of the case," JA1033 n.3; *see* JA1051 n.12.

The district court acknowledged that the military's policies were
subject to "rational basis review," which includes "a powerful
presumption that the challenged classification is valid" and requires a

12

showing that "there is no rational relationship between the disparity of treatment and some legitimate governmental purpose." JA1050. And the district court stated that review of plaintiffs' APA claims proceeded under the same standard. JA1050.

The district court nevertheless concluded that none of the government's rationales survived this standard. The district court rejected arguments that the policies "are rationally related to promoting the health and readiness of the armed forces," viewing those arguments as having been "made and rejected" in the *Harrison* and *Roe* litigation. JA1051; *see* JA1051-1058. The district court also rejected the claim that the policies are rationally related to the military's "interest[] in respecting host nation laws and in maintaining a ready force of warfighters with unrestricted deployability." JA1061. The court found that this concern was not significant because the military "do[es] not defer to discriminatory host-nation laws, regulations, and restrictions relating to other historically marginalized groups, including women and LGBTQ+ individuals," JA1062, including laws regulating behavior and appearance, and concluded that it was therefore "irrational" for the

13

military to "defer to host-nation laws only with regard to asymptomatic HIV-positive individuals with undetectable viral loads," JA1065.

The district court also rejected the claim that "the increased financial burden of caring for an HIV-positive patient" relative to individuals without HIV is a rational basis for barring accession. JA1058 (alteration omitted). The court acknowledged that this argument was not at issue in *Harrison* or *Roe*. JA1058. But it asserted that the military was required to document these increased costs with record evidence, and held that there was no "admissible evidence" of "disproportionately higher financial costs." JA1060. The court also regarded as "more fatal" the fact that the military pays for health care for "service members' dependents living with HIV." JA1060. In the court's view, the fact that "civilians are not denied accession opportunities if their dependents are HIV positive" rendered concerns about greater costs "a non sequitur" because the military was willing to take on those costs for dependents. JA1060.

The district court issued a permanent injunction "(1) enjoining defendants from denying plaintiffs Wilkins, Coe, and Noe, and any other similarly situated asymptomatic HIV-positive individual with an

14

undetectable viral load, accession in the United States military based on their HIV status; [and] (2) enjoining defendants from enforcing the HIV-specific provisions of their policies and regulations . . . barring asymptomatic HIV-positive individuals with undetectable viral loads from accession into the United States military." JA1067; JA1070.

The district court also ordered the Secretary of the Army to "reevaluate the decision to remove Wilkins from his earned position at USMAPS." JA1066. The court acknowledged that Wilkins has passed the statutory maximum age for matriculation to West Point, *see* 10 U.S.C. § 7446(a), but believed that the age requirement could "not be used as a sword against Wilkins" to "exacerbate the harm he experienced from defendants' unlawful accessions ban," JA1066, and thus ordered that the Army reevaluate Wilkins' application "without regard to [his] age," JA1067.

## SUMMARY OF ARGUMENT

Under rational basis review, the fundamental question is whether the distinction the military draws between individuals with no medical conditions and individuals with HIV in making accession decisions reflects "a rational relationship between the disparity of treatment and

15

some legitimate governmental purpose." *Heller v. Doe ex rel. Doe*, 509

U.S. 312, 320 (1993). That standard is easily satisfied here. The

military seeks healthy individuals for accession because such

individuals may be deployed worldwide without health-related

restriction and present no known risks or additional strain on military

resources. Individuals with HIV—like the hundreds of other conditions

the military treats as disqualifying for accession—are meaningfully

different from healthy individuals on these metrics. Their deployability

is limited by the need to provide medication and related care for their

condition, their inability to perform certain tasks while deployed (or

risks they would pose to others if deployed in certain settings), and

foreign affairs considerations. They also incur known costs, as well as

possible future costs related to comorbidities and other issues. The

military may rationally decide that these differences warrant treating

individuals with HIV differently from healthy individuals for purposes

of accession.

The district court's contrary conclusion relied heavily on this

Court's decision in *Roe v. Department of Defense*, 947 F.3d 207 (4th Cir.

2020). But *Roe* addressed military policies governing the retention of

soldiers who contracted HIV after joining the military, not accession. The military applies different—and more relaxed—standards for retention because of the time and resources the military has invested in training the servicemember. *Roe* also acknowledged that individuals with HIV could not perform some tasks that healthy soldiers could perform and that the circumstances of deployment might render deployment of an individual with HIV inappropriate, confirming that the military can rationally distinguish between individuals with HIV and healthy individuals.

The district court also erred in multiple respects in its remedial analysis. It ordered the military to consider one plaintiff for admission to USMAPS even though that plaintiff exceeds the statutory age limit for admission to the U.S. Military Academy. 10 U.S.C. § 7446(a). District courts cannot use their equitable power to "disregard statutory and constitutional requirements," *INS v. Pangilinan*, 486 U.S. 875, 883 (1988), and there is no question here that the statutory age limit is valid.

In addition, the district court erred in extending its permanent injunctive relief to apply to non-parties in the absence of a certified

17

class action.  Both Article III and traditional principles of equity require that an injunction should be tailored to remedy the harm suffered by the plaintiffs, and an injunction limited to the plaintiffs would achieve that end without implicating any of the well-known problems with universal injunctive relief.

## STANDARD OF REVIEW

This Court reviews a grant of summary judgment "de novo, applying the same standard that the district court was required to apply." *Calloway v. Lokey*, 948 F.3d 194, 201 (4th Cir. 2020).

## ARGUMENT

## I.   The Military's Accession Policy Is Lawful Under Rational Basis Review

The military has long treated HIV as one among hundreds of disqualifying conditions for accession.  As explained further below, this policy is, at a minimum, rational because individuals with HIV are different from healthy individuals in multiple ways relevant to military service: their condition and need for continuous treatment limit their deployability, create additional logistical hurdles if they do deploy, and incur healthcare costs not present for healthy individuals.

As the district court recognized, the differential treatment between healthy individuals and individuals with HIV is subject to highly deferential review under the rational basis standard. JA1050; *see Doe v. University of Md. Med. Sys. Corp.*, 50 F.3d 1261, 1267 (4th Cir. 1995) (applying rational basis review to distinction based on HIV status). Under that standard a distinction in treatment will be upheld "if there is a rational relationship between the disparity of treatment and some legitimate governmental purpose." *Heller v. Doe ex rel. Doe*, 509 U.S. 312, 320 (1993). The standard is not demanding: "a classification must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification," and such classifications "may be based on rational speculation unsupported by evidence or empirical data." *Id.*

Under this standard, the defendant has no burden to produce evidence supporting a policy; instead, the plaintiff bears the heavy burden "'to negative every conceivable basis which might support'" the policy, "whether or not the basis has a foundation in the record." *Heller*, 509 U.S. at 320-21 (quoting *Lehnhausen v. Lake Shore Auto Parts Co.*, 410 U.S. 356, 364 (1973)). Moreover, a policy survives rational basis

19

review "even when there is an imperfect fit between means and ends" and even if it "'is not made with mathematical nicety" or "results in some inequality." *Id.* at 321 (quoting *Dandridge v. Williams*, 397 U.S. 471, 485 (1970)). And here, that already-deferential standard is being applied in the context of "'complex, subtle, and professional decisions as to the composition, training, equipping, and control of a military force,' which are 'essentially professional military judgments'" entitled to respect. *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) (quoting *Gilligan v. Morgan*, 413 U.S. 1, 10 (1973)); *see Goldman v. Weinberger*, 475 U.S. 503, 507-08 (1986).

Plaintiffs contend, and the district court held, that it is irrational for the military to treat certain individuals with HIV—namely, those who are asymptomatic and have an undetectable viral load through antiretroviral medication—differently from healthy individuals who are receiving no treatment for any condition. That conclusion disregards the military's interest in denying accession to individuals with known medical conditions and applies a far more demanding standard of review that bears no resemblance to rational basis review. The judgment should be reversed.

20

## A.      Denying Accession to Individuals With Disqualifying Medical Conditions, Including HIV, Rationally Advances Military Interests

1.  The military seeks healthy people to join its ranks.  The reasons for that requirement are obvious.  The military's primary purpose is to prepare for and win military conflicts.  The military "cannot be ready to deploy, fight, and win our Nation's wars without recruiting and retaining high quality, physically fit, medically qualified soldiers who can deploy, fight, and win decisively on any current or future battlefield."  JA336.  In particular, the military is required to prepare for a range of possible conflicts—not solely operations against low-level insurgencies, as in recent conflicts in Afghanistan and Iraq, but also a large-scale conflict with a near-peer military, such as China. The military's accession policies thus "are not based solely on medical conditions experienced in current or past conflicts," but instead "take into account health and medical fitness concerns that may be posed by potential future conflicts."  JA337; JA318.

In the event of such a conflict—or any significant military operation—the military seeks to ensure that soldiers can be rapidly deployed to high-stress environments or combat operations with

minimal complications or delays. That can include deployment to

forward operating positions or other locations where resupply or

medical treatment is unreliable or challenging because of enemy action,

remoteness, or other reasons. Medical conditions may limit a soldier's

ability to deploy to certain locations because of these logistical concerns,

may impose additional logistical burdens during a deployment, or may

limit the tasks or types of roles a particular soldier can fill. Accession

policy thus emphasizes that prospective members of the military should

be "[m]edically adaptable to the military environment without

geographical area limitations." JA525. The military's body tasked with

developing medical accession standards—the Accession and Retention

Medical Standards Working Group—similarly considers, among other

factors, whether "personnel are capable of operationally performing

with the best physical and medical outcomes" and are "capable of

completing training and maintaining worldwide deployability." JA313.

In making accession determinations, the military also considers

the long-term risks and consequences of accession of individuals with

medical conditions. DOD policy thus provides that prospective

members of the military should be "[f]ree of medical conditions or

22

physical defects that may reasonably be expected to require excessive time lost from duty for necessary treatment or hospitalization, or may result in separation from the Military Service for medical unfitness." JA524. And that judgment takes into account not only the current status and severity of a particular medical condition, but also "how an individual's medical condition may progress over time." JA337; JA318-319. Even a condition that is currently mild or well-controlled may become more severe or lead to other complications in the future, such as side effects from treatments or potential comorbidities. JA318-320.

Moreover, because the military provides health care for all soldiers, taking on individuals with known health conditions inevitably increases the military's costs for providing care, placing an additional burden on military resources. JA322. The military thus also takes into account ensuring a "cost-efficient force of healthy members in service." JA313. That additional expenditure of resources continues after a soldier separates from military service, as former servicemembers are entitled to health care after separation.

Finally, infectious diseases present additional concerns. Infectious diseases by definition affect the health of not only the

particular servicemember with the condition, but also present a risk of transmission to other servicemembers, affecting their capacity for and effectiveness in continued military service. DOD policy thus recognizes that persons seeking accession should be "[f]ree of contagious diseases that may endanger the health of other personnel." JA524.

2. As these points illustrate, the military's interest in ensuring that people who join are healthy furthers a "legitimate governmental purpose." *Heller*, 509 U.S. at 320. And it should be beyond dispute that, as a general matter, the distinctions the military draws between healthy individuals and individuals with preexisting medical conditions for purposes of accession are rational. Individuals with high blood pressure, ADHD, hepatitis, or hundreds of other medical conditions are not similarly situated to healthy individuals when it comes to accession to the military. Individuals with no preexisting health conditions are readily deployable abroad; present no obvious risks to themselves or their fellow soldiers; have no special logistical requirements that could limit their deployability or the performance of their duties once deployed; and place no unique burdens on the military's resources and operations during or after their military service.

24

HIV is no different from other conditions in this regard, even with respect to asymptomatic individuals with an undetectable viral load. An individual with HIV differs from a healthy individual in multiple respects relevant to military service.  To maintain their asymptomatic and undetectable status, the person must take antiretroviral medication daily.  JA797-798.  The need for medication affects the military's ability to deploy that individual.  "The availability of medical assets in deployed settings varies widely and is dependent on the resources available in the particular deployed setting and the current pace of military operations," and "medical and supporting logistical resources" are generally "more limited the closer a military position is to active combat."  JA422.  "Forward military positions" generally have "less access to pharmacy capabilities," and "far forward positions close to front lines" have "minimal or no access to mail-order pharmacy or other resupply."  JA423.  In addition, "[e]ven in more established areas of operation, pharmacies must often be limited to common medications for operational reasons including mobility needs and the cost of maintaining pharmacy supplies."  JA423.  And, of course, even existing supplies of medication—or medication already issued to a soldier—can

25

be lost or destroyed during military operations or in transit by an enemy intent on striking supplies.  JA423.

Similarly, an individual with HIV must also have recurrent viral load testing, at periods of time ranging from every three months to annually.  JA420; JA674.  Such testing may not be readily available where a particular individual would be deployed, and "[i]t is not possible to send out products or people for laboratory testing from certain locations or under certain circumstances due to potential mission operation tempo, safety or logistical concerns."  JA422.  For example, in recent conflicts in Iraq and Afghanistan, blood samples requiring testing often had to be shipped to laboratory facilities outside the theater of operations, creating delays "of two to four weeks for results depending on the location of the forward military position from which they were being sent."  JA422.

The need to supply medication, provide testing, and address any follow-up medical treatment would thus place additional burdens on military resources in a deployment as compared to a healthy individual, requiring the devotion of time, energy, and resources to ensuring that medication is provided and resupplied and that any necessary blood

26

samples are collected, transported for testing at an appropriate facility and by appropriately trained personnel, and results delivered in a timely manner. In some circumstances that could require locating the individual as their unit is moved in fluid military conditions or evacuating an individual to receive appropriate testing or care—again with corresponding distraction from other aspects of the military mission. And those logistical burdens would be especially acute in a conflict with a near-peer military, such as China. Compared to recent conflicts, such adversaries may have greater ability to disrupt military supply chains and to contest air superiority, control of the seas, or other means of resupply. JA423-424.

HIV's status as a transmissible disease creates additional distinctions between individuals with HIV and healthy individuals, particularly by limiting the types of tasks those individuals can perform and limiting the circumstances in which they can be deployed. Generally, deployed soldiers must be prepared to donate blood directly to other soldiers through an emergency blood collection system known as the "walking blood bank." JA341. Through that system, fellow soldiers donate blood to wounded comrades in circumstances where

27

blood pre-screened for bloodborne diseases is unavailable. JA342.

Hospital facilities with pre-screened blood may not be available,

supplies of pre-screened blood may rapidly dwindle in a mass-casualty

situation, or a particular soldier's injuries may lead to rapid blood loss

and the need for immediate transfusions before the soldier can reach a

facility with pre-screened blood. JA341-343. Thus, the walking blood

bank is of particular importance for injuries "near the front lines, or in a

small unit" where "immediate transfusion is necessary and must be

provided quickly by whoever is nearby." JA344. During recent

operations in Iraq and Afghanistan, over 6,000 such transfusions were

performed, and the military expects that more would be necessary in

future large scale combat operations. JA342-343. And here, too, the

need for the walking blood bank would be likely to increase in a near-

peer conflict where transporting blood and other medical supplies may

be more difficult given enemy operations or potential air superiority.

JA345; JA430-431.

Unlike healthy soldiers, individuals with HIV cannot participate

in the walking blood bank. Although the precise risk of transmission

through blood transfusion for individuals with undetectable viral loads

28

is not known, that risk "remains substantial." JA427. That a viral load

is "undetectable" does not that mean no HIV is present in the

individual's blood, and a unit of donated blood could contain "between

250 and 5,000 copies of HIV," rendering transmission feasible. JA430.

Current FDA guidance thus states that individuals who have ever

tested positive for HIV should not donate blood. JA398; JA344 n.3. In

accord with this guidance, soldiers with HIV are generally forbidden by

the military from donating blood. JA344. That inability to donate

would increase "risk to the [soldier's] unit" by reducing the available

blood supply in emergent situations. JA430. In addition, the military

has to account for risks created by the fact that orders are not

invariably followed; under pressure, soldiers may forget or even

disregard orders to avoid disclosing their HIV status or in light of

emergent conditions, thus risking transmission to their fellow soldiers.

JA429; JA320-321.

Individuals with HIV also present unique risks and challenges

associated with combat medical care that may affect the ability of those

around them to carry out their duties. For blood-to-blood exposure in a

medical or other occupational setting, "an undetectable serum viral load

does not eliminate the possibility of HIV transmission," and the CDC therefore recommends immediate post-exposure prophylactic treatment for individuals exposed to the blood of an HIV-infected person via a percutaneous injury (*e.g.*, a needle stick or other skin-piercing injury). JA699. And the risk of transmission from such injuries in the context of combat medical care is likely substantially greater than in civilian settings. Combat medical care can involve severe wounds with "substantially greater volumes of blood" than in civilian contexts and that may include embedded shrapnel or broken (and thus sharp) bones. JA427-428. In addition, combat medical care can be provided by first-responder fellow soldiers or others in high-intensity settings, and those individuals may have limited ability to take pre-exposure or post-exposure precautions usually available in civilian hospital settings and who may themselves suffer from cuts, abrasions, or other injuries. JA428-429; *accord* JA319.

If a soldier has suffered potential blood-to-blood exposure through combat medical care, military practice and CDC guidance would require that the soldier be offered a preventative course of antiretroviral medication, along with regular testing for a period thereafter. JA699;

30

JA428-429. "In most instances, this would require removal of a soldier from the field to obtain the appropriate testing" at a medical facility with testing capabilities, which could "significantly degrade mission performance . . . particularly for small units." JA429. And "if the person needing to be removed was a combat surgeon or other medical caregiver, that could limit the ability to provide medical care to other wounded service members." JA429.

All of these concerns would persist regardless of whether an individual who is deployed has managed to maintain an undetectable viral load during their deployment. But they are substantially increased if an individual experiences viral rebound while deployed because of lost or destroyed medication (whether through hostile action or error) or inconsistent adherence under the high-stress circumstances of overseas military operations. "An increased viral load results in an increased ability to transmit HIV infection via blood exposure, blood transfusion, and sexual contact." JA425.

The military also may properly take into account uncertainties about HIV. For example, there is no guarantee that an individual who has successfully achieved an undetectable viral load in civilian life will

31

be able to maintain adherence to medication in the unique environment of military service, much less under the stresses of a deployment to a combat zone or other theater of operations. "[I]ndividuals on such deployments may be involved in near-constant movement, and deployed service members may have little sleep, high stress, and highly irregular daily activities," which may "make it more likely that an individual would forget to take their daily medication or otherwise fail to maintain strict adherence" to their medication. JA424-425. Similarly, there is no available research about "[t]he effects of a high stress setting such as on a military deployment on an HIV infection," though generally "high stress settings have a known negative effect on viral and bacterial infections" such as herpes, shingles, mononucleosis, and tuberculosis. JA425; JA322. In addition, some commonly-used regimens of antiretroviral medication "are associated with bone mineral density loss, renal dysfunction, weight gain, and increased lipid profiles," though the implications of these findings are presently unknown. JA417-418; *see* JA321-322. The military is not required to make itself a testing ground for these concerns.

32

The combined effect of these considerations is to put the military to choices it does not face with healthy individuals. Deploying individuals with HIV to certain postings would require the military to accept risks of mission degradation or transmission. The military would thus be required to choose between running those risks or limiting the deployment of individuals with HIV to areas where such issues are less likely to arise.

Individuals with HIV are different from healthy individuals along other axes as well. For one, individuals with HIV impose costs on the military that are not incurred by healthy individuals. The military pays for testing and other screening costs related to accession, medical care for soldiers during service, and after military service a veteran may receive disability payments or other benefits. JA322. It is self-evident that medical care—including antiretroviral medication and testing—costs money, and that care for comorbid conditions developed after accession would also cost money. *See Heller*, 509 U.S. at 320 (explaining that classifications "may be based on rational speculation"). Indeed, although the parties dispute whether specific evidence of these costs is properly before the Court, *see infra* pp. 53-57, there is no

33

dispute that the military must pay for the costs of antiretroviral medication and testing for members of the military, and plaintiffs' statement of undisputed facts repeats a prior estimate from the Department of Defense that "antiretroviral therapy costs between $10,000 and $25,000 per person annually." JA751. Those considerations illustrate that individuals with HIV are not similarly situated to individuals without HIV in creating a "cost-efficient force of healthy members in service." JA313.

Finally, HIV implicates unique foreign affairs concerns. U.S. military forces abroad are generally dependent on the consent or invitation of a host nation for their continued presence. Many of those host nations have their own laws on a range of issues—such as alcohol, pornography, or other matters—that are more restrictive than U.S. law, and the military generally "respects those laws" to "preserve amicable relations between the United States and host nations." JA435; *see* JA440-447 (Central Command policies regarding alcohol, gambling, pornography, and other matters). Several nations that host U.S. military forces, such as Kuwait, have laws that restrict or prohibit the entry or presence of individuals with HIV. JA436, JA437. Violating

34

those prohibitions would not only put the service member at risk of deportation, denial of medical treatment, or other consequences, but also damage the host nation's trust and potentially threaten the U.S. military's future presence and operations in that country. JA437. Military deployment policies thus generally recognize that deployment of individuals with HIV is "dependent on host nation requirements." JA437; JA515. Again, no concerns of this type are presented by healthy individuals who seek to join the military.

As these considerations demonstrate, individuals with HIV are meaningfully different from healthy individuals seeking to join the military in multiple respects. Their deployability is limited by the need to provide medication and related care for their condition, their inability to perform certain tasks while deployed (or risks they would pose to others if deployed in certain settings), and foreign affairs considerations. They also incur known costs, as well as possible future costs related to comorbidities and other issues. None of that is true of healthy individuals. That is more than sufficient to demonstrate that the military's denial of accession to persons with HIV reflects "a

35

rational relationship between the disparity of treatment and some legitimate governmental purpose." *Heller*, 509 U.S. at 320.

## B. The District Court's Contrary Conclusion Was Erroneous

Despite the distinctions articulated above, the district court held that the Constitution requires the military to accept asymptomatic HIV-positive individuals with an undetectable viral load. That conclusion rested on a series of errors that misinterpreted this Court's prior precedent and departed from the basic premises of rational basis review. Moreover, if this Court were to endorse the district court's reasoning, it would suggest that the Constitution bars the military from declining to accept individuals with a host of other health conditions beyond HIV.

### 1. This Court's decision in *Roe* underscores the error of the district court's analysis

The district court largely rejected these rationales based on this Court's prior affirmance of a preliminary injunction in *Roe v. Department of Defense*, 947 F.3d 207 (4th Cir. 2020), and the district court's own eventual resolution of the *Roe* litigation and a parallel suit. The district court stated that many of "the scientific and medical issues"

the military raised had already "been resolved" in those cases, including

rejecting arguments that "the military's HIV policies are rationally

related to promoting the health and readiness of the armed forces."

JA1051.  And for each rationale, the district court drew express

comparisons to the decision in *Roe*.  *See* JA1051-1057.

That approach fundamentally misunderstands the posture and

reasoning of this Court's decision in *Roe*.  There, two active-duty Air

Force airmen who contracted HIV after joining the Air Force challenged

a combination of military policies that led to their discharge.  After

their diagnosis, plaintiffs were referred to the military's Disability

Evaluation System to determine whether they could continue to serve.

*Roe*, 947 F.3d at 214, 216-17.  Although Air Force policies generally

allowed HIV-positive airmen to continue serving, the Disability

Evaluation System recommended that plaintiffs be discharged because

they could not be deployed to the Central Command area of

responsibility, which covers Iraq, Afghanistan, and other areas.  *Id.* at

215-16.  Then-effective Central Command policy generally precluded

deployments by HIV-positive service members, and because "[e]ighty

percent of all Air Force deployments" at the time were to Central

37

Command, and the plaintiffs were in positions with relatively high deployment rates, the military determined that they should be discharged. *Id.* at 215-17. The *Roe* plaintiffs brought APA and Fifth Amendment challenges to the military's discharge decisions, and the district court entered a preliminary injunction on both APA and constitutional grounds barring their discharge because "they are classified as ineligible for worldwide deployment or deployment to the [Central Command] area due to their HIV-positive status." *Id.* at 217.

This Court affirmed the preliminary injunction solely on the ground that the plaintiffs were "likely to succeed on their claim that the deployment policies at issue violate the APA because the Government has not—and cannot—reconcile these policies with current medical evidence." *Roe*, 947 F.3d at 220; *see id.* at 225 n.3 (declining to consider the plaintiffs' "equal protection claim"). This Court held that to the extent the military had a categorical ban on deployments by HIV-positive individuals to Central Command, the military had "fail[ed] to offer an explanation that is reconcilable with the scientific and medical evidence available to it" and thus "did not comply with the APA in promulgating this policy." *Id.* at 225. Specifically, the Court believed

38

that the military had "fail[ed] to account for current medical literature and expert opinion about current HIV treatment and transmission risks." *Id.* at 226. The Court held that the military's various rationales—including the risk of transmission through battlefield medical care or blood transfusions, the need for treatment, or the risks of disruption of that treatment—did not support a "categorical ban" on deployment. *Id.* at 226-28. Instead, the servicemembers were entitled to "an individualized determination" under military policies about deployment that would consider "the climate, altitude, nature of available food and housing, availability of medical, behavioral health, dental, surgical, and laboratory services, or whether other environmental and operational factors may be hazardous to the deploying person's health." *Id.* at 223.

*Roe* thus addressed the retention of servicemembers who contract HIV after joining the military, not accession. *See* JA1046 (acknowledging that "the validity of the accessions bar" was "not presented" in *Roe*). The military treats decisions about retention differently from decisions about initial accession. As discussed, accession standards reflect the military's desire to have healthy

39

individuals without deployment restrictions or "known medical risks" join its ranks.  JA313.  The health standards for retention address different considerations.  Those standards are set forth in a separate volume of military policy and are generally less strict than the standards for accession.  JA312; *see* Department of Defense Instruction 6130.03, vol. 2, *Medical Standards for Military Service: Retention* (June 6, 2022).[3]  Many conditions that are disqualifying for accession—such as diabetes, high blood pressure, food allergies, sleep apnea, and ADHD—do not automatically require separation from the military if developed after accession.  *See id.* at 31 (diabetes); *id.* at 26 (high blood pressure); *id.* at 30 (allergic reactions (anaphylaxis)); *id.* at 35 (sleep apnea); *id.* at 36 (behavioral health conditions, including ADHD).

That differential treatment is itself rational: the more relaxed standards for retention "reflect[], in part, that at the 'retention' stage the military has already invested time and resources into the service member."  JA312.  Military careers can span decades, and soldiers may develop health conditions over the course of their service.  The military

---

[3] https://www.esd.whs.mil/Portals/54/Documents/DD/issuances/dodi/613003_vol02.PDF.

is thus willing to relax its medical standards to some degree to retain
soldiers who have "demonstrated a level of performance" and whom the
military has spent months or years preparing for their current roles.
JA312.  In addition, already-serving soldiers are in the military
healthcare system, giving the military full visibility into the soldier's
health and progression over time, while at the accession stage "the
military has no present relationship with the applicant and must rely
on information obtained from external sources (*e.g.* civilian medical
records)."  JA312-313.

   This Court's decision in *Roe*—and the district court's subsequent
permanent injunction in that case—did not require or suggest that
individuals with HIV must be treated the same as healthy individuals
for purposes of deployment or retention decisions.  This Court instead
emphasized the military's failure to conduct "an individualized
determination" about deployability under military procedures that
would consider the appropriateness of deployment given the medical
condition and circumstances of the contemplated deployment.  947 F.3d
at 223; *see* JA491, JA494-495, JA510-511 (Central Command
instructions addressing deployability determinations).  Thus, under the

41

final judgment that followed from *Roe*, the military retains discretion to decline to deploy individuals with HIV to certain postings based on concerns related to their HIV status. *See* JA1077 (providing that servicemembers with HIV "are not non-deployable solely for the reason that they are HIV-positive" but that "[d]ecisions on the deployability of covered personnel will be made on a case-by-case basis and must be justified by the Service member's inability to perform the duties to which he or she would be assigned"); JA421 (explaining that certain deployments may not be appropriate for servicemembers with HIV); JA437 (noting that some deployment waivers for individuals with HIV have been denied based on host country restrictions).

*Roe* thus does not undermine the basic point that there are material differences between individuals with HIV and healthy individuals. *Roe* instead confirms that individuals with HIV do not meet the basic criteria the military has identified as essential to accession: that persons joining the military should be capable of unrestricted deployment worldwide, do not have health conditions that may lead to a degraded ability to perform their duties, contribute to a

42

cost-effective fighting force, and be free of infectious diseases that could affect other soldiers.

The district court's failure to appreciate these distinctions riddled its factual and legal analysis. The district court repeatedly drew comparisons between individuals who develop health conditions *after* joining the military with individuals who already have health conditions *before* they join the military. The court concluded, for example, that concerns about transmission through blood transfusions were not relevant because "service members who test positive for HIV are ordered not to donate blood," JA1053 (quoting *Roe*, 947 F.3d at 227), dismissed concerns about treatment needs or insufficient adherence to medication because antiretroviral medications "have no special storage requirements" and soldiers could be provided with "several months' worth" of medication in advance "as the military does for servicemembers deploying with other chronic but managed conditions," JA1052 (quoting *Roe*, 947 F.3d at 226-27), and asserted that risks of transmission through medical care are low, JA1055-1056. But as discussed, the salient point is that at the accession stage the military may rationally prefer healthy individuals who present none of these

43

considerations over individuals with health conditions that limit their ability to deploy or participate in activities expected of other healthy soldiers, or create risks of transmission to others (even if low).  All of those distinctions reflect a "rational relationship between the disparity of treatment" and the "legitimate governmental purpose" of seeking healthy individuals to join the military.  *Heller*, 509 U.S. at 320.

The district court did not hold or suggest that criteria the military has identified are not legitimate governmental purposes.  Nor could the district court have reached such a conclusion: not only is the military's decision to prioritize those considerations reasonable on its own terms, the military's judgment reflects precisely the sort of "'complex, subtle, and professional decisions as to the composition, training, equipping, and control of a military force,' which are 'essentially professional military judgments'" entitled to deference.  *Winter*, 555 U.S. at 24 (quoting *Gilligan*, 413 U.S. at 10).  As this Court has recently reiterated, respect for those judgments is warranted given the judiciary's relative lack of expertise with "day-to-day military operations" and lack of "the tactical skills of a Major General" or "the

44

logistical talents of a Sargeant Major." *Dorado-Ocasio v. Averill*, __

F.4th __, 2025 WL 478406, at *7 (4th Cir. 2025).

### 2. The district court erred in its treatment of issues not addressed in *Roe*

Although the considerations outlined above are alone sufficient for

the military's accession policy to satisfy rational basis review, the

district court also erred in its treatment of additional rationales for the

military's policy that were not at issue in *Roe*. Specifically, *Roe* did not

address in detail the military's concerns with respecting host nation

laws, *see* 947 F.3d at 226, and did not consider concerns about increased

costs for medical and post-separation care, *see* JA1058. The district

court's treatment of these issues misapplied fundamental principles of

rational-basis review in multiple respects.

a. Some of those errors mirror the district court's other mistakes.

For example, with respect to the military's foreign relations concerns,

the district court noted that in *Roe* this Court stated that it was not

clear "whether the laws of host nations 'appl[y] to both military

servicemembers and civilians' or whether 'the inability to enter one

nation would preclude deployment to the entire area.'" JA1061-1062

(quoting *Roe*, 947 F.3d at 225-26). That simply rehashes the district

45

court's failure to appreciate the differences between accession and retention policies; whether or not individuals with HIV could be deployed to some countries, the salient point is that individuals without HIV have no comparable restrictions on their deployability.

The district court acknowledged that the military has declined to deploy current servicemembers with HIV to countries that bar entry of such individuals, but believed that the military is constitutionally required to disregard those concerns because it does not "defer to discriminatory host-nation laws, regulations, and restrictions relating to other historically marginalized groups, including women and LGBTQ+ individuals," as well as "non-Muslims," none of whom are precluded from accession.  JA1062, JA1064.  But none of those groups are barred from entering or being present in those countries; the district court instead noted laws regulating "specific behaviors, ways of dressing, or speech."  JA1063; *see* JA1064 (noting laws against "same-sex relations" and prohibiting "the public practice of religions other than Islam").[4]  Those regulations do not preclude deployment to such

---

[4] In addition, to the extent the district court believed that host nation laws on these or other topics are disregarded, soldiers deployed

*Continued on next page.*

nations altogether, and thus are not comparable to a prohibition on the mere entry or presence of an individual with a health condition, particularly an infectious disease.

The district court committed the same errors in addressing the extra costs individuals with HIV impose on the military. The court acknowledged that "cost-reducing decisions have been found to constitute a rational basis for government conduct." JA1059; *see Armour v. City of Indianapolis*, 566 U.S. 673, 682-84 (2012). The court nevertheless concluded that such concerns were irrelevant because "the military's accession policy permits civilians to enlist in the military even when their dependents require HIV-related health care that is provided by DoD." JA1060-1061. The district court did not explain why it is irrational for the military to treat direct costs incurred by servicemembers—including costs incurred after those individuals leave military service—differently from care provided to dependents. The

---

to Central Command are restricted in their religious activities to respect local religious practice, *see* JA447-448, and are instructed to "become familiar with and respect the laws, regulations, and customs of their host nation to the extent host nation and local laws, regulations, and customs do not interfere with the execution of official duties," JA447.

military does not generally seek information about the health status of dependents (which not all soldiers have upon accession), and in any event those dependents may have or acquire other healthcare coverage, may age out of coverage, and do not incur post-separation financial obligations.

More generally, the district court's apparent view that the military's rationales were underinclusive is an especially weak basis on which to question the accession policy. A policy survives rational basis review "even when there is an imperfect fit between means and ends" and even if it "'is not made with mathematical nicety" or "results in some inequality." *Heller*, 509 U.S. at 321 (quoting *Dandridge*, 397 U.S. at 485). Policymakers generally have "leeway to approach a perceived problem incrementally," and such line-drawing "inevitably requires that some persons who have an almost equally strong claim to favored treatment be placed on different sides of the line, and the fact [that] the line might have been drawn differently at some points is a matter for legislative, rather than judicial, consideration." *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 315-16 (1993) (quoting *U.S. R.R. Ret. Bd. v. Fritz*, 449 U.S. 166, 179 (1980)); *accord Williamson v. Lee Optical of*

48

*Okla., Inc.*, 348 U.S. 483, 489 (1955). That deferential approach is even more appropriate with respect to line-drawing and policy judgments made by the military because "[m]atters intimately related to foreign policy and national security are rarely proper subjects for judicial intervention," as such matters are "exclusively entrusted to the political branches." *Haig v. Agee*, 453 U.S. 280, 292 (1981) (quoting *Harisiades v. Shaughnessy*, 342 U.S. 580, 589 (1952)).

b. The district court also erred by insisting that some of the government's rationales failed because the government had not provided "admissible evidence" demonstrating, for example, "that the accession of some unidentifiable number of asymptomatic HIV-positive individuals with undetectable viral loads would produce 'disproportionately higher financial costs.'" JA1060. As discussed, under rational basis review a classification "may be based on rational speculation unsupported by evidence or empirical data," and it is the *plaintiff*'s burden to "negative every conceivable basis which might support'" the policy, "whether or not the basis has a foundation in the record." *Heller*, 509 U.S. at 320-21.

49

The district court did not dispute the common-sense proposition that individuals with HIV have greater health-care costs than healthy individuals. Nor could it have. Healthcare is not costless, and an individual who requires more healthcare services—such as antiretroviral medication, regular blood tests, and subsequent care for any comorbid conditions that develop—will inevitably incur more costs. That is far more than "rational speculation." *Heller*, 509 U.S. at 320. Indeed, far from providing evidence to "negative" this "basis" by proving that individuals with HIV would incur no additional costs, plaintiffs expressly acknowledged these costs: their own statement of undisputed facts recited estimates the district court previously relied on that antiretroviral medication alone costs between $10,000 and $25,000 per individual per year. JA751; *see Harrison v. Austin*, 597 F. Supp. 3d 884, 913-14 (E.D. Va. 2022).

The district court believed that it could disregard this principle of rational basis review by relying on *Plyler v. Doe*, 457 U.S. 202 (1982), which applied a heightened form of scrutiny, asking whether a classification "furthers some substantial goal of the State" and inquiring into "evidence in the record" supporting claims of increased

50

costs. *Id.* at 224, 228; *see* JA1060. As the Supreme Court subsequently made clear, however, the heightened scrutiny applied in *Plyler* has generally been "applied only in cases that involved discriminatory classifications based on sex or illegitimacy," and the Supreme Court has thus never "extended [*Plyler*'s] holding beyond the unique circumstances that provoked its unique confluence of theories and rationales." *Kadrmas v. Dickinson Pub. Schs.*, 487 U.S. 450, 459 (1988) (citations and quotation marks omitted). The district court gave no explanation for extending *Plyler*'s more searching review here. It did not conclude, for example, that the accession policy reflected a classification "based on sex or illegitimacy." *Id.* Nor did the district court apply this Court's precedent treating such a classification as subject to ordinary rational basis review. *See Doe*, 50 F.3d at 1267; JA1054 n.13.

In any event, many of the relevant facts are not in dispute. It is undisputed, for example, that individuals living with HIV must take medication at least daily, must be regularly tested, and must maintain adherence to their medication regimens to maintain viral suppression. The military has also relied on FDA and CDC guidance—which

51

plaintiffs do not dispute—stating that individuals with HIV cannot donate blood and that caregivers exposed to potential blood-to-blood transmission should receive swift prophylactic care. Those facts alone provide a sufficient basis to support an accession policy that distinguishes between at individuals with HIV and healthy individuals.

The district court's criticisms about a lack of evidence of increased costs ring especially hollow given that the government did, in fact, provide such evidence. In 2022, DOD convened a working group to consider, *inter alia*, whether changes to the military's accession policy for HIV might be appropriate. JA323. That working group formulated and considered cost estimates for the care of individuals with HIV in military service. It noted that on average, the military spent $2,537 on health care annually for a service member without HIV, while it spent an average of $15,654 annually on health care for a service member with HIV. JA326. The working group also gathered information about past payouts for disability benefits to HIV-positive servicemembers. JA327. Taking into account those costs, as well as costs related to accession and increased blood testing during service, the working group concluded that each new HIV-positive servicemember would cost

52

approximately $153,000 per year more than a new servicemember without HIV. JA328. The working group memorialized these cost estimates in its internal reports, which were produced to plaintiffs in this litigation. *See* JA947, JA985.

The district court excluded this evidence of costs on the theory that the person who provided it was not qualified as an expert on "economics or statistical analysis" qualified under Federal Rule of Evidence 702. JA932-933; *see* JA938; JA1059 n.16. That was mistaken on multiple levels. To begin, the declaration attached tables of costs "created by or for the working group." JA323. Those tables were taken directly from the working group's memoranda, and those memoranda were themselves admissible under Federal Rule of Evidence 803(8) as government records. *Compare* JA330-334, *with* JA956, JA957, JA970, *and* JA991, JA995; *see United States v. Vidacak,* 553 F.3d 344, 351 (4th Cir. 2009) (concluding that government records fell within Fed. R. Evid. 803(8) without any "foundational testimony" because "they were created by the [agency] to memorialize its activities"). Thus, there was admissible evidence of the military's costs associated with HIV care, regardless of whether the declarant who attached those tables was

qualified as an expert.  The district court did not address this issue in its oral ruling excluding these portions of the declaration.

The rationale the district court offered for excluding the information was also faulty.  Generally, witnesses can testify to facts within their personal knowledge, *see* Fed. R. Evid. 602, and a witness may offer opinion testimony rationally based on his perception if it is helpful to understand his testimony or to determine a fact in issue, Fed. R. Evid. 701.  Rule 702, by contrast, requires the qualification of expert witnesses who "come[] to the case as a stranger," as well as qualification of hybrid fact-expert witnesses to the extent they seek to provide "*additional*" scientific, technical, or specialized testimony developed "for purposes of trial."  *Downey v. Bob's Disc. Furniture Holdings, Inc.*, 633 F.3d 1, 7, 8 n.5 (1st Cir. 2011).

Information about the working group's estimates was comfortably within Rule 701's provision for lay opinion testimony.  The declarant who reported the working group's estimates—Dr. Paul Ciminera, the military's Program Director for Medical Accessions and Retention Policy, JA310—served as the working group's Action Officer, and thus had firsthand knowledge of the cost estimates the working group

54

reviewed.  JA323.  Dr. Ciminera's testimony was thus based on his first-hand percipient knowledge of the estimates the working group received and created.  As this Court has explained, such lay opinion testimony is admissible because it "arise[s] from the personal knowledge or firsthand perception of the witness."  *Lord & Taylor, LLC v. White Flint, L.P.*, 849 F.3d 567, 575 (4th Cir. 2017); *see id.* at 575-76 (allowing witness to testify about likely costs of a commercial renovation despite not being qualified as an expert); *MCI Telecomms. Corp. v. Wanzer*, 897 F.2d 703, 706 (4th Cir. 1990) (similar).  And courts have likewise recognized that such testimony is admissible even where the witness is relying on materials prepared by others.  *See Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1175 (3d Cir. 1993) (allowing lay testimony relying "on the reports of an accountant").

In any event, plaintiffs' own expert acknowledged that individuals with HIV would incur greater healthcare costs than healthy individuals, though he disputed the magnitude of those costs.  Specifically, plaintiffs' expert acknowledged that "the cost of eliminating the accessions bar would . . . not be zero," JA1160; *accord* JA1163; and accepted that he had no "basis to disagree" with the

55

assessment that "DOD's per person healthcare costs are higher for HIV positive individuals than non-HIV positive individuals," JA1170-1171. There was thus no basis for the district court to reject out of hand the obvious fact that healthcare costs for an individual with HIV are greater than healthcare costs for a healthy individual.

c. A few final aspects of the district court's reasoning deserve note. As discussed, hundreds of conditions are disqualifying for accession, many of which may be managed by medication or other interventions. The district court's ruling here effectively concludes that the Constitution requires the military to take a more lenient approach to individuals with HIV than to individuals with numerous other disqualifying medical conditions, including many that present no risk of transmission. That is troubling on its own terms. But it is far from clear that the district court's rationale can be cabined to HIV. Other conditions that can be managed by daily medication that lacks special storage requirements—high blood pressure, asthma, or various mental health conditions, to name just a few—would be equally suspect under the district court's flawed analysis. After all, an individual who develops those conditions may be able to be retained in military service

56

and even deploy in some circumstances, and any cost rationale would, on the district court's view, fail if treatment is provided for that condition to military dependents.  It would be startling, to say the least, to discover that the Constitution precludes the military from declining to accept individuals with many pre-existing health conditions into military service.

The district court appears to have been untroubled by the expansive ramifications of its reasoning because it viewed decisions about the appropriate composition of the military as within the court's province.  The court closed its opinion by announcing its view that the military's accession policy "hamper[s] the military's own recruitment goals" given the court's belief that "each of the military branches will miss their recruiting targets this year."  JA1068.  Those observations followed earlier comments at hearings about the military's recruitment standards, the needs of the military in modern warfare, and the court's view of the appropriate balance of risks of transmission during deployment.  *See* JA942-943 (describing missed "recruitment quotas," stating that "it's no longer the same old battlefield" and "more and more military action is being done by cyber attacks, by drones," rendering it

57

"very problematic that this group of people who want to serve are being kept out," and downplaying risks of transmission through blood transfusions because "I think if you ask the wounded person, they would rather have HIV that can be controlled rather than die"); JA1200-1201 (stating that the "enlistment crisis that the military is facing . . . weighs in, I think, any appropriate analysis of what is a rational basis").

These comments reflect the district court's apparent view that it was free to supplant the military's expert judgments based on the court's own assessment of whether individuals with HIV—or any other condition, for that matter—should be admitted to military service in light of the changing nature of warfare or the degree of risk posed. That view is inconsistent with rational basis review and with longstanding principles of judicial deference to military decisionmaking. It is for the military—and Congress through its lawmaking authorities—to decide how to balance the military's manpower needs with other concerns about readiness, deployability, and the risks created by HIV or any other condition. The district court's analysis should have begun and ended with the basic recognition that individuals with HIV are not

58

similarly situated to healthy individuals for purposes of accession, and this Court should reverse because the district court disregarded the primary role of the military in making "'complex, subtle, and professional decisions as to the composition, training, equipping, and control of a military force,' which are 'essentially professional military judgments.'" *Winter*, 555 U.S. at 24 (quoting *Gilligan*, 413 U.S. at 10).

## II.    The District Court's Remedial Order Exceeded Its Authority

Even if the district court was correct on the merits, the court's remedial order exceeded its authority in at least two respects: (1) the court entered a remedy for plaintiff Wilkins that is foreclosed by a statute not challenged in this case, and (2) the court erred in extending its injunction beyond the plaintiffs in this suit.

### A.    An Uncontested Statute Forecloses the Relief the District Court Ordered as to Plaintiff Wilkins

Wilkins was denied admission to USMAPS after his medical exam during entry processing revealed that he has HIV.  The district court stated that "successful" completion of the USMAPS program would have enabled Wilkins to "receive[] an appointment at the United States Military Academy West Point."  JA1066.  The district court thus

59

ordered the Secretary of the Army to "reevaluate the decision to remove Wilkins from his earned position at USMAPS." JA1066. The district court issued this relief even though Congress has provided that a condition of eligibility for the Academy is that the "candidate . . . must not have passed his twenty-third birthday on July 1 of the year in which he enters the Academy," 10 U.S.C. § 7446(a), and Wilkins no longer meets that requirement. Thus, even if Wilkins successfully completed the USMAPS program, he would be statutorily ineligible for an appointment at West Point. The district court disregarded this statutory eligibility condition because enforcing it would, in the court's view, "exacerbate the harm [Wilkins] experienced from defendants' unlawful accessions ban." JA1066. The court thus ordered the Army to reevaluate Wilkins' application to USMAPS "without regard to his age." JA1066.

The district court lacked authority to proceed in this manner. It is well settled that district courts cannot use their equitable power to "disregard statutory and constitutional requirements." *INS v. Pangilinan*, 486 U.S. 875, 883 (1988); *see, e.g.*, *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327-28 (2015); *In re Landbank Equity*

60

*Corp.*, 973 F.2d 265, 271 (4th Cir. 1992); *Goodluck v. Biden*, 104 F.4th 920, 926 (D.C. Cir. 2024).  *Pangilinan* illustrates the point: Filipino nationals alleged that they had been unable to apply for U.S. citizenship during a statutory time period after the federal government revoked the authority of a consular official to accept applications, leaving no official with authority to accept applications in the Philippines for approximately nine months of the statutory period.  486 U.S. at 879-80.  The Ninth Circuit held that the revocation was unlawful and ordered naturalization of the plaintiffs even though their applications were filed after the statutory time period.  *Id.* at 882.  The Supreme Court reversed, explaining that the plaintiffs had "no statutory right to citizenship" and that "[c]ourts of equity can no more disregard statutory and constitutional requirements and provisions than can courts of law."  *Id.* at 883 (quoting *Hedges v. Dixon County*, 150 U.S. 182, 192 (1893)).

The same principle applies here.  There is no question that the statutory age limit on enrollment at the Academy is constitutional.  The district court could not properly order the military to disregard an

61

unquestioned requirement imposed by Congress by invoking its authority to craft an equitable remedy.

The district court did not acknowledge the basic principle that equitable power cannot be used to circumvent valid federal statutory requirements. It instead relied on cases in which courts determined that they had to pass on the constitutionality of a state law because the Social Security Act premised the availability of federal benefits on state law. *See Cox v. Schweiker*, 684 F.2d 310, 317 (5th Cir. Unit B 1982) ("[T]he structure and language of 42 U.S.C.A. § 416(h)(2)(A) of the Social Security Act, referring to state law on intestate inheritance, makes relevant the issue of the constitutionality of a particular state law."); *Thornton v. Commissioner of Soc. Sec.*, 570 F. Supp. 3d 1010, 1021-22 (W.D. Wash. 2020) (similar for "validity of a marriage"); *Ely v. Saul*, 572 F. Supp. 3d 751, 764-65 (D. Ariz. 2020) (same). Determining whether Wilkins has "passed his twenty-third birthday on July 1 of the year in which he enters the Academy," 10 U.S.C. § 7446(a), does not require examining the constitutionality of any other statute or regulation.

As the district court acknowledged, Wilkins may pursue other routes to seek a commission as an officer.  JA1066 n.19.  But the district court could not properly order the Army to disregard an uncontested statutory requirement.

### B.    A Universal Injunction Extending Relief to Non-Parties Was Improper

1.  The district court's permanent injunction here is also overbroad.  It does not simply require the military to permit the accession of the plaintiffs in this suit but instead extends to non-parties, permanently barring the military from "denying . . . accession" not only to the plaintiffs but also to "any other similarly situated asymptomatic HIV-positive individual[s] with an undetectable viral load" based on their HIV status.  JA1067.  The injunction similarly enjoins the military from enforcing the HIV-related policies at issue in this suit, apparently against anyone.  JA1067.

That expansive relief cannot be squared with basic Article III or equitable principles.  Under Article III, "a plaintiff's remedy must be 'limited to the inadequacy that produced his injury.'"  *Gill v. Whitford*, 585 U.S. 48, 66 (2018) (alteration omitted); *see Lewis v. Casey*, 518 U.S. 343, 360 (1996) (narrowing an injunction that improperly granted "a

63

remedy beyond what was necessary to provide relief" to the injured parties). Similarly, traditional principles of equity require that an injunction be "no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979).

Those principles illustrate the overbreadth of the injunction here. The plaintiffs sued to challenge policies that prevent them from joining the military. Their asserted injury is thus completely remedied by relief that allows them to join the military. *See Virginia Soc'y for Human Life, Inc. v. Federal Election Comm'n*, 263 F.3d 379, 393 (4th Cir. 2001) (holding that a nationwide injunction was inappropriate because an injunction limited to the plaintiff "adequately protects it from the feared prosecution"), *overruled on other grounds by The Real Truth About Abortion, Inc. v. Federal Election Comm'n*, 681 F.3d 544, 550 n.2 (2012). They have no cognizable interest in whether other non-parties are able to join the military or not and have no standing to seek relief on behalf of others.

Indeed, this suit illustrates many of the well-documented pitfalls of universal injunctive relief. Nationwide injunctions encourage forum

64

shopping. *Arizona v. Biden*, 40 F.4th 375, 396 (6th Cir. 2022) (Sutton, J., concurring). They operate asymmetrically, granting relief to strangers around the nation if a single plaintiff prevails but not precluding litigation by others if the plaintiff loses. *Cf. United States v. Mendoza*, 464 U.S. 154, 159-60 (1984) (holding that non-mutual collateral estoppel does not apply against the federal government). They circumvent the rules governing class actions in federal courts, which provide a mechanism for litigating widely shared claims that accounts for many of the drawbacks of nationwide relief. *See* Fed. R. Civ. P. 23. And such injunctions empower a single district court to pretermit meaningful litigation on the same issue in other courts, thereby preventing further percolation of the issues. *See Department of Homeland Sec. v. New York*, 140 S. Ct. 599, 600 (2020) (Gorsuch, J., concurring in the grant of stay). That concern is salient here: the district court's permanent injunction covering nonparties means that the issue cannot meaningfully be litigated in another court. And that is especially anomalous where—as discussed above—the district court excluded evidence the military offered in support of the rational basis for its policies, then declared that the military's policy failed scrutiny

65

because the military had failed to provide evidence. *See supra* pp. 51-52.

The Supreme Court recently reiterated the problems posed by nationwide injunctions in granting a stay in *Labrador v. Poe ex rel. Poe*, 144 S. Ct. 921 (2024). There, the district court had issued a preliminary injunction prohibiting the defendant from enforcing a state law against parties and nonparties, and the Supreme Court stayed the district court's order "except as to" the specific plaintiffs. *Id.* at 921. That stay was premised on five Justices' conclusion that universal injunctions providing relief outside the parties to the case are likely impermissible. *Id.* at 927 (Gorsuch, J., concurring in the grant of stay); *id.* at 933 n.4 (Kavanaugh, J., concurring in the grant of stay).

2. The district court did not acknowledge the fundamental principles of Article III standing or equity that generally limit relief to the parties. Nor did it explain why nationwide relief reaching non-parties was necessary to remedy any injury to the plaintiffs here. The district court instead noted that this Court in *Roe* had affirmed a preliminary injunction that applied to non-parties while providing general guidance on the need for courts to "'mold [their] decrees to meet

the exigencies of the particular case,' 'carefully consider[] the equities,'

and '"focus[] specifically on the concrete burdens that would fall" on the

parties and on the public consequences of an injunction.'" JA1067

(quoting *Roe*, 947 F.3d at 232). Without analyzing any of these factors,

it proceeded to announce in the next paragraph a universal permanent

injunction. JA1067.

Neither *Roe* nor that cursory treatment can sustain the universal

injunction here. As an initial matter, even if such injunctions are

permissible, "they should be handed down only in extraordinary

circumstances." *CASA de Md., Inc. v. Trump*, 971 F.3d 220, 262 (4th

Cir. 2020), *vacated for reh'g en banc*, 981 F.3d 311 (4th Cir.). And even

on its own terms, *Roe* does not support the district court's universal

injunction. As noted, *Roe* affirmed a preliminary injunction blocking

the discharge of a "limited number of servicemembers" who were

"identifiable by" the military during the litigation based on a categorical

policy while continuing to allow "individualized determinations" of

fitness for deployment (and potential discharge). 947 F.3d at 232-33.

Here, by contrast, the permanent injunction applies indefinitely to an

unknown number of future unidentified persons who seek to join the

67

military, thereby cutting off further percolation. And this Court in *Roe* noted the district court's belief in that case that the "stigma and discrimination" faced by individuals with HIV "may pose a challenge for other similarly situated servicemembers to bring suits on their own behalf." *Id.* at 233. The district court made no similar statement here, and even if it had, there is no indication that such concerns could justify a universal permanent injunction given the availability of other tools to address them, such as the class action mechanism or proceeding under pseudonyms (as two plaintiffs have here).

That leaves only *Roe*'s suggestion that a broad injunction was appropriate because the military's policy was "categorical" and not dependent on the circumstances of an individual plaintiff. 947 F.3d at 232-33. But as courts have regularly recognized, that alone cannot justify universal relief; many challenges to federal statutes or rules focus on arguments broadly applicable to a range of individuals, and adopting a rule that such policies are properly enjoined universally would "justify such a remedy in all cases when federal law is implicated." *CASA de Md.*, 971 F.3d at 262.

More generally, *Roe* did not address any of the points about Article III or equity practice discussed above illustrating the countervailing considerations that make universal relief generally inappropriate.  And the *Roe* Court did not have the benefit of the Supreme Court's subsequent opinions and order staying an injunction as it applied beyond the plaintiffs in *Poe*, 144 S. Ct. at 927 (Gorsuch, J., concurring in the grant of stay), 933 n.4 (Kavanaugh, J., concurring in the grant of stay).  Thus, at a minimum, this Court should narrow the district court's broad injunction to apply only to the individual plaintiffs.

69

## CONCLUSION

For the foregoing reasons, the judgment of the district court should be reversed.

Respectfully submitted,

BRETT A. SHUMATE
   *Assistant Attorney General*

ERIK S. SIEBERT
   *United States Attorney*

CHARLES SCARBOROUGH

 *s/ Brad Hinshelwood*
BRAD HINSHELWOOD
   *Attorneys, Appellate Staff*
   *Civil Division, Room 7256*
   *U.S. Department of Justice*
   *950 Pennsylvania Avenue NW*
   *Washington, DC 20530*
   *(202) 514-7823*
   *bradley.a.hinshelwood@usdoj.gov*

August 2025

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 12,734 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Century Schoolbook 14-point font, a proportionally spaced typeface.

*s/ Brad Hinshelwood*
Brad Hinshelwood