No. 24-2079

IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

—————————————

ISAIAH WILKINS, CAROL COE, NATALIE NOE, and MINORITY
VETERANS OF AMERICA

Plaintiffs-Appellees,

v.

PETE HEGSETH, in his official capacity as Secretary of Defense, and
DANIEL P. DRISCOLL, in his official capacity as Secretary of the Army

Defendants-Appellants.

—————————————

On Appeal from the United States District Court
for the Eastern District of Virginia

—————————————

**REPLY BRIEF FOR APPELLANTS**

—————————————

BRETT A. SHUMATE
  *Assistant Attorney General*

ERIK S. SIEBERT
  *United States Attorney*

CHARLES W. SCARBOROUGH
BRAD HINSHELWOOD
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7256*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 514-7823*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................................ii

INTRODUCTION AND SUMMARY OF ARGUMENT...........................1

ARGUMENT .......................................................................................3

I.  The Military Rationally Denies Accession to Individuals with
    Numerous Health Conditions, Including HIV ................................3

    A.  The Military Has a Valid Interest in Limiting
        Accession to Individuals Without Pre-existing
        Conditions That Could Affect Their Service ..........................3

    B.  The Military Has Also Identified Other Valid
        Rationales for Denying Accession to Individuals with
        HIV .................................................................................14

II. The District Court's Injunctive Relief Should Be Narrowed.........24

    A.  Plaintiffs Do Not Defend the District Court's Order
        Compelling the Army to Ignore an Uncontested
        Statutory Requirement ........................................................24

    B.  Plaintiffs Fail to Justify the District Court's Universal
        Injunction ..........................................................................25

CONCLUSION ................................................................................34

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Cases:**                                                                    **Page(s)**

*Burlington N. R.R. Co. v. Nebraska,*
    802 F.2d 994 (8th Cir. 1986) .............................................................. 24

*CASA, Inc. v. Trump,*
    2025 WL 654902 (4th Cir. Feb. 28, 2025) .......................................... 27

*Corner Post, Inc. v. Board of Governors of the Fed. Rsrv. Sys.,*
    603 U.S. 799 (2024) ....................................................................... 32

*Department of Homeland Sec. v. Regents of Univ. of Cal.,*
    591 U.S. 1 (2020) ........................................................................... 31

*Doe v. University of Md. Med. Sys. Corp.,*
    50 F.3d 1261 (4th Cir. 1995) ............................................................... 4

*Ellis v. International Playtex, Inc.,*
    745 F.2d 292 (4th Cir. 1995) ...................................................... 22, 23

*Gilligan v. Morgan,*
    413 U.S. 1 (1973) ....................................................................... 8, 13

*Gonzales v. Carhart,*
    550 U.S. 124, 163 (2007) ........................................................................ 7

*Harrison v. Austin,*
    597 F.Supp.3d 884 (E.D. Va. 2022) ........................................ 13-14, 14

*Heller v. Doe ex rel. Doe,*
    509 U.S. 312 (1993) ....................................................... 4, 8, 17, 18, 19

*HIAS, Inc. v. Trump,*
    985 F.3d 309 (4th Cir. 2021) ............................................................. 26

*Hunt v. Washington State Apple Advert. Comm'n,*
    432 U.S. 333 (1977) ........................................................................ 29

*Lehnhausen v. Lake Shore Auto Parts Co.,*
    410 U.S. 356 (1973) ............................................................................ 8

ii

*Lightning Lube, Inc. v. Witco Corp.*,
  4 F.3d 1153 (3d Cir. 1993) .................................................... 24

*Music Choice v. Copyright Royalty Bd.*,
  774 F.3d 1000, 1015 (D.C. Cir. 2014) .................................. 20

*Roe v. Department of Def.*,
  947 F.3d 207 (4th Cir. 2020) ............................... 1, 9-10, 10, 11, 12, 26

*TransUnion, LLC v. Ramirez*,
  594 U.S. 413 (2021) ............................................................ 29

*Trump v. CASA, Inc.*,
  145 S. Ct. 2540 (2025) ..................................................25, 27, 28, 30

*United States v. Skrmetti*,
  145 S. Ct. 1816 (2025) ........................................................ 7

*United States v. Texas*,
  599 U.S. 670 (2023) ...................................................... 32, 33

*Virginia Soc'y for Human Life, Inc. v. Federal Election Comm'n*,
  263 F.3d 379 (4th Cir. 2001) .............................................. 32

*Winter v. Natural Res. Def. Council, Inc.*,
  555 U.S. 7 (2008) ................................................... 2, 7-8, 13

**Statute:**

10 U.S.C. § 7446(a) ................................................................ 24

**Rules:**

Fed. R. Evid. 701 .................................................................. 23

Fed. R. Evid. 803(8) .......................................................... 21, 22

iii

## INTRODUCTION AND SUMMARY OF ARGUMENT

The military seeks to admit individuals to military service who do not have pre-existing health conditions that could limit their deployability in any future conflict or on any future battlefield.  HIV is just one among hundreds of disqualifying conditions for accession, and the military has explained that individuals with HIV—even asymptomatic individuals with an undetectable viral load because of antiretroviral medication—would be limited in their ability to deploy in some circumstances.  That includes deployment to front-line units in a conflict, where the ability of the military to provide care and medication is constrained and where the inability of an HIV-positive soldier to donate blood would be especially detrimental.  And even beyond those considerations, the military has identified other factors—the cost of treatment and maintaining relations with countries that bar entry of individuals with HIV—that further distinguish individuals with HIV from healthy individuals for purposes of accession.

Plaintiffs' brief largely ignores the substantive reasoning the military has offered.  Plaintiffs instead assert that this Court's decision in *Roe v. Department of Defense*, 947 F.3d 207 (4th Cir. 2020), dictates

that the military must always deploy individuals with well-controlled HIV, regardless of the circumstances of the deployment. That would be an astonishing holding, and it is not what this Court determined in considering a "categorical" policy barring deployment in *any* circumstances. *Id.* at 228. And plaintiffs' response to the military's other rationales largely repeat the district court's analysis without responding to the errors identified in our brief.

At bottom, plaintiffs' view is that the Constitution requires the military to treat HIV more favorably than it treats numerous other conditions that are disqualifying for accession, even though individuals with those conditions may be deployable in some circumstances. But they never explain how the district court's judgment—and the rationales they ask this Court to adopt—can be cabined to HIV, and their brief expressly invites challenges to the military's policies barring accession to "people with other chronic but manageable conditions." Br. 33. The Supreme Court has rejected that sort of judicial supervision of the military's judgments about "the composition ... of a military force" in favor of deference to "professional military judgments." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) (quotation

2

omitted).  This Court should not invite a cascade of cases second-guessing the military's assessment of the balance between accepting individuals with pre-existing medical conditions and the military's assessment of its needs in current and future conflicts.

## ARGUMENT

I.  **The Military Rationally Denies Accession to Individuals with Numerous Health Conditions, Including HIV**

A.  **The Military Has a Valid Interest in Limiting Accession to Individuals Without Pre-existing Conditions That Could Affect Their Service**

**1.**  Our opening brief explained in detail the military's interest in applying accession standards that screen out individuals with hundreds of pre-existing medical conditions, including HIV.  Opening Br. 21-24. Those accession standards ensure that persons joining the military are, *inter alia*, "[m]edically adaptable to the military environment without geographical area limitations," "[f]ree of contagious diseases that may endanger the health of other personnel," and "[m]edically capable of performing duties without aggravating existing physical defects or medical conditions."  JA524-525.  The military body tasked with developing accession standards thus considers whether "personnel are capable of operationally performing with the best physical and medical

3

outcomes" and are "capable of completing training and maintaining worldwide deployability," as well as ensuring a "cost-efficient force of healthy members in service."  JA313.

We also explained that the military's decision to draw a distinction between individuals with HIV—even HIV well-controlled by antiretroviral medication—and healthy individuals without HIV or other preexisting medical conditions is rationally related to those purposes.  Opening Br. 24-36; *see Heller v. Doe ex rel. Doe*, 509 U.S. 312, 320 (1993) (noting that rational basis review is satisfied "if there is a rational relationship between the disparity of treatment and some legitimate governmental purpose").[1]  Most significantly, the deployment of individuals with HIV presents unique considerations that do not arise for individuals with no pre-existing conditions.  In a military conflict—particularly one with a near-peer military, such as China— deployment of individuals with HIV to forward positions or other combat areas would not be appropriate.  As we explained, such

---

[1] Plaintiffs do not press the argument here that distinctions based on HIV status are subject to heightened scrutiny, Br. 21 n.3, and do not engage with this Court's precedent applying rational basis review to such classifications, *Doe v. University of Md. Med. Sys. Corp.*, 50 F.3d 1261, 1267 (4th Cir. 1995).

deployments have limited medical services (including blood testing), pharmacy capabilities, and supplies. JA422-423. Moreover, resupplying forward positions to replace lost, destroyed, or depleted medication also presents unique challenges, as front lines may be shifting, and an enemy may make efforts to destroy supplies or cut supply lines by land, air, or sea. JA423-424.

In addition, individuals with HIV cannot participate in blood donation to other soldiers—known as the "walking blood bank"—in a mass-casualty situation, because such blood donation poses a risk of transmitting HIV. JA341-344. That source of blood was frequently used by U.S. soldiers in Iraq and Afghanistan and is likely to be used even more often in a future large-scale conflict. JA342-345. Moreover, battlefield medical care also presents a risk of transmission, as an injured soldier with HIV may be cared for by a fellow soldier or military medic with their own open wounds, and the provision of care itself presents some risk of injury to the provider where the injured soldier may have shrapnel, bone fragments, or other sharp objects embedded in their injuries. JA427-429, JA319. And even if transmission does not ultimately occur, the military has explained that CDC guidelines

5

require offering antiretroviral medication to a care provider as post-exposure prophylaxis, along with regular testing.  JA428-429, JA699. That would require a period where the provider could not care for other soldiers where there is a risk of blood exposure and could require evacuating that care provider to a different location to provide post-exposure prophylaxis.  JA429.

Finally, the military has noted uncertainties related to HIV and the circumstances of military service.  In particular, it is uncertain whether individuals who have achieved viral suppression will maintain such suppression under the stresses of a deployment, both because the high-stress nature of a deployment that may involve little sleep, rapid movement, and frequent engagement with enemy forces may undermine adherence to medication and because there is no available research about the effects of such settings on HIV infection even when someone adheres to a medication regimen.  JA424-425; JA322.

These limitations on the deployability of individuals with HIV provide a rational basis, standing alone, to deny accession.  The Constitution does not compel the military to accept individuals who present known medical conditions that limit their deployability and

may be transmissible, just as it does not require the military to accept

individuals with hundreds of other pre-existing medical conditions.

And where uncertainties remain, the Supreme Court has repeatedly

explained that rational basis review affords "wide discretion" to set

policy "in areas where there is medical and scientific uncertainty."

*United States v. Skrmetti*, 145 S. Ct. 1816, 1836 (2025) (quoting

*Gonzales v. Carhart*, 550 U.S. 124, 163 (2007)).

Even beyond those considerations, individuals with HIV are

different from healthy individuals in multiple other respects, including

the presence of some host-country laws that restrict entry—thus

limiting deployability in another respect—and the costs of providing

care for that pre-existing condition and associated progression or

comorbidities.  Opening Br. 33-35.  The military's adoption of accession

standards that reflect these differences is particularly reasonable in

light of the deference due the military's "'complex, subtle, and

professional decisions as to the composition, training, equipping, and

control of a military force,' which are 'essentially professional military

judgments'" entitled to respect.  *Winter v. Natural Res. Def. Council,*

*Inc.*, 555 U.S. 7, 24 (2008) (quoting *Gilligan v. Morgan*, 413 U.S. 1, 10 (1973)).

**2.** Plaintiffs "agree" that the military has a valid interest in having accession policies that accept "medically qualified soldiers who can deploy … on any current or future battlefield," Br. 23-24, and they do not appear to dispute that the military may rationally treat accession policy differently from deployment policy. Their argument thus rests on the assertion that individuals "with well-managed HIV fulfill all" of the military's "medical criteria for accession." Br. 24. Plaintiffs' position thus necessarily reduces to a series of remarkable propositions: that the military cannot rationally consider *any* HIV-related medical considerations in making deployment decisions, including the risk of transmission through blood donation or other means, Br. 28, and that individuals with well-managed HIV have *no* deployability restrictions as a result of their condition, Br. 2.

Given the breadth of plaintiffs' claims, and their heavy burden under rational basis review "to negative every conceivable basis which might support" the military's policy, *Heller*, 509 U.S. at 320-21 (quoting *Lehnhausen v. Lake Shore Auto Parts Co.*, 410 U.S. 356, 364 (1973)),

8

one would expect plaintiffs to carefully engage with the justifications

the military has offered for its accession policy.  Instead, plaintiffs

largely ignore them.  They do not dispute, for example, the military's

assessment of its medical treatment and pharmacy capacities in front-

line areas and the risks to resupply during military operations—

concerns not applicable to healthy soldiers not dependent on

medication.  Nor do plaintiffs dispute that individuals with HIV cannot

donate blood or address the military's explanations of how that would

affect deployability in small units or in settings closer to the front lines

of a conflict.  As to transmissibility, plaintiffs claim that individuals

with well-controlled HIV "*do not have* a disease that presents a risk of

battlefield transmission," Br. 27, but they do not acknowledge, much

less dispute, the CDC's guidance that even in civilian health care

settings "exposure to a source patient with an undetectable serum viral

load does not eliminate the possibility of HIV transmission or the need

for [post-exposure prophylaxis] and follow-up testing."  JA699.

Instead, plaintiffs' response to the medical and logistical

rationales the military has offered consists almost entirely of the claim

that this Court's prior decision in *Roe v. Department of Defense*, 947

9

F.3d 207 (4th Cir. 2020), concluded that such concerns could not "provide a rational basis for decision-making in any context, including here." Br. 28. That is incorrect. As explained in our opening brief (at 37-43), *Roe* addressed the validity of a "categorical" deployment policy under which individuals who contracted HIV after joining the military could *never* be deployed to a particular area, regardless of their individual circumstances. *Roe*, 947 F.3d at 228 (explaining that the military had "failed to meet the APA's requirement to explain a *categorical* ban on deploying HIV-positive service members" to the Central Command area of responsibility (emphasis added)). *Roe*'s conclusion that this categorical ban on deployment was arbitrary and capricious cannot be converted into a holding that the military *must always* deploy individuals with HIV, regardless of the circumstances of the deployment.

In fact, the Court in *Roe* noted the existence of military regulations allowing individualized determinations about deployability taking into account "the climate, altitude, nature of available food and housing, availability of medical, behavioral health, dental, surgical, and laboratory services, or whether other environmental and operational

10

factors may be hazardous to the deploying person's health," 947 F.3d at 223 (quotation omitted), and separately faulted the military for failing to apply those individualized procedures to the plaintiffs, *id.* at 223-24; *see id.* at 228. Such individualized determinations would be irrelevant if, as plaintiffs contend, *Roe* held that the military could *never* decline to deploy someone with HIV to a particular deployment. Thus, in complying with the final *Roe* injunction, DOD provides that sort of individualized consideration, as current servicemembers who contract HIV "are not non-deployable solely for the reason that they are HIV-positive" but "[d]ecisions on the deployability of covered personnel will be made on a case-by-case basis and must be justified by the Service member's inability to perform the duties to which he or she would be assigned." JA1077.[2]

---

[2] Moreover, after the district court issued final judgment in *Roe*, including a permanent injunction, Dkt. No. 320, *Roe v. Austin*, No. 18-cv-01565 (E.D. Va. Apr. 6, 2022), the plaintiffs in that case moved to enforce the injunction based on various asserted harms related to deployment or potential deployment of individual members of the military with HIV, Dkt. No. 359, *Roe*, No. 18-cv-01565 (E.D. Va. May 3, 2023). The district court denied that motion, explaining that *Roe* involved "a categorical bar to deployment" that had "essentially been corrected by" the revised DOD policy cited above. Dkt. No. 392, *Roe*, No. 18-cv-01565, at 5:14-15 (E.D. Va. Aug. 10, 2023) (transcript of June 23, 2023 hearing).

By contrast, at the accession stage, there is no comparable requirement that the military admit prospective soldiers first and then engage in individualized determination about particular deployments based on health considerations.  Instead, at the accession stage the military may rationally prefer prospective soldiers who it knows will have *no* deployment restrictions because of health conditions—in other words, individuals who are "[m]edically adaptable to the military environment without geographical area limitations," have no "contagious diseases," JA524-525, and can "maintain[] worldwide deployability," JA313—over individuals with pre-existing health conditions that will limit their deployability.  That is just as true for HIV as it is for the hundreds of other disqualifying conditions, including those that may not preclude deployment in all circumstances if developed after accession.  *See Roe*, 947 F.3d at 221 (noting waiver process for deployment of servicemembers with specified conditions to Central Command); JA491, JA494-495, JA510-511 (Central Command instructions about deployability determinations).

Plaintiffs' remaining arguments build on their misunderstanding of *Roe*.  They repeatedly fault the government for failing to provide "new

12

evidence" not considered by this Court in *Roe*. *E.g.*, Br. 26. Of course, the record for a preliminary injunction that this Court considered in a prior appeal in a different case cannot determine whether this record supports the distinct policies at issue here.[3] And as explained, the considerations at play in evaluating accessions policy are different from those at issue in the retention decisions and related deployment policy considered in *Roe*. The military has accordingly provided declarations detailing the concerns animating the accessions policy and addressing specific issues that would make deployment of individuals with HIV inappropriate in some circumstances. As discussed, those concerns provide more than a rational basis for the policy and have even greater force given the deference owed to the military's judgments about the proper "composition" of a fighting force. *Winter*, 555 U.S. at 24 (quoting *Gilligan*, 413 U.S. at 10).

Plaintiffs likewise err in relying (Br. 28-29) on the district court's decision in a separate case, *Harrison v. Austin*, 597 F. Supp. 3d 884

---

[3] Plaintiffs themselves struggle with the point: on concerns about potential comorbidities, for example, they acknowledge that such evidence "wasn't addressed in *Roe*" but argue that it somehow also "conflicted with" the "holding" of *Roe*. Br. 28. Plaintiffs cannot have it both ways.

(E.D. Va. 2022). *Harrison* involved a suit by an enlisted member of the National Guard who contracted HIV after joining the Guard and who sought to commission as an officer. *Id.* at 898-99. The military generally treats any commissioning—including by a presently enlisted soldier—as a new "accession" and applies accession standards. *See, e.g.*, JA531 (noting that accession standards apply to "[a]pplicants for appointment as commissioned or warrant officers"). The district court held that the military could not bar the plaintiff in that case from commissioning because of his HIV. *Harrison*, 597 F. Supp. 3d at 915. Even setting aside that *Harrison* is a district-court decision with no binding force here, that case involved an individual *already* in the military. Thus, regardless of whether the district court correctly resolved *Harrison*, it has no bearing on the military's decisions about whether to admit individuals to the military in the first instance.

## B.    The Military Has Also Identified Other Valid Rationales for Denying Accession to Individuals with HIV

The considerations above are sufficient, by themselves, to reverse. The Constitution does not compel the military to deploy individuals with HIV—or any other medical condition—in all circumstances, and

14

the military may rationally determine that it will deny accession to individuals with pre-existing medical conditions. But the military has also identified further considerations that provide independent rational bases for distinguishing between persons with HIV and healthy individuals, and plaintiffs do little to undermine those considerations.

1. Consider first the military's need to respect host-country laws in nations where the military's presence is based on consent. Opening Br. 34-35. Plaintiffs essentially urge that the Constitution compels the military to ignore host-country laws, regardless of the effects that could or would have on diplomatic relations or military operations. Nothing supports that premise. Plaintiffs repeat (Br. 51-52) the district court's view that the military cannot abide by such host-country restrictions given that the military purportedly "ignore[s] host-nation restrictions on" groups such as women and non-Muslims. Br. 51. But none of those "restrictions" are based on medical conditions or communicable diseases, and none precludes the entry or presence of such individuals. Instead, as the district court itself explained, those laws regulate "specific behaviors, ways of dressing, or speech." JA1063. Plaintiffs cannot identify any impermissible disparity of treatment based on that

15

apples-to-oranges comparison. And plaintiffs' objection that there is no "evidence of any host-nation enforcement" of HIV-related restrictions "against military members," Br. 51, ignores that such enforcement has never before been a meaningful possibility because the military has not knowingly deployed HIV-positive soldiers to those countries.

Plaintiffs likewise fail to come to grips with the fact that accession of individuals with HIV imposes substantial additional costs on the military to provide for medical care during and after military service. At the outset, despite spilling considerable ink disputing the admissibility of specific pieces of cost-related evidence (Br. 41-47), plaintiffs ignore their own statement of undisputed facts and the testimony of their own expert, both of which recognize meaningful costs to the military. *See* Opening Br. 50, 55-56. Thus, regardless of whether the particular cost evidence discussed further below is admissible, it is undisputed that "the cost of eliminating the accessions bar … would not be zero," JA1160; *accord* JA1163, that "DOD's per-person healthcare costs are higher for HIV positive individuals than non-HIV positive individuals," JA1170-1171, and that antiretroviral medication alone would cost the military between $10,000 and $25,000 per individual per

16

year, JA751.  Given these statements by plaintiffs and their own expert, they can hardly contend that the military's claims of increased costs are "unsupported" (Br. 41) or "hypothetical" (Br. 47).  Thus, even setting aside that no evidence is required on this point under rational-basis review, *see Heller*, 509 U.S. at 320, plaintiffs cannot seriously dispute that the military would incur additional costs.

Plaintiffs' other responses are no more persuasive.  They begin by citing statutes that they say preclude consideration of costs, but they acknowledge that these statutes "do not apply to the military."  Br. 35.  The military is free to consider the costs of providing care for HIV—or any other condition—in setting accession policy.  Nor does the general "National HIV/AIDS Strategy," Br. 35, create an exception for HIV; that document says nothing about military accession generally or in the specific objectives it references for DOD, *see, e.g.*, JA95 (stating that DOD should work with other agencies on preventing HIV spread abroad); JA111 (stating that DOD should "[c]ontinue to implement interventions, testing, education, and training on the prevention of transmission of HIV infection").

17

Plaintiffs alternatively contend that even if HIV imposes additional costs, the military is required to ignore those costs. Br. 37-38. Plaintiffs suggest that the military does not consider "the cost of healthcare for recruits with any other condition, including chronic ones requiring ongoing management," Br. 38, and so cannot consider them here. But even assuming that is true—though the record is silent on that question—it would not aid plaintiffs. All of those conditions are disqualifying for accession, and so are treated identically to HIV in that respect. Assuming that the military has regarded other considerations as fully dispositive for other conditions does not render the military's assessment of costs here any less rational. *See Heller*, 509 U.S. at 320-21.

Finally, plaintiffs repeat the district court's observation that the military does not deny accession based on their dependents' medical conditions, for which the military may also incur some financial cost. Br. 39-40. We explained that many individuals seeking accession have no dependents, that dependents may have access to other health insurance or care or age out of coverage, and that dependents do not

18

incur the same disability or post-separation costs, Opening Br. 47-48, and plaintiffs simply ignore those distinctions.

**2.**  In any event, though the court need not reach the issue given the acknowledged higher costs and the existence of multiple other rational bases for the policy, plaintiffs' argument that "hypothetical costs" cannot provide a rational basis for a distinction (Br. 47-49) is fundamentally mistaken.  Plaintiffs have litigated this case as a rational basis challenge under the Equal Protection Clause of the Fifth Amendment, and the Supreme Court has long made clear that in adjudicating such challenges, "rational speculation unsupported by evidence or empirical data" is a sufficient basis to uphold a classification.  *Heller*, 509 U.S. at 320 (quotation omitted).  Plaintiffs cite nothing supporting the proposition that rational basis review operates differently because the challenged policy is promulgated by an agency rather than by a legislature; constitutional rational basis review is not a chameleon.

Plaintiffs' real objection appears to be that when conducting statutory arbitrary and capricious review under the Administrative Procedure Act, a court is supposed to review the agency record

supporting the decision, and so a court may properly scrutinize the evidence the agency considered. *See* Br. 49. Even under the APA, however, an agency's predictive judgments about future economic effects are entitled to significant deference. *See, e.g.*, *Music Choice v. Copyright Royalty Bd.*, 774 F.3d 1000, 1015 (D.C. Cir. 2014) ("The 'arbitrary and capricious' standard is particularly deferential in matters implicating predictive judgments." (quotation omitted)). And plaintiffs do not—and cannot—dispute the obvious proposition that health care costs money, such that more individuals with HIV will increase costs to the military. Indeed, plaintiffs' own expert and statement of undisputed facts both recognize this obvious point. JA751, JA1160, JA1163, JA1170-1171.

Moreover, plaintiffs did not contend at summary judgment that the agency's policy should be judged by a standard more demanding than rational basis review. They instead argued before the district court that the arbitrary-and-capricious and rational-basis standards were identical and did not confine themselves to an administrative record. They also urged the district court to import and rely on the records from prior challenges to other policies. *See* Br. 25 (highlighting

20

that "the district court made the records in *Harrison* and *Roe I* part of
the record here").  That irregular procedure does not ultimately matter
here, as the military's declarations make clear that the military's policy
would survive arbitrary and capricious review just as it survives
rational basis review.  But plaintiffs' buyer's remorse about their
litigation strategy—and newfound respect for APA record-review
principles—provides no basis for sustaining the judgment on appeal.

3.  In any event, plaintiffs fail to justify the district court's refusal
to consider additional evidence of costs DOD compiled during a review
of accession and retention policies related to HIV.  We explained in our
opening brief (at 53-54) that such evidence—from reports memorializing
DOD's activities—is admissible under Federal Rule of Evidence 803(8).
Plaintiffs now advance a lengthy argument about the Rule 803(8)
factors.  Br. 44-47.  But the district court engaged in no such analysis,
and thus did not consider whether the records were facially reliable or
whether plaintiffs had met their burden to demonstrate unreliability.
*See* Fed. R. Evid. 803(8)(B).

Plaintiffs' contentions are in any event mistaken.  The reports
document DOD's efforts to determine the costs incurred and expected

21

for HIV care. Those documents thus "set[] out" the "activities" of DOD in considering HIV-related issues. Fed. R. Evid. 803(8)(A)(i). Determining, for example, how much DOD spent on average on healthcare for servicemembers with and without HIV between 2014 and 2021—the subject of one table of the reports, JA332; JA970—is standard fare for the agency's ordinary activities. That historical information alone would be sufficient to demonstrate that individuals with HIV incur additional costs, regardless of plaintiffs' objections to DOD's projections of *future* costs based on assumptions about how many individuals with HIV might join the military. Indeed, plaintiffs' own expert did not suggest that these compilations of past data were incorrect, instead disputing how those costs should be expected to change in the future. JA904-910. And the military's efforts to estimate future costs are no less part of its policymaking process than any other. Plaintiffs' disagreement with DOD's estimates is not a reason to pretend those estimates do not exist. *See Ellis v. International Playtex, Inc.*, 745 F.2d 292, 303 (4th Cir. 1984) (concluding that objections to "the methodology of" government studies "should have been addressed to the relative weight accorded the evidence and not its admissibility").

22

Plaintiffs likewise cannot show that these documents are inherently untrustworthy. Several of their contentions would undermine the admissibility of many agency records: their apparent view is that records cannot be reliable if an agency has withheld privileged material, Br. 45, or has engaged in a policymaking process while litigation is ongoing, Br. 45-46; *see Ellis*, 745 F.2d at 303 (rejecting argument that report was untrustworthy because such reports were often prepared "with the possibility of litigation on the horizon"). And, of course, the policymaking process leading to the reports began in June 2022, before this litigation began. *See* JA986. Plaintiffs cite no case excluding evidence of an agency's own review of its past expenditures and its estimate of future expenditures if policy changes.

Even aside from Rule 803(8), plaintiffs cannot salvage the district court's approach to Rule 701(c). They acknowledge that Dr. Ciminera's declaration was based on "percipient knowledge." Br. 43. And Rule 701(c) is commonly invoked to allow lay opinion testimony based on personal experience; that is the point of the many cases, which plaintiffs consign to a footnote, holding that knowledge "acquired through review

of records prepared in the ordinary course of business, or perceptions based on industry experience, is a sufficient foundation for lay opinion testimony." *Burlington N. R.R. Co. v. Nebraska*, 802 F.2d 994, 1004-05 (8th Cir. 1986). Courts thus commonly recognize that witnesses may testify about the conclusions of an analysis prepared by others without qualifying as an expert in the relevant subject matter, *e.g.*, *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1175 (3d Cir. 1993), and the only "analysis" Dr. Ciminera performed in his declaration was simple arithmetic using the working group's tables, *see* JA323-328.

## II.    The District Court's Injunctive Relief Should Be Narrowed

Plaintiffs likewise fail to justify the vastly overbroad and inappropriate relief the district court ordered.

### A.    Plaintiffs Do Not Defend the District Court's Order Compelling the Army to Ignore an Uncontested Statutory Requirement

Plaintiffs expressly "do not defend" the aspect of the district court's order that compels the military to consider plaintiff Isaiah Wilkins for admission to West Point notwithstanding that he is older than the statutory age limit for admission. Br. 17 n.1; *see* 10 U.S.C. § 7446(a); JA1066, JA1071. Plaintiffs note that Wilkins has "decided to

24

seek accession by other means."  Br. 17 n.1.  And even aside from

plaintiffs' express refusal to defend that relief, it is insupportable for all

the reasons explained in our brief.  *See* Opening Br. 59-63.  Accordingly,

that aspect of the judgment should be vacated regardless of the Court's

other conclusions; the Court cannot simply affirm the judgment in full,

as plaintiffs appear to request.  Br. 62.

### B.    Plaintiffs Fail to Justify the District Court's Universal Injunction

In addition, the district court's universal injunction cannot be

squared with the Supreme Court's decision in *Trump v. CASA, Inc.*, 145

S. Ct. 2540 (2025).  In *CASA*, the Supreme Court addressed "whether

Congress has granted federal courts the authority to universally enjoin

the enforcement of an executive or legislative policy," and declared that

"Congress has granted federal courts no such power."  *Id.* at 2550.

Instead, the governing principle is that a court granting equitable relief

"may administer complete relief *between the parties*," which is "not

synonymous with 'universal relief.'"  *Id.* at 2557 (quotation omitted).

"Under this principle, the question is not whether an injunction offers

complete relief to *everyone* potentially affected by an allegedly unlawful

act; it is whether an injunction will offer complete relief *to the plaintiffs*

*before the court*." *Id.* at 2557.  In *CASA*, that dictated that a stay was appropriate for "[t]he individual and associational" plaintiffs in those cases, as in that case an injunction limited to barring application of the challenged policy to an individual would "give that plaintiff complete relief." *Id.*

*CASA* thus makes clear that this Court's prior decisions are overruled to the extent they assert the "equitable power of district courts, in appropriate cases, to issue nationwide injunctions extending relief to those who are similarly situated to the litigants" where such relief is not necessary to remedy the plaintiffs' injuries.  *Roe*, 947 F.3d at 232; *HIAS, Inc. v. Trump*, 985 F.3d 309, 326-27 (4th Cir. 2021).  The district court here relied on that proposition in entering universal relief, JA1066-1067, and that relief was plainly inappropriate: like the individual plaintiffs in *CASA*, an injunction barring application of the policy barring accession for individuals with HIV would fully remedy plaintiffs' injury.

Plaintiffs appear to recognize the flaws in the district court's approach, acknowledging that the court's order uses "wording" that "is not what a court would use if it had the *CASA* ruling before it."  Br. 61-

26

62.  But they offer two theories for why universal relief was nevertheless appropriate in this case.  Neither justifies the district court's judgment.

**1.**  Plaintiffs first argue that universal relief is necessary to provide complete relief to members of the Modern Military Association (MMA), an associational plaintiff here.  Br. 54, 56-59.  But that simply rehashes the argument advanced by the association in *CASA*, which likewise contended that universal relief was necessary because it had members nationwide.  *See CASA, Inc. v. Trump*, 2025 WL 654902, at *1 (4th Cir. Feb. 28, 2025) (denying stay in *CASA* based in part on assertion that "an injunction limited to the parties—including organizations with hundreds of thousands of members nationwide— would be unworkable in practice and thus fail to provide complete relief to the plaintiffs").  The Supreme Court rejected that argument, instead emphasizing that the "[t]he individual and associational" plaintiffs in those cases would receive "complete relief" from a narrower injunction. *CASA*, 145 S. Ct. at 2557; *see id.* at 2565 (Thomas, J., concurring) (noting that the Court "readily dispatche[d]" with arguments that the plaintiff associations required a universal injunction).

27

The same principle applies here. To the extent MMA's members are injured by the accession policy, it is because they (like the named plaintiffs) are unable to join the military because they have HIV, despite also being asymptomatic and having an undetectable viral load. Relief that precludes the military from barring those individuals from accession based on their HIV status would provide those individuals with complete relief; "[e]xtending the injunction to cover all other similarly situated individuals," or even MMA members who lack standing, "would not render" an injured individual's "relief any more complete." *CASA*, 145 S. Ct. at 2557-58.

Indeed, plaintiffs appear to recognize as much, ultimately suggesting that the injunction "should … at minimum run to the benefit of all M[M]A members." Br. 59. But even that overstates matters. MMA claimed "nearly 3,000 members" nationwide when this suit was filed, Br. 57, which includes current servicemembers, "family members and caregivers of veterans," and "nonmilitary individuals," only some of whom "want to join or rejoin the Armed Forces." JA857-858. Many of those members lack standing to challenge the accession policy at issue here, either because they are already in the military or because they

28

have no imminent plans to join the military. Such members thus have no claim that MMA could press on their behalf. *See Hunt v. Washington State Apple Advert. Comm'n*, 432 U.S. 333, 342 (1977) (stating that an organization may "assert the claims of its members"). Nor has MMA identified who among its members were both members at the time the suit was brought and had standing at that time. *See, e.g.*, *TransUnion, LLC v. Ramirez*, 594 U.S. 413, 431 (2021) ("Article III does not give federal courts the power to order relief to any uninjured plaintiff …." (quotation omitted)). MMA has thus failed to establish a factual predicate for any relief to any unidentified members, and at a minimum cannot justify relief running beyond whatever (presently unknown) subset of members had standing when the suit was brought.

**2.** Second, plaintiffs attempt to recast the district court's universal injunction as a universal vacatur under the APA. Br. 59-62. They argue that because "the district court could properly set aside the regulations on a universal basis under the APA," Br. 60, they are entitled to universal relief, and double down on that assertion in a post-brief letter, *see* Letter, Doc. 63 (Aug. 29, 2025).

29

That argument suffers from several flaws. Most fundamentally, plaintiffs' assertion that the district court's judgment "functionally sets aside [an] agency rule under the APA," Br. 59, ignores the text of the judgment itself. As *CASA* underscores, injunctive relief and vacatur are distinct remedies, *see* 145 S. Ct. at 2554 n.10 (explaining that the Court was not "resolv[ing] the distinct question whether the [APA] authorizes federal courts to vacate agency action"), not least because an injunction—unlike a vacatur—carries the threat of enforcement by contempt. And here, the judgment is unambiguous that the defendants "are ENJOINED from denying plaintiffs … and any other similarly-situated asymptomatic HIV-positive individual with an undetectable viral load[] accession … based on their HIV status," and "are ENJOINED from enforcing the HIV-specific provisions of their policies barring asymptomatic HIV-positive individuals with undetectable viral loads from accession." JA1070.

Moreover, the district court's injunction goes far beyond what any "vacatur" could provide. Plaintiffs describe vacatur as operating to "cancel, annul, or revoke" a regulation and "treat the regulation as if it never existed." Br. 59. But the injunction here permanently enjoins the

30

military from *ever* denying accession to "any … asymptomatic HIV-positive individual with an undetectable viral load … based on their HIV status," JA1070, independent of any current or future DOD policy. By barring the military from ever "deal[ing] with the problem afresh by taking *new* agency action," *Department of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 21 (2020) (quotation omitted), the district court's injunction exceeds any remedy that could be described as a vacatur.

Finally, the absence of any discussion by the district court of whether to "vacate" the military's policies, and the court's decision to enter an injunction, reflect plaintiffs' own litigation choices. Plaintiffs' complaint did not request vacatur or that the policies be "set aside," instead seeking declaratory and injunctive relief. JA42-43. This Court may not convert the injunction into a remedy plaintiffs did not request and did not receive.

Those considerations suffice to demonstrate that the district court's actual judgment cannot be sustained on plaintiffs' new theory, and the injunction should, at a minimum, be vacated to the extent it goes beyond the plaintiffs here. But more generally, there is no basis

31

for this Court to reach questions about vacatur where that remedy has never been broached before plaintiffs' response brief in this Court.  As the government has explained in detail elsewhere, the APA does not authorize universal vacatur as a remedy, and such a remedy would in any event be subject to ordinary equitable tailoring principles, not automatically universal.  *See, e.g.*, Br. for Petitioner at 40-44, *United States v. Texas*, 599 U.S. 670 (2023) (No. 22-58); Reply Br. for Petitioner at 16-20, *Texas*, 599 U.S. 670 (No. 22-58).  Justices of the Supreme Court have expressed divergent views on the question.  *See Texas*, 599 U.S. at 692-703 (Gorsuch, J., concurring, joined by Thomas and Barrett, JJ.) (expressing doubts about vacatur's availability and scope); *Corner Post, Inc. v. Board of Governors of the Fed. Rsrv. Sys.*, 603 U.S. 799, 826-43 (2024) (Kavanaugh, J., concurring) (asserting that universal vacatur is an available remedy under the APA).

In fact, the very case plaintiffs cite—*Virginia Society for Human Life, Inc. v. Federal Election Commission*, 263 F.3d 379 (4th Cir. 2001)—rejected a virtually indistinguishable effort to justify a universal injunction by invoking the APA.  There, this Court—presaging the current debate about vacatur—explained that "nothing in the language

32

of the APA … requires us to exercise such far-reaching power," and emphasized that universal relief would "impos[e] our view of the law on all the other circuits." *Id.* at 394; *see Texas*, 599 U.S. at 695-99, 702-03 (Gorsuch, J., concurring) (similar).

Thus, if this Court concludes that plaintiffs are entitled to relief, it should vacate the injunction insofar as it extends beyond the plaintiffs. That would fully remedy plaintiffs' injury and afford them the relief requested in their complaint, and would leave contested questions about the availability and nature of vacatur under the APA for an appropriate future case.

## CONCLUSION

For the foregoing reasons, the judgment of the district court should be reversed.

Respectfully submitted,

BRETT A. SHUMATE
  *Assistant Attorney General*

ERIK S. SIEBERT
  *United States Attorney*

CHARLES SCARBOROUGH

*s/ Brad Hinshelwood*

BRAD HINSHELWOOD
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7256*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 514-7823*
  *bradley.a.hinshelwood@usdoj.gov*

September 2025

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 6,245 words.  This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Century Schoolbook 14-point font, a proportionally spaced typeface.

*s/ Brad Hinshelwood*
Brad Hinshelwood