**No. 24-2079**

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

———————————

ISAIAH WILKINS, CAROL COLE, NATALIE NOE,
and MINORITY VETERANS OF AMERICA

*Plaintiffs-Appellees,*

*V.*

PETE HEGSETH, in his official capacity as Secretary of Defense, and
DANIEL P. DRISCOLL, in his official capacity as Secretary of the Army

*Defendants-Appellants.*

———————————

Appeal from the U.S. District Court for the Eastern District of Virginia,
Case No. 1:22-cv-1272 (LMB/IDD), Hon. Leonie M. Brinkema

———————————

## PETITION FOR REHEARING *EN BANC*

———————————

Peter E. Perkowski
PERKOWSKI LEGAL, PC
515 S. Flower St. Suite 1800
Los Angeles, CA  90071
213-340-5796
peter@perkowskilegal.com

Scott A. Schoettes
SCOTT A. SCHOETTES, ESQ.
275 Sandy Point Trail
Palm Springs, CA 92262
773-474-9250
sschoettes@gmail.com

*Counsel for Plaintiffs-Appellees*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................ iii

STATEMENT OF PURPOSE ..................................................................... 1

BACKGROUND ........................................................................................ 4

ARGUMENT ............................................................................................. 5

I.   A Mistaken Belief *Roe* Was Decided on an Insubstantial Record Led *Wilkins* to Discount the Soundness, Strength, and Authority of *Roe*'s Holdings. ........................................................... 5

　A.   *Roe*'s Record on Deployability Was Well-Developed and Comprehensive in Scope.............................................................. 5

　B.   Defendants Failed to Improve the Record on Deployability. ........ 9

II.  *Wilkins'* False Conception of the Record Led to Multiple Determinations and Conclusions Directly Contrary to *Roe.* .......... 11

　A.   Availability of Medication ...................................................... 12

　B.   Testing to Monitor Medication Effects..................................... 13

　C.   Blood Donation ...................................................................... 14

　D.   Rationality of Medical Justifications for Deployment Bar ........ 15

III. *Wilkins'* Embrace Contradicts *Roe*'s Rejection of Host-Nation Restrictions as a Rational Basis for the Deployment Bar.............. 17

IV.  The Version of Military Deference Employed in *Wilkins* Is Incompatible with *Roe*. .............................................................. 19

# TABLE OF AUTHORITIES

## <u>CASES</u>

*Guerra v. Scruggs*, 942 F.2d 270 (4th Cir. 1991) .................................... 19

*Harrison v. Austin*, 597 F. Supp. 3d 884 (E.D. Va. 2022) ................. passim

*Mindes*, 453 F.2d 197 (4th Cir. 1971) ................................................19, 20

*Roe v. Dept. of Defense*, 947 F.3d 207 (4th Cir. 2020) ....................... passim

*Wilkins v. Austin*, 745 F. Supp. 3d 375 (E.D.Va. 2025) .................... passim

*Wilkins v. Hegseth*, 167 F.4th 237 (4th Cir. 2026) .......................... passim

## <u>REGULATIONS</u>

DOD Instruction 6130.03, Volume 1, *Medical Standards for Military Service: Appointment, Enlistment, or Induction,* May 8, 2018 (Incorporating Change 4, November 16, 2022) .............................. 21

## STATEMENT OF PURPOSE

In counsel's judgment, the panel opinion conflicts with the unanimous opinion in *Roe v. Dept. of Defense*, 947 F.3d 207 (4th Cir. 2020), and this conflict is not addressed in the opinion.

An erroneous understanding of the record in *Roe*—and therefore *Roe's* impact on litigation with a co-extensive record on key issues—resulted in an opinion at odds with *Roe*. Regarding the military's HIV-related personnel policies, *Roe* holds: "Plaintiffs are likely to succeed on the merits … because the Government, by failing to offer an explanation that is reconcilable with the scientific and medical evidence available to it, did not comply with the APA in promulgating this policy." *Id.* at 225. While acknowledging that the arbitrary and capricious standard equates to rational basis review, *Wilkins* holds: "We conclude that the Military, acting in furtherance of its mission to raise and maintain the armed forces, did not run afoul of the Due Process Clause applied in the military context when adopting and enforcing its HIV policies." *Wilkins v. Hegseth*, 167 F.4th 237, 246-47 (4th Cir. 2026).

These two holdings, rooted in nearly identical records on the proffered justifications for refusing to deploy servicemembers living with

1

HIV[1] are irreconcilable. Several conclusions *Wilkins* reaches about HIV-related risks are counterfactual and contradict *Roe*. Specifically, *Wilkins* contravenes *Roe's* determinations that: treatment for HIV is relatively simple; testing to monitor treatment effects, if necessary, is easily accomplished; treatment interruption has no short-term or substantive effect on capabilities, safety, or job performance; and any resulting decline in immune system function is easily reversed upon resumption.

Similarly, *Wilkins'* characterization of blood donation as a deployment duty is belied by *Roe's* rejection of it as a rational basis. Juxtaposed with *Roe's* accurate description of Defendants' blood collection and administration practices, including the extremely low percentage of transfusions sourced through *voluntary* unscreened donations, *Wilkins'* unquestioning acceptance of mere representations in Defendants' briefs is revealed.

---

[1] As members of this group, counsel respectfully request that "people living with HIV," "people with HIV," or "HIV-positive people" be used, not "HIV-infected people." The latter is demeaning and stigmatizing because it centralizes HIV as a defining attribute and focuses on infectiousness and the limited circumstances in which it is communicable if untreated.

2

The same is true of the purported policy of "diplomatic deference" to host-nation restrictions people with HIV. *Roe* rejected host-nation restrictions as a rational basis for refusing to deploy servicemembers with HIV because Defendants had not sufficiently explained or supported this proffered justification to give it credence. Relying solely on Defendants' characterizations, *Wilkins* overlooks that the record did not improve for Defendants—and developed in Plaintiffs' favor—on this subject. Even if this Court rejects the district court's detailed analysis recognizing Defendants' supposed "diplomatic deference" policy as a proxy for discrimination, the Court cannot give this justification greater credence than *Roe*.

The novelty of *Wilkins'* version of military deference is manifest in comparison to *Roe*. By layering a reverent level of military deference over a relaxed, deferential rational basis review, *Wilkins* renders discrimination claims practically unreviewable. In nearly identical factual circumstances, *Roe* explicitly rejected non-justiciability and deferred without abandoning the responsibility to assess whether military policy complies with federal law.

3

Because *Wilkins'* extreme deference yielded multiple conflicts with *Roe*, this Court—the "home circuit" of the Pentagon—should grant this petition. *En banc* review will allow the Court to clarify the level of deference owed to military decision-making in this context and to determine whether the district court correctly applied *Roe* by tempering scrutiny with deference to rule in Plaintiffs' favor.

## BACKGROUND

Wilkins commenced after summary judgment in Roe and Harrison, companion cases also hinging on deployability. *Wilkins v. Austin*, 745 F.Supp.3d 375, 386 (E.D.Va. 2025). In *Harrison*, the district court applied *Roe*'s central holding—that "obsolete understandings" of HIV, "outmoded and at odds with current science," cannot justify a deployment ban, "even under a deferential standard of review and even according appropriate deference to the military's professional judgments"[2]—and granted summary judgment. *Harrison v. Austin*, 597 F.Supp.3d 884, 915 (E.D.Va. 2022). In analyzing Harrison's equal protection claim, the district court distinguished enlistees from those in

---

[2] *Roe*, 947 F.3d at 227.

service to moot Defendants' cost-based rationale for denying Harrison's commission. *Id.* at 914.

Five months later, Plaintiffs challenged the last barrier to full service for people with HIV. Despite the district court's repeated reminders that the justifications proffered in <u>Roe</u> and <u>Harrison</u> had previously been adjudicated in Plaintiffs' favor, Defendants pressed them again. Applying *Roe,* the district court re-evaluated and again rejected the medical and "diplomatic deference" justifications. Subsequently laying bare the inconsistencies and irrationality of Defendants' cost-based justification, the district court granted summary judgment in Plaintiffs' favor.

## ARGUMENT

I.  **A Mistaken Belief *Roe* Was Decided on an Insubstantial Record Led *Wilkins* to Discount the Soundness, Strength, and Authority of *Roe*'s Holdings.**

A.  ***Roe*'s Record on Deployability Was Well-Developed and Comprehensive in Scope.**

The deployability of servicemembers with well-managed HIV has predominated this litigation. Though the criteria for retention, deployment, and accession are framed slightly differently—with the deployment standard designed to assess deployment to a specific location

5

and the retention and accession standards' goal of establishing "worldwide deployability"—all the standards focus on this core function. *Harrison,* 745 F.Supp.3d at 889-98.

Defendants' rationales for their HIV-related personnel policies were developed before discovery opened in <u>Harrison</u>. They were first articulated to Congress in 2014. *Roe* J.A.462 at 1 (referencing 2014 report). In 2018, more detailed explanations were developed in a second report to Congress ("2018 Report"), included in *Roe*'s record. *Id.*; *Roe*, 947 F.3d at 227. Excepting the cost-based justification initially articulated after *Roe*, Defendants' purported justifications have not changed.

Defendants fully developed, examined, and vetted the purported justifications for barring deployment of servicemembers with HIV before appellate briefing in *Roe*. <u>Roe</u> was filed six months after <u>Harrison</u>, the first case hinging on the purported inability of servicemembers with HIV to deploy worldwide. *Harrison,* 597 F.Supp.3d at 889-90. By the time <u>Roe</u> was *filed*, motions to dismiss and for a preliminary injunction had been fully briefed, argued, and decided—and discovery had opened—in <u>Harrison</u>. <u>Harrison v. Esper</u>, No. 1:18-cv-641-LMB-IDD, Dkt.59, 68; <u>Roe v, Esper</u>, No. 1:18-cv-1565-LMB-IDD, Dkt.1. Five months later,

6

Defendants appealed the preliminary injunction in <u>Roe</u>, a year after litigation focusing on deployability had commenced. *Id.*, Dkt.112. Appellate briefing began *after* discovery closed. *Id.*, Dkt.32; <u>Roe</u>, App. No. 19-1410, Dkt.18, 64. Confident in their appeal, Defendants persuaded the court to stay trial pending its result. <u>Roe</u>, No. 1:18-cv-1565-LMB-IDD, Dkt.244. Before appellate briefing, both sides fully understood the evidentiary support for their arguments.

The appellate record was extensive and comprehensive in scope. Three hundred pages of appellate briefing supplemented 1500 pages of materials. *Harrison*, 597 F.Supp.3d at 891. In addition to hundreds of pages of regulations, documentation of plaintiffs' discharges, and multiple lay and expert affidavits, the record included the 2018 Report,[3] which—with the exception of HIV-related healthcare costs—contains all the justifications Defendants proffered in <u>Roe</u>, <u>Harrison</u>, and <u>Wilkins</u>:

> [I]n the context of the extraordinary challenges of many aspects of military service, including potential mission needs under highly stressful combat conditions or in extremely austere and dangerous places worldwide, even well-managed HIV infection carries risks of complications and comorbidities, possibly with latent effects, immune

---

[3] *Roe*, 947 F.3d at 227 (referencing "2018 report to Congress, which the Government cites as an explanation for its policies").

7

> system dysregulation, neurocognitive impairments
> [], disrupted medication maintenance and
> necessary monitoring for potential side-effects,
> possible military vaccination adverse effects, and
> potential communicability, including in
> circumstances of buddy-aid to a seriously injured
> member in combat and emergency whole blood
> battlefield transfusions.

2018 Report, at 9. The *Roe* record was extensive, developed over several months, and close to complete—at least in terms of Defendants' arguments and material evidence to support the purported justifications—and the full breadth of arguments regarding deployability were presented to this Court.[4]

*Wilkins'* attempt to distinguish *Roe* based on the quality of the two appellate records is premised on a gross misperception. The opinion describes the *Roe* record as "scant" and distorts its contents, inexplicably omitting key words from *Roe*'s description:

> *Other than* the text of [the deployment policy]
> itself and the Cron declaration, which is a post-hoc
> explanation of the policy, the [DoD] has offered no
> rationale for its policy of non-deployment for HIV-
> positive servicemembers, nor has it identified the
> evidence it considered in formulating the policy.

---

[4] *Roe*'s reference to a "limited record" at "this preliminary stage" is hortatory, maintaining the possibility Defendants would harmonize their contradictory positions on deployment waivers—but they never did.

*Roe*, 947 F.3d at 225 (emphasis added). In *Wilkins*, this became:

> *Roe*'s holding on the categorical ban on deployment was based on a scant evidentiary record, in which the military "offered no rationale for its policy of non-deployment for HIV-positive servicemembers, nor [did] it identif[y] the evidence it considered in formulating the policy."

*Wilkins*, 167 F.4th at 246.[5] *Wilkins* theorizes Defendants lacked opportunity to present their rationales during rushed appellate briefing when in fact *Roe* explains Defendants *failed* to provide a reasonable explanation (*i.e.*, rationale) despite ample opportunity.

## B. Defendants Failed to Improve the Record on Deployability.

After *Roe*, Defendants failed to produce any new material evidence in support of their deployability arguments. At summary judgment, Defendants couldn't identify any new, material evidence in the expanded record. *Harrison*, 597 F.Supp.3d at 908. After its own search, the court reached the same conclusion as *Roe*:

> Although the record has since been supplemented through additional discovery, the government

---

[5] *Wilkins* mistakes *Roe*'s references to lack of explanation in the *agency record* for lack of explanation in the *record on appeal*; *Roe* rejected several justifications allegedly supported by regulations, policies, and affidavits submitted on appeal. *Roe*, 947 F.3d at 221-228.

9

> offers essentially the same explanations for its policies in its summary judgment briefing. Accordingly, at oral argument, the first question the government was asked was what new evidence it had adduced. None of the evidence described in the government's answer … , and none of the limited evidence identified as new in the government's summary judgment briefing, justifies reaching a different conclusion than that reached by the Fourth Circuit in *Roe*. All but one of the government's explanations continue to focus on the risk of HIV transmission … . These explanations remain either contradicted by scientific evidence or unsupported by the record.

*Id.* After disposing of Defendants' two other purported justifications, the district court entered injunctions restricting use of HIV status in deployment and commissioning decisions for current servicemembers. *Id.* at 915-16.

In Wilkins, Defendants proffered the same rationales rejected in *Roe*, which had subsequently been rejected in *Harrison*. *Austin*, 745 F.Supp.3d at 389. To avoid duplication of effort and expense, the court granted Plaintiffs' motion to incorporate the Harrison and Roe records into Wilkins. *Id.* at 389 n.12. On summary judgment, Defendants again failed to produce any new material evidence and made no new arguments to support the purported justifications. *Id.* at 389-92.

10

> Merely labeling an argument as new does not make it so. These arguments, for which defendants fail to provide any new evidence or support, amount to the same set of justifications defendants offered in *Harrison* and *Roe* that this Court and the Fourth Circuit already found to be "obsolete" and insufficient "to justify a ban, even under a deferential standard of review and even according appropriate deference to the military's professional judgments."

*Id.* at 391 (quoting *Roe*, 947 F.3d at 228); *accord id.* at 389 ("Although the Court repeatedly instructed the parties that 'a significant amount of the scientific and medical issues have been resolved,' … defendants nevertheless … rehash[ed] the same arguments made and rejected by the Court and Fourth Circuit in *Harrison* and *Roe*.")

Though poorly supported, Defendants fully presented these arguments in *Roe* and at every stage thereafter. *Wilkins*' embrace of the unsupported, speculative arguments rejected in *Roe* creates the foundational conflicts between these opinions.

## II. *Wilkins*' False Conception of the Record Led to Multiple Determinations and Conclusions Directly Contrary to *Roe*.

Upon recognizing the records on deployability in *Roe* and *Wilkins* are materially indistinguishable, the multiple conflicts between the opinions become readily apparent. Because many factual premises on

11

which this Court relied in *Roe* are factual premises upon which the

district court relied, *Wilkins'* contradictory restatement of them is a

direct rejection of foundational aspects of *Roe.* The following quotes

illuminate the conflicts:

## A.    Availability of Medication

*Wilkins*:    [N]ecessary medicine may not always be available in particular deployed settings, as "far forward positions close to front lines have minimal or no access to mail-order pharmacy or other resupply" and, it adds, even in more "established areas of operation," the medicine may not always be available. Moreover, if an HIV-infected servicemember were to attempt to carry his medication during military operations, it could be lost or destroyed. (167 F.4th at 244 (quoting Defendants' brief)).

*Roe*:    [T]he Government's assertion that HIV requires "highly specialized" treatment is contrary to evidence in the record. Around three-quarters of HIV-positive individuals take a single daily pill, which does not require special storage or handling. These medications generally tolerate extreme conditions well. And treatment produces minimal side effects and imposes no dietary restrictions. (947 F.3d at 226.)

This simple treatment also undermines the Government's assertion that "austere conditions" would "disrupt[ ] it." Because the medications have no special storage requirements, servicemembers with HIV can be prescribed several months' worth of their medication at a time, just as the military

12

does for servicemembers deploying with other chronic but managed conditions. (*Id.*)

Even if treatment were disrupted, HIV-positive servicemembers would "not immediately suffer negative health outcomes." … J.A. 795. "It often takes weeks for an individual's viral load to reach a level that would not be considered 'suppressed.'" *Id.* Even then, the virus enters a period of clinical latency that can last years, often with no symptoms or negative health outcomes. And, when an individual resumes treatment, even supposing the virus developed a resistance to the previous treatment regimen, a switch to a different regimen will return that patient to viral suppression. (*Id.* at 227 (quoting expert report of infectious disease doctor/researcher).)

## B.    Testing to Monitor Medication Effects

*Wilkins*:    [Because] HIV-infected persons must also be tested on a regular basis, the additional "time, energy, and resources to collect, transport for testing at an appropriate facility and by appropriate trained personnel, and [have] results [returned] in a timely manner" will burden the Military. Indeed, at forward positions, testing might not even be possible. (167 F.4th at 244-45 (quoting Defendants' brief).)

*Roe*:    While HIV-positive individuals need viral load testing, the testing is routine and can readily be conducted by a general practitioner, either on-site or by shipping a sample to a lab. (947 F.3d at 226.)

Plaintiffs offer declarations of two physicians with extensive experience in the field of HIV who state that a patient with an undetectable viral load for

13

at least two years typically receives viral load testing twice a year. … Whether testing is needed once or twice every year, the treatment is not "highly specialized." (*Id.*)

## C.    Blood Donation

*Wilkins*      Moreover, the Military notes that "deployed soldiers must be prepared to donate blood directly to other soldiers through an emergency blood collection system known as the "walking blood bank," yet all agree that HIV-infected persons cannot donate blood as even a low level of viral copies could infect the recipient. (167 F.4th at 245 (quoting Defendants' brief)).

The Military recited how this Military need was exemplified during the operations in Iraq and Afghanistan, when "over 6,000 such transfusions were performed." (*Id.*)

*Roe*          The record does not support the Government's arguments about the risk of transmission through transfusions. Servicemembers who test positive for HIV are ordered not to donate blood. Therefore, any risk of HIV transmission through transfusion is by servicemembers who are unaware of their HIV-positive status. (947 F.3d at 227.)

Where FDA-screened blood is unavailable, the military turns first to a "walking blood bank," a volunteer servicemember who is pre-screened to donate blood. [*citing* Amicus Brief of Former Military Officials] If no such servicemember is available, the military turns to volunteers who have donated recently. Finally, the military turns to other volunteers. (*Id.* at 227 n.4.)

14

[A]mong the 1.13 million servicemembers deployed to Afghanistan or Iraq during the six-year study period, the military found no instances of transmission through trauma care, blood splash, transfusion, or other battlefield circumstances. (*Id.*)

## D.   Rationality of Medical Justifications for Deployment Bar

*Wilkins*   As to HIV-infected persons in particular, the Military has concluded that HIV-infected persons, even under an effective antiretroviral regimen, present conditions that could limit or complicate the Military's mission. (167 F.4th at 244.)

*Roe*   The Government has not—*and cannot*—reconcile these [deployment] policies with current medical evidence. (947 F.3d at 220 (emphasis added).)

Upon review, each explanation offered by the Government for the policy is unsupported by the record or contradicted by scientific evidence, leading us to conclude … the Government failed to consider the relevant evidence and offers explanations so contrary to that evidence as to be arbitrary. (*Id.* at 225.)

The Government's justifications for a categorical ban, offered through the Cron declaration, do not account for the Plaintiffs' persuasive and credible evidence—evidence available to the Government when it enacted this policy—on HIV treatment and transmission risk." (*Id.* at 228.)

And the record and the military's own research support the conclusion of the military-official amici—including former Secretaries of the Army, Air Force, and Navy, a former Assistant Secretary

15

of Defense, and a former Director of Health and Safety for the Coast Guard—that "there is no legitimate reason to deny HIV positive service members the opportunity to deploy." Amicus Br. of Former Military Officials at 7. (*Id.*)

*Wilkins* also attempts to distinguish *Roe* by describing the accessions standard as "forward-looking" compared to the deployment standard for current servicemembers. If "forward-looking" means more discerning about long-term health, the accessions standard is indeed more discerning or *stringent*—but more stringent in irrelevant ways given *Roe*'s holdings on deployability. The relative stringency of the accessions and deployment standards is reflected in the criteria articulated within them to guide decision-making, including decisions about which conditions presumptively fail the standard. But unlike *Roe* (and *Harrison*) and *Austin*—which detail the criteria of these respective standards and scrutinize the justifications rooted in them using record evidence—*Wilkins* does not mention them.

Examination of these two sets of criteria—as seen in *Austin* and *Harrison*—makes plain that *Roe* renders the purported medical justifications no more relevant for accessions than for deployment. *Austin,* 745 F.Supp.3d at 380-81. *Roe* held plaintiffs were likely to

16

succeed in establishing that Defendants' deployment policies were/are arbitrary and capricious (*i.e.,* not rational) and that people with well-managed HIV are medically qualified to deploy worldwide. The accessions criteria do not, because they cannot, countermand the truths articulated in *Roe*.[6]

### III.    *Wilkins'* Embrace Contradicts *Roe*'s Rejection of Host-Nation Restrictions as a Rational Basis for the Deployment Bar.

*Wilkins* also fails to recognize the impact of *Roe*'s holding that it's arbitrary and capricious to refuse to deploy servicemembers with HIV at all because there may be a handful of countries that place restrictions on their entry. A necessary predicate to plaintiffs' likelihood of success was a determination that classifying servicemembers non-worldwide deployable based on discriminatory regulations in a few countries is not rational. *Roe*, 947 F.3d at 225-26 (holding the evidence submitted "fails

---

[6] Defendants' interpretation narrows *Roe* (and *Harrison*) to solely requiring an individualized determination, thereby reviving use on an individual basis of justifications this Court declared arbitrary and capricious. AOB at 42-44. Given *Wilkins'* endorsement, servicemembers will again struggle to secure non-discriminatory deployment determinations.

to 'articulate a satisfactory explanation' for the policy and fails to provide a 'rational connection between the facts found and the choice made'").

As with medical justifications, Defendants failed to produce new material evidence in support of this purported justification on remand. *Harrison*, 597 F.Supp.3d at 908 n.22 ("*Roe* rejected this argument in part because the record before it did not show whether the laws of host nations 'appl[y] to both military servicemembers and civilians' or whether 'the inability to enter one nation would preclude deployment to the entire area.' The summary judgment record is no different on these points.") Though *Harrison* permitted continuing denial of deployment to countries barring entry to civilians with HIV, that permission left unaltered *Roe*'s  holdings that such restrictions were not an adequate justification for classifying servicemembers with HIV as less than "worldwide deployable," a prerequisite for retention, commissioning, and *entry* into the military. *Id.* at 914-15.

After learning of Defendants' selective application of "diplomatic deference," the district court went a step further by preventing Defendants from using host-nation restrictions to deny deployments to servicemembers with HIV, thereby mooting Defendants' claim that

18

recruits with HIV are not worldwide deployable. *Austin*, 745 F.Supp.3d at 394-96. This Court's review of these aspects of the decision, opinion and injunctions are similarly guided and cabined by *Roe*'s rejection of "foreign relations concerns" as a rational basis for barring deployment.

## IV.    The Version of Military Deference Employed in *Wilkins* Is Incompatible with *Roe*.

The conflicts between *Roe* and *Wilkins* are rooted in incongruent applications of military deference. *Roe* acknowledges the deference given to military decision-making while recognizing the important judicial role in ensuring military leaders are not violating constitutional rights or applicable laws. *Roe*, 947 F.3d at 230 ("'[T]here will always be some interference when [courts] review' military decisions. *Guerra*, 942 F.2d at 276 (quoting *Mindes*, 453 F.2d at 201). But military decisions are not categorically immune from judicial review[.]"); *id.* at 220 ("[C]ourts retain a role, and an important one, in ensuring that agencies have engaged in reasoned decision-making.").

*Wilkins*, on the other hand, layers military deference over an already relaxed rational basis standard to create a new level of deference foreign to the jurisprudence. 167 F.4th at 243-44. This new version of military deference appears to require acceptance of the military's

19

representations without examining the record to verify veracity. *Id.* at *passim* (citing no record evidence). This approach leads inexorably to the rubber-stamping *Roe* denounced. *Roe*, 947 F.3d at 220 ("[A]lthough we accord substantial deference to an agency's final action and presume it valid, the arbitrary-and-capricious standard does not reduce judicial review to a rubber stamp of agency action." (cleaned up)).

*Wilkins'* renders many cases non-justiciable. In *Roe*, the Court analyzed the justiciability of plaintiffs' challenge to military action, applied the *Mindes* factors, and determined the claims were justiciable. *Roe*, 947 F.3d at 218. *Wilkins* functionally places such military conduct beyond judicial reach, much like non-justiciability but without its doctrinal guidelines. The military thereby becomes all but immune to discrimination claims not meriting heightened scrutiny.

If adopted, this extreme version of deference should be cabined to subjects on which the experience and professional judgment of military leaders create unique expertise. *Id.* at 218, 230. Managing healthcare benefits calls upon expertise in business management, not professional judgments about military affairs. Evidencing the disconnect from military expertise, cost of healthcare was not mentioned in regulations

20

pertaining to retention, deployment, commissioning, or accession—that is, until amended after *Harrison* identified cost of HIV-related care as the sole surviving potential justification. DoDI 6130.03 at 10; *Harrison*, 597 F.Supp.3d at 914. Because health benefits are run-of-the-mill labor costs for employers, military deference on this purported justification is inappropriate.

**Undersigned counsel respectfully request oral argument.**

April 6, 2026

Peter E. Perkowski
PERKOWSKI LEGAL, PC
515 S. Flower St., Ste 1800
Los Angeles, CA 90071
peter@perkowskilegal.com
(213) 340-5796

Respectfully submitted,

/s/ *Scott Schoettes*
Scott A. Schoettes
SCOTT A. SCHOETTES, ESQ.
275 Sandy Point Trail
Palm Springs, CA 92262
sschoettes@gmail.com
(773) 474-9250

*Counsel for Plaintiffs-Appellees*

## CERTIFICATE OF COMPLIANCE
## WITH TYPE-VOLUME LIMITATIONS

Pursuant to Rule 32(g)(1) and 40(d)(3) of the Federal Rules of

Appellate Procedure, I certify that the attached brief contains 3900

words, as measured by the word-processing system used to prepare it,

and complies with the typeface requirements of Federal Rule of

Appellate Procedure 32(a)(5) and the type-style requirements of Federal

Rule of Appellate Procedure 32(a)(6) because it was prepared in

Microsoft Word using 14-point Century Schoolbook, a proportionally

spaced typeface.

/s/ *Scott Schoettes*
Scott A. Schoettes
*Counsel for Plaintiffs-Appellees*

April 6, 2026