**No. 24-2079**

---

**IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT**

———————

ISAIAH WILKINS, CAROL COE, NATALIE NOE, and MINORITY
VETERANS OF AMERICA

Plaintiffs-Appellees,

v.

PETE HEGSETH, in his official capacity as Secretary of Defense, and
DANIEL P. DRISCOLL, in his official capacity as Secretary of the
Army,

Defendants-Appellants.

———————

On Appeal from the United States District Court
for the Eastern District of Virginia

———————

**OPPOSITION TO PETITION FOR
REHEARING EN BANC**

———————

BRETT A. SHUMATE
  *Assistant Attorney General*

CHARLES W. SCARBOROUGH
BRAD HINSHELWOOD
  *Attorneys, Appellate Staff
  Civil Division, Room 7256
  U.S. Department of Justice
  950 Pennsylvania Avenue NW
  Washington, DC 20530
  (202) 514-7823*

---

**TABLE OF CONTENTS**

**Page**

INTRODUCTION AND SUMMARY ........................................................1

STATEMENT...............................................................................................3

ARGUMENT ...........................................................................................10

    I.     The Panel Opinion Does Not Conflict With *Roe*'s
         Discussion of Deployability....................................................11

    II.    Plaintiffs Identify No Conflict Stemming from Any
         Other Aspect of the Panel Opinion........................................16

CONCLUSION .......................................................................................20

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Cases:** **Page(s)**

*Gilligan v. Morgan,*
   413 U.S. 1, 10 (1973) ..........................................................................20

*Roe v. Department of Defense,*
   947 F.3d 207 (4th Cir. 2020) .........................................2, 11, 13, 16, 17

*Rostker v. Goldberg,*
   453 U.S. 57 (1981) ...............................................................................19

## INTRODUCTION AND SUMMARY

This case addresses the military's policies governing who can join the military (referred to as "accession").  The military generally seeks healthy individuals to join its ranks because such individuals present no special health-related limitations on their deployment worldwide or on the roles they can perform in the military, as well as no known health risks to themselves or their fellow soldiers.  As a result, hundreds of different medical conditions—including high blood pressure, diabetes, asthma, limited motion in a joint, vision and hearing defects, peanut allergies, or communicable diseases like hepatitis—are disqualifying for accession.

The military has long included Human Immunodeficiency Virus (HIV) in the list of disqualifying conditions.  Individuals with HIV—including those whose condition is well-managed through daily medication—cannot be deployed in all settings.  HIV is thus no different from the numerous other conditions that are disqualifying for accession, including chronic conditions managed by medication.  Yet the district court here held that the military's bar on accession by individuals with well-controlled HIV is unconstitutional under rational basis review and

issued a universal injunction barring the military from enforcing its longstanding accession policies.

The panel here correctly reversed that unprecedented decision, and plaintiffs' rehearing petition does not satisfy the demanding criteria for rehearing en banc. Plaintiffs rely entirely on a purported conflict between the unanimous panel opinion and this Court's decision in *Roe v. Department of Defense*, 947 F.3d 207 (4th Cir. 2020), but their arguments rest on a fundamental misunderstanding of the panel's reasoning here. As the panel explained, resolving this case did not require "question[ing]" the factual premises about HIV treatment that *Roe* discussed—and, indeed, are largely undisputed here. Slip Op. ("Op.") 16. Instead, this case involves application of those facts in a fundamentally different context: while *Roe* addressed the military's "categorical ban on deployment of *current* servicemembers" with HIV without individualized consideration of their fitness for a particular deployment, this case instead involves "forward-looking policies related to *initial entry*." Op. 17 (emphases in original). At the initial entry stage, the military may rationally decline to accept individuals with conditions that may limit their deployability or incur significant

2

additional costs. Thus, as the panel properly recognized, just as the military generally bars accession by individuals with high blood pressure, diabetes, or a host of other conditions, the military may rationally deny accession to individuals with HIV.

## STATEMENT

**1.** Individuals seeking to join the military must satisfy a variety of requirements, including health standards. These medical requirements are designed to "[e]nsure that individuals considered for appointment, enlistment, or induction into the Military Services are," *inter alia*, "[f]ree of contagious diseases that may endanger the health of other personnel," "[f]ree of medical conditions or physical defects that may reasonably be expected to require excessive time lost from duty for necessary treatment or hospitalization, or may result in separation from the Military Service for medical unfitness," and "[m]edically adaptable to the military environment without geographical area limitations." JA524-525.

Hundreds of medical conditions are considered disqualifying for accession. *See* JA533-574. For example, individuals are disqualified from accession if they require contact lenses or hearing aids to address

3

vision or hearing issues, JA536, JA537, have had a heart valve surgically repaired, JA541, have a history of inflammatory bowel disease, JA545, have limited range of motion in a joint, JA555-556, JA557, have had psoriasis as an adult, JA561, have acute allergic reactions to fish, crustaceans, shellfish, peanuts, or tree nuts, JA563, have headaches severe enough to cause two missed days of work or other activities in the previous year, JA568, have sleep apnea or forms of insomnia requiring medication, JA570, or have autism spectrum disorder, JA570.

The list of disqualifying conditions also includes communicable diseases, such as hepatitis, until a cure is documented. *See, e.g.*, JA545-546, JA573. And the list includes many chronic conditions that can be managed through regular medication, including asthma, JA540, high blood pressure (hypertension), JA559, diabetes, JA564, and Attention Deficit Hyperactivity Disorder (ADHD), JA570.

HIV is also a disqualifying condition. JA563, JA580, JA614. HIV is an incurable and transmissible condition that affects the body's immune system. JA414. HIV can be transmitted through sexual

4

contact, blood transfusions or other blood-to-blood contact, and other means.  JA426.

Although HIV cannot be cured, HIV infections can be managed through antiretroviral medications.  JA418.  For many patients, consistent adherence to such medications—commonly taken as a once-daily pill or pair of pills—can reduce the number of copies of the virus in a patient's blood to a point "undetectable" on currently-available blood tests.  JA419-420; JA799-800.  Individuals with well-managed HIV generally receive blood tests at regular intervals: initially every three to six months, and then at longer intervals of six or twelve months, depending on the patient's condition.  JA420; JA674.  If a patient stops taking medication, however, their viral load will increase, which can occur less than a week after stopping medication.  JA424, JA683.

Although persons with well-managed HIV pose essentially no risk of sexually transmitting HIV to another person, transmission through other routes, such as blood transfusions or other blood-to-blood methods of transmission, remains possible.  JA426-427; JA45-46.  Thus, persons with an undetectable viral load remain forbidden from donating blood, JA427; JA398, and individuals exposed to potential blood-to-blood

5

transmission from a person with an undetectable viral load, such as in a medical setting, should immediately begin a course of prophylactic medication and receive recurrent testing for a period of time thereafter. JA699-700; JA428.

**2.**  Plaintiffs here—three individuals with HIV who seek to join the military and a membership organization—brought this suit contending that the military's HIV accessions policy failed rational basis review and was arbitrary and capricious under the Administrative Procedure Act.  The district court granted summary judgment to plaintiffs, rejecting the military's explanations that individuals with HIV cannot be deployed in all circumstances because of medical, logistical, and diplomatic issues, and that individuals with HIV incur additional costs for the military over healthy soldiers who do not require continuous treatment and testing for a preexisting medical condition.  JA1049-65.  The district court entered a universal injunction barring application of the military's accession policies to anyone, not just the plaintiffs here.  JA1070-71.

After briefing and oral argument, the panel unanimously reversed the district court.  The panel explained that under rational basis

6

review, a difference in treatment will be upheld "if there is a rational relationship between the disparity of treatment and some legitimate governmental purpose," and that under rational basis review, classifications are "accorded a strong presumption of validity and must be upheld if there is *any reasonably conceivable state of facts* that could provide a rational basis for the classification."  Op. 9 (emphasis in original).  Moreover, the panel explained, because "complex, subtle, and professional decisions as to the composition, training, equipping, and control of a military force are essentially professional military judgments," review of the military's decisions about accession policy also implicates doctrines of deference to military judgments.  Op. 9, 10 (quotation omitted).

Applying those principles, the panel held that the military had provided three independent rational bases for treating individuals with HIV differently from individuals without HIV for purposes of accession, and that these rationales likewise foreclosed plaintiffs' claims under the Administrative Procedure Act.  Op. 15, 18.  While any one of these three bases would be sufficient, Op. 15, the panel began with the military's interest in ensuring that individuals who join the military can be

7

deployed worldwide.  Op. 12-13.  The panel observed that individuals with HIV will not be deployable in all circumstances, such as "forward operating positions or other locations where resupply or medical treatment is unreliable or challenging because of enemy action, remoteness, or other reasons."  Op. 12.  The military has explained that "far forward positions close to front lines have minimal or no access to mail-order pharmacy or other resupply," such that it would be difficult, if not impossible, to supply soldiers with medication or to replace medication lost or destroyed during combat operations.  Op. 13.  Blood testing is also unlikely to be available in such settings.  Op. 13.  And deployed soldiers with HIV cannot donate blood to other soldiers, which may be of particular concern in small units far from resupply or evacuation.  Op. 14.

Moreover, the panel observed, the military had documented that "the cost of maintaining an HIV-infected soldier is substantially higher than the cost of maintaining an otherwise medically fit soldier."  Op. 14; *accord* Op. 18 (noting rationality of declining to "admit a class of persons who will cost the Military more money than will persons outside of that class").  Finally, the panel noted that the military had

demonstrated that "HIV implicates unique foreign affairs concerns," as some countries, such as Kuwait, have "laws that restrict or prohibit the entry or presence of individuals with HIV" and thus limit the deployability of individuals with HIV.  Op. 15.

The panel also addressed plaintiffs' reliance on *Roe*.  The panel noted *Roe*'s conclusions that HIV infections can be "well managed" and that individuals with well-managed HIV pose a "very low" risk of transmission, have "few, if any, noticeable effects on their physical health," and "can perform most of the duties of military service."  Op. 17 (quotations omitted).  The panel "d[id] not question these findings."  Op. 17.  The panel instead explained that *Roe* addressed a "categorical ban on deployment of *current* servicemembers, rather than the rationales undergirding forward-looking policies related to *initial entry* that are presented here."  Op. 17. Noting that *Roe* was "based on a scant evidentiary record, in which the military 'offered *no* rationale for its policy of non-deployment for HIV-positive servicemembers, nor [did] it identif[y] the evidence it considered in formulating the policy,'" the panel emphasized that here the military has "provided substantial

9

evidence explaining its rationales in light of its mission." Op. 17
(quoting *Roe*, 947 F.3d at 225).

## ARGUMENT

The petition for rehearing en banc should be denied. The panel
decision is correct, and plaintiffs identify no conflict with any decision of
the Supreme Court or another circuit. To the extent plaintiffs' petition
goes beyond factbound disputes about the record in this case, it rests
entirely on the assertion that the panel decision conflicts with this
Court's prior decision in *Roe*. But that claim of conflict ignores critical
distinctions between the two cases that the panel here properly
identified and relied upon. For example, the panel here correctly
recognized that the military may rationally decide not to admit
individuals with HIV, as the issues presented by initial accession are
fundamentally different from the circumstances presented in *Roe*,
which addressed a blanket policy of discharging individuals who
contracted HIV *after* entering military service. In upholding the
military's ability to refuse accession to individuals with HIV, the panel
properly concluded that limitations on deployability and increased
medical costs justified forward-looking policies related to initial entry,

10

given the military's interest in ensuring that persons entering military service have no pre-existing limitations on deployment or obvious increased health costs.

## I.     The Panel Opinion Does Not Conflict With *Roe*'s Discussion of Deployability

Plaintiffs devote the bulk of their petition (Pet. 11-17) to a series of arguments that the panel's conclusions here conflict with factual premises about HIV treatment this Court adopted in *Roe*, asserting that the decision here is a "direct rejection of foundational aspects of *Roe*," Pet. 12, and that this purported "conflict is not addressed in the [panel] opinion," Pet. 1.  Those arguments lack merit and ignore the many ways in which the panel here not only accepted, but embraced, many undisputed facts about HIV and its treatment discussed in *Roe*.  There is no disagreement, for example, that many individuals can achieve an undetectable viral load through a "single daily pill" that "does not require special storage or handling" and "generally tolerate[s] extreme conditions well" while "produc[ing] minimal side effects and impos[ing] no dietary restrictions."  *Roe*, 947 F.3d at 226.  Nor is there any dispute that annual or biannual regular viral load testing is not especially complex and can be conducted "by a general practitioner, either on-site

11

or by shipping a sample to a lab." *Id.* The panel here went out of its way to acknowledge that "[m]uch of what plaintiffs argue is, indeed, supported by *Roe*," and emphasized that "[w]e do not question these findings." Op. 16.

Equally undisputed, however, is that at the accession stage the military has a weighty interest in ensuring that new entrants are "[m]edically adaptable to the military environment without geographical area limitations" and "[f]ree of contagious diseases that may endanger the health of other personnel." JA524-525. The body that makes accession policy for the military thus considers whether individuals are "capable of completing training and maintaining worldwide deployability" while in service. JA313. And the military makes those judgments on a categorical basis: for example, all individuals with high blood pressure or diabetes are excluded from accession, even if such individuals would be deployable in some circumstances. JA559, JA564.

As the panel correctly observed, the considerations that govern at the accession stage are thus different from those applied to decisions about retention and deployment of *current* servicemembers.

Servicemembers may develop health conditions after joining the military (and after they have been trained and developed specialized skills), and in those circumstances, the military generally engages in individualized determinations to decide whether a servicemember may be assigned to a particular deployment and whether a servicemember should be discharged on health grounds or remain in military service. In *Roe*, for example, this Court noted military regulations for deployment to the Central Command area of responsibility (which covers much of the Middle East and Central Asia) that called for consideration of "the climate, altitude, nature of available food and housing, availability of medical, behavioral health, dental, surgical, and laboratory services, or whether other environmental and operational factors may be hazardous to the deploying person's health." 947 F.3d at 223. Indeed, similar factors are presently considered in determining whether individuals who contract HIV after entering military service may participate in a particular deployment. *See* JA1077 (providing that "[d]ecisions on the deployability of [HIV-positive] personnel will be made on a case-by-case basis and must be justified by the Service member's inability to perform the duties to which he or she would be

13

assigned"); JA421 (explaining that certain deployments may not be appropriate for servicemembers with HIV).

But as the very need for individualized determinations indicates, individuals with pre-existing health conditions—even those well-managed by medication—will not be deployable in *all* settings, including in the full range of potential conflicts in which the U.S. military could find itself. For example, it would not be appropriate to deploy individuals with HIV to forward combat positions in a large-scale conflict with a near-peer military like China. The factual premises underlying that unremarkable conclusion are themselves undisputed. It is not disputed that individuals with HIV cannot donate blood. While that limitation may be less salient in a deployment to a location far from the front lines of a conflict, it can be a significant limitation in small units near the front lines, where each soldier may be called upon as a potential source of blood donation for wounded fellow soldiers. JA344. Similarly, near the front lines, the military's ability to resupply soldiers with medication—which may be lost or destroyed in combat operations—or to provide regular testing is limited. JA422-23. Plaintiffs have not disputed these premises about front-line

14

deployments in a significant conflict, and *Roe* says nothing about them. The panel thus quite rightly observed that these factors render certain deployments inappropriate for individuals with HIV. Op. 13-14.

Plaintiffs apparently accept that, at the accession stage, the military may properly admit only individuals with no deployment limitations based on medical issues—in other words, individuals "[m]edically adaptable to the military environment without geographical area limitations." JA524. Indeed, before the panel, they "agree[d]" that the military has a valid interest in having accession policies that accept "medically qualified soldiers who can deploy … on any current or future battlefield." Resp. Br. 23-24.

At bottom, then, plaintiffs' theory of a conflict with *Roe* rests on the view that *Roe* holds that individuals with HIV *must* be deployed in *all* circumstances—in other words, that the military could *never* consider a servicemember's HIV as limiting the deployments that individual could participate in. They thus characterize *Roe* as holding "that people with well-managed HIV are medically qualified to deploy worldwide." Pet. 17. But that characterization cannot be squared with *Roe*'s emphasis on the military's regulations governing individualized

15

determinations about the appropriateness of a particular deployment. 947 F.3d at 223. And *Roe* had no occasion to reach such a sweeping conclusion: all the *Roe* plaintiffs needed to demonstrate was that individuals with HIV could deploy in *some* circumstances, such that individualized consideration was necessary.

Plaintiffs' novel reading of *Roe* would also have astonishing consequences. As discussed, hundreds of conditions are disqualifying for accession. On plaintiffs' view, however, accession limitations for a wide variety of other conditions that can be managed by daily medication that lacks special storage requirements—high blood pressure, asthma, or various mental health conditions, to name just a few—would be invalid. After all, an individual with any of those conditions might be able to deploy in some circumstances. But the panel here properly rejected the extraordinary proposition that the Constitution precludes the military from declining to accept individuals with such pre-existing health conditions into military service.

## II.   Plaintiffs Identify No Conflict Stemming from Any Other Aspect of the Panel Opinion

Similar errors undergird plaintiffs' other contentions. At the outset, much of plaintiffs' petition is devoted to purported discrepancies

16

between the record here and the records plaintiffs assert were developed in *Roe* and other cases that never reached this Court. Plaintiffs do not explain why these factbound disputes would warrant rehearing, which is reserved for cases of conflict or questions of "exceptional importance." Fed. R. App. P. 40(b)(2). In any event, the record compiled by the military here was tailored to the specific challenge plaintiffs brought, describing the reasons why certain deployments would be inappropriate for individuals with HIV in settings different from those at issue in *Roe*. *See supra* at 12-13; Opening Br. 4-6, 21-33.

Plaintiffs' other contentions misapprehend both *Roe* and the panel opinion. Plaintiffs observe that *Roe* rejected the military's reliance on "host nation requirements." *Roe*, 947 F.3d at 226; Pet. 17-19. But *Roe* did so because the military had not identified any such requirements or explained how they might apply, much less demonstrated "whether the inability to enter one nation would preclude deployment to the entire [Central Command] area," as required to support the categorical non-deployment policy at issue there. 947 F.3d at 225-26. Here, as noted, the military has no obligation to demonstrate that *every* nation has such

17

entry restrictions, and as the panel observed, the military here identified at least one nation (Kuwait) with such restrictions. Op. 15. Indeed, plaintiffs themselves apparently acknowledge that the military is still free to decline "deployment to countries barring entry to civilians with HIV." Pet. 18. In short, the panel properly recognized that host-nation requirements were more significant here than in the circumstances presented in *Roe*.

Similarly, plaintiffs acknowledge, as they must, that the additional costs incurred for medical care of individuals with HIV were not at issue in *Roe* at all. Pet. 6, 7. As the panel recognized, that rationale alone would be a sufficient basis to reverse the district court's judgment and uphold the military's policies. Op. 15. Plaintiffs have no meaningful response to this aspect of the holding. They suggest that it is a product of an "extreme version of deference" to the military. Pet. 20. But the panel made clear that the military's rationales would survive rational basis review wholly apart from any extra level of deference. Op. 18 (noting that the Military "demonstrate[d] the reasonableness of its classification under the rational basis standard").

18

In any event, plaintiffs are wrong to assert (Pet. 19-20) that the panel opinion here is inconsistent with *Roe*'s approach to the deference owed to the military's professional judgments. *Roe* recognizes that courts "give great deference to the professional judgment of military authorities concerning the relative importance of a particular military interest." 947 F.3d at 219. *Roe* simply concluded that the plaintiffs there were likely to succeed "even according appropriate deference to the military's professional judgments." *Id.* at 228.

Plaintiffs' reference to *Roe*'s discussion of the *Mindes* factors for justiciability (Pet. 20) is even further afield. The government here did not contend that the military's HIV accession policy was unreviewable. Instead, the military has consistently defended that policy on its merits. And the decision here does not place any military conduct "beyond judicial reach." Pet. 20. The panel opinion here simply recognizes— citing Supreme Court cases that plaintiffs make no effort to distinguish—that "complex, subtle, and professional decisions as to the composition, training, equipping, and control of a military force are essentially professional military judgments" that courts must deferentially review. *Rostker v. Goldberg*, 453 U.S. 57, 65-66 (1981)

19

(quoting *Gilligan v. Morgan*, 413 U.S. 1, 10 (1973)).  The panel properly concluded that judgments about how to balance front-line pharmacy capacity or the need for blood transfusions in future large-scale conflicts against the military's manpower needs and other considerations are precisely the sorts of judgments that courts are ill-equipped to second-guess.

## CONCLUSION

For the foregoing reasons, the petition for rehearing en banc should be denied.

Respectfully submitted,

BRETT A. SHUMATE
  *Assistant Attorney General*

CHARLES W. SCARBOROUGH

 *s/ Brad Hinshelwood*
BRAD HINSHELWOOD
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7256*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 514-7823*
  *bradley.a.hinshelwood@usdoj.gov*

April 2026

20

**CERTIFICATE OF COMPLIANCE**

This response complies with the Court's order of April 7, 2026, limiting a response to 3,900 words, because it contains 3,560 words. This response was prepared using Microsoft Word 2013 in Garamond 14-point font, a proportionally spaced typeface.

*s/ Brad Hinshelwood*
Brad Hinshelwood