1

IN THE UNITED STATES COURT OF APPEALS

FOR THE

FOURTH CIRCUIT

ISAIAH WILKINS, ET AL.,

     Plaintiffs–Appellees,

v.                                    No. 24–2079

PETE HEGSETH, ET AL.,

     Defendants–Appellants.

_____

TRANSCRIPT OF ORAL ARGUMENT

HELD ON

TUESDAY, DECEMBER 9, 2025

BEFORE

THE HONORABLE PAUL V. NIEMEYER, CIRCUIT JUDGE

THE HONORABLE JULIUS N. RICHARDSON, CIRCUIT JUDGE

THE HONORABLE ALLISON JONES RUSHING, CIRCUIT JUDGE

U.S. COURT OF APPEALS

1100 EAST MAIN STREET

RICHMOND, VIRGINIA 23219

2

APPEARANCES

Appearing on behalf of the Appellees:

SCOTT A. SCHOETTES, ESQUIRE

Schoettes Law Offices

275 Sandy Point Trail

Palm Springs, California 92262

(773) 474-9250

sschoettes@gmail.com

-and-

LINDA T. COBERLY, ESQUIRE

Winston & Strawn LLP

35 W. Wacker Drive

Chicago, Illinois 60601

(312) 558-5600

lcoberly@winston.com

3

APPEARANCES (CONTINUED)

Appearing on behalf of the Appellants:

BRADLEY HINSHELWOOD, ESQUIRE

U.S. Department of Justice

Civil Division, Appellate Staff

950 Pennsylvania Avenue, NW, Room 7256

Washington, DC 20530

(202) 514–7823

bradley.a.hinshelwood@usdoj.gov

4

TRANSCRIPT OF ORAL ARGUMENT

HELD ON

TUESDAY, DECEMBER 9, 2025

JUDGE NIEMEYER: All right. The next case we're going to hear this morning is Wilkins versus Hegseth. And Mr. Hinshelwood, whenever you're ready we'll hear from you.

MR. HINSHELWOOD: Good morning, Your Honors. May it please the Court. Brad Hinshelwood for the government.

Individuals seeking to join the military must generally be free of health conditions that may affect their service, including when or where they could be deployed in the event of war. The military

has identified hundreds of different health conditions that make individuals ineligible to join the military.

These conditions run the gamut from food allergies to prior heart surgery, from IBS to migraines, and from sleep apnea to autism, and the list includes many conditions that are chronic but manageable with regular medication such as asthma, high blood pressure, and diabetes.

HIV is just another of the pre-existing

5

medical conditions that the military deems disqualifying for accession.  The distinction the military draws between individuals with HIV and individuals with no pre-existing health conditions is plainly rational and serves important military ends.

Individuals with HIV, even when well managed with regular medication, cannot be deployed in all settings, present some risks of transmission that cannot be completely eliminated, create additional financial costs, and raise foreign affairs concerns not presented by healthy

individuals.

The District Court's judgment here rested on a failure to appreciate the fundamental distinction between accession policy and then the military's policies about retention and deployment for individuals who are already in the military.

At the accession stage, the military can reasonably determine that it's not going to accept individuals who present known circumstances, known health risks, that are going to preclude their deployment in certain circumstances. They may be deployable in some circumstances, but not all, and that's a decision the military can make at the

6

accession stage.

That's different from the judgment the military makes with respect to retention for individuals who develop conditions after they've joined the military, and after the military has invested significant time in training those individuals, putting them into special, you know, specialized roles in some instances, and providing those individuals with, you know, extensive resources and –– and the military is already, you

know, providing those individuals with medical care and has full visibility into their condition and ability to continue to serve.

So that, you know, fundamental distinction really goes to why the military here could determine, if you look at the declarations provided, for example by Colonel Blaylock or by Dr. Seminara, that there are going to be inevitably some circumstances where individuals with HIV, just like individuals with high blood pressure or other conditions, are not going to be deployable.

So if you have circumstances where someone is being deployed to a front line position that's going to be difficult to re-supply, that's going to be in a small unit potentially where their inability

7

to donate blood to other fellow soldiers --

JUDGE RICHARDSON:  Can you -- just to -- just to sort of turn to maybe the elephant in the room.  Can -- can you talk about our previous decision on deployment?  We are obviously bound by that.

MR. HINSHELWOOD:  Mm-hmm.

JUDGE RICHARDSON:  And you continue to reference back that we're making decisions at entry that are based, at least in part, on deployment. And we have a case obviously addressing the ability of the Army to make decisions about who they deploy. And one argument obviously is that case was just wrong, but that's not an argument that this panel can do anything about.

So can you -- you help us understand how to situate the arguments that you're making in light of that binding precedent?

MR. HINSHELWOOD:  Absolutely, Your Honor, and that's the next thing I wanted to turn to, which is, you know, that distinction between accession and the retention is going to be -- it's -- it's critical to understand the difference between this case and Roe, which is the case you're referring to.

So in Roe, you had individuals who

8

contracted HIV after they joined the military, so they're already in the military.

And at that point the military had said, we're going to discharge these individuals because we think they couldn't deploy to the central command

region of responsibility, and we –– because we have a policy that people with HIV just can't go there, full stop, ever, regardless of the circumstances of the deployment, or at least that's how the District Court understood that policy.

And what this Court held in Roe was, no, no, no. What you have to do is at least give individualized consideration to those individuals and say, okay, no, I'm going to consider the specific circumstances of the deployment and decide, because there probably are some deployments you could do, and, you know, it's not appropriate to discharge those people right now without giving them that kind of individualized consideration.

So that's now what the military does with individuals in that position. It undertakes an individualized consideration that considers things like, as this Court recognized in Roe, the availability of medical services and pharmacy supplies, and other things of that nature, that are

all the considerations that I think everyone should recognize, limit the ability of the military to

deploy these individuals.

Roe didn't say you have to deploy these people until all circumstances, regardless. Roe just say, you can't, at the outset, decide that they're never deployable in any circumstances and discharge them once they're already in and you have yourself a -- a -- a process for individualized determinations.

That's not, you know, and so that's the fundamental distinction between what's going on in Roe and what's going on here.

I mean, Roe is really about --

JUDGE RICHARDSON: Right, but --

MR. HINSHELWOOD: -- providing that individualized determination.

THE COURT: But why -- why -- why shouldn't we read Roe to say, well, at -- at entry you've got the same question, right?

So because the individualized determination on the back end on deployment could say, listen, it's perfectly acceptable if you're going to, you know, deploy to a, you know, non-combat zone role where you're an accountant, that --

10

that that's a perfectly acceptable deployment while, you know, perhaps sort of forward combat zone positions are not acceptable.

But why, given that that back-end decision exists on deployment, I think the argument would be, you can't just rely on deployment at the entry stage.

MR. HINSHELWOOD:  Right.

JUDGE RICHARDSON:  Help me understand why -- why I got to pull -- I -- I don't pull those apart given that now you have this back-end consideration.  And so you just would have to say, like, HIV folks, they -- they need to be accountants and, you know, we can debate whether paper cuts are a sufficient problem that that causes an issue or not, or, you know, whether a combat zone is a sufficient risk or not, but that you've got to do that on the front end just like you do on the back end.

MR. HINSHELWOOD:  Right.  So, Your Honor, I mean, that's an argument that the military can't have any disqualifying medical conditions effectively at all.  I mean, because can you make the same argument about high blood pressure, about diabetes, about asthma, about ADHD, about literally

every other condition.  You've just --

JUDGE RICHARDSON:  I -- I don't -- I don't disagree that the logic --

MR. HINSHELWOOD:  -- and --

JUDGE RICHARDSON:  -- is there, but that doesn't mean that that's not what the logic is.

MR. HINSHELWOOD:  Well, I -- I --

JUDGE RICHARDSON:  And I'm just -- I'm trying to take Roe, which is binding.  I'm not necessarily saying that its logic is like --

MR. HINSHELWOOD:  Yeah, I -- I --

JUDGE RICHARDSON:  -- is -- is right.  I'm just saying I got it.

MR. HINSHELWOOD:  I mean, I -- I don't --

JUDGE RICHARDSON:  And so now why, I mean, I understand you might say, okay, well, Roe only applies to HIV and it wouldn't apply to high blood pressure.  And so, but -- but maybe we think the logic of Roe applies to high blood pressure just like it does HIV, and so why wouldn't that similarly demand at entry that the Army has to take everybody.  I mean, I, you know, the slippery slope is not

always a fallacy.

MR. HINSHELWOOD:  Right.

JUDGE RICHARDSON:  Sometimes it's just

12

like the effective logic.

MR. HINSHELWOOD:  Well, Roe itself said it wasn't talking about, you know, accession policies. It said it was focused on this question of what you do with folks who develop these conditions after they're in the military --

JUDGE RICHARDSON:  Right, and just because you say you're not talking about something doesn't mean the logic of what you say doesn't apply beyond the very facts that you have.

MR. HINSHELWOOD:  Right.  But, so the -- the -- the fundamental distinction, which again I actually don't take Plaintiffs to dispute here, is that the military can make a judgment up front ex ante at the accession stage about what risks it wants to take on.

And if somebody presents known risks that will limit their deployability, of whatever particular type, whether that's medical or some other, the military can decide, okay, we're not

going to take that risk.  We are going to instead, you know, pass on that person and we'll take other people who don't present those known risks.

And the idea that the military is forbidden from doing that as a Constitutional matter

13

or as a matter of just basic rationality review, would be pretty astonishing.  I mean, that's not at all what this Court was saying in Roe.

What the Court was saying in Roe was that it was unfair when the military had its own -- had policies that it was applying to other conditions.

JUDGE NIEMEYER:  Well, why -- you haven't mentioned, and I'm wondering why, as these questions are being raised, isn't there -- is there a distinction between someone who is already in the military to whom the military has accepted and now has responsibilities to take care of them, as opposed to who is going to be accepted in the military at -- at the initial stage.

It seems to me at the initial stage, there are no obligations of the military to take somebody, but after accession and once somebody's in the

military, there may be obligations, if not probably legal but also moral and -- and -- and military-wise to take care of your soldiers who are -- who are -- become susceptible to some kind of disease or medical condition, or even a wound in the course.

It seems to me that -- that might provide a basis for distinguishing to some extent, Roe and -- and the circumstance.

14

MR. HINSHELWOOD:  Right.  Well, certainly nobody has a right to join the military.  And so I think you're right to -- to draw that distinction. And I mentioned a few minutes ago --

JUDGE NIEMEYER:  Well, I'm not sure --

MR. HINSHELWOOD:  -- the distinction --

JUDGE NIEMEYER:  -- I'm really asking this, because the -- this idea comes to mind is that they're -- once somebody's in the military, the military now has some obligations, and they -- instead of throwing them out, they ought to take care of them.  That's the idea --

MR. HINSHELWOOD:  Right.

JUDGE NIEMEYER:  -- of Roe, whereas here the question is, can the military screen persons

based on medical conditions before they take on individuals and then create that obligation.

MR. HINSHELWOOD: Yeah, and -- and I think part of the -- a central part of the holding of Roe was it said, look, to the extent the military can provide this kind of individualized determination, it's -- and it's, you know, for individuals who are already in the military rather than just to start discharging them with no individualized consideration, it should do that.

15

Because yes, once there's that relationship, there may be obligations, legal or otherwise, that are formed, you know, that the military has to abide by.

And that was part of the crux of this Court's holding in Roe was that the military hadn't abided by the sort of regulations it had in place.

And I also mentioned the fact that just as a practical matter, when individuals develop conditions after they join the military, the military has already invested significant time and training in those individuals, and, you know, may

have -- may have an interest in making a judgment about those people, that it wants to retain them despite their condition because of, you know, the valuable skills they developed or -- or whatever other reasons the military may have.

None of that exists at the accession stage. At the accession stage, the military can absolutely make the judgment that, you know, it's going to avoid these known risks. It's not going to take on these known concerns. And then, you know, that's --

JUDGE RICHARDSON: Where does the word "accession" come from? I found it to be strange.

16

MR. HINSHELWOOD: I don't -- I'm not sure exactly, Your Honor, I mean --

JUDGE RICHARDSON: Is that a military term?

MR. HINSHELWOOD: It is, and it refers to the just enlistment, induction, or appointment.

JUDGE RICHARDSON: Yeah.

MR. HINSHELWOOD: So becoming -- becoming a member of the military, joining the military is all that is, for the most part. There are some

circumstances where folks already in the military, the accession standards apply to them, but by and large we're talking about people joining the military from civilian life.

JUDGE JONES RUSHING: Can your -- can your case be made even without these medical rationales in -- in attempting to distinguish Roe? What you were saying just now made me think of your cost argument. You have an argument about the cost the military's willing to take on that wasn't addressed in Roe.

And then the sort of diplomacy rationale that seemed the Roe Court was saying we don't see the evidence in the record for that, but they didn't seem to rule out the -- the possibility, and you're

17

not talking about those today which makes me think maybe they're not your best arguments, but I want to get your perspective on whether all of these are sort of independently sufficient or whether they work together, or how -- how should I understand your arguments.

MR. HINSHELWOOD: Yeah. So they certainly

are independently sufficient. I believe I mentioned them at the end of my introduction. I'm certainly not running away from them.

JUDGE JONES RUSHING: Sure.

MR. HINSHELWOOD: Absolutely those are additional independent reasons that were not addressed in Roe, that this Court could affirm on -- sorry -- could reverse on in this particular instance, you know.

So obviously the military does incur additional costs and can make that judgment up front, that it doesn't want to take individuals on who are going to incur known costs as opposed to individuals who, you know, may develop conditions later in their service, you know.

Obviously the military can't know that at the outset necessarily. And the same thing with, to the extent that the particular condition precludes

18

deployability to some places because of entry bans or other things that the military addresses, you know, that obviously is an additional reason why their deployability is going to be limited.

So, you know, all of those are independent

reasons, and those two were not addressed in Roe. I -- I -- I started with the sort of, you know, medical logistical rationales because I think even taking at face value all the sort of statements this Court made in Roe about HIV and its treatment.

The military still may rationally determine that it's not going to allow those individuals to access in the same way that it makes that determination for high blood pressure or any number of other conditions that might be manageable with medication, that have literally no risk of transmission.

And HIV, you know, as this Court pointed out in Roe, the risk of transmission may be very low for individuals whose, you know, HIV is well managed with any retroviral medication, but that's not zero.

And there are certainly circumstances, for example the CDC guidance talks about occupational exposures in a medical care setting, that you cannot fully rule out the possibility of transmission. And

19

so caregivers who are exposed to potential blood-to-blood transmission are supposed to receive treatment

and testing for a period of time thereafter.

And in the military context, that could mean taking soldiers off the front lines, taking military doctors out of hospitals, or field, you know, care situations, preventing them from providing care to others in the meantime, potentially having to evacuate them out of a particular area.

So it's just plain that there are going to be circumstances where those kinds of decisions are not things the military has to be put to, and it can make the judgment up front that it's not going to take those risks on at the outset.

I'm certainly happy to answer any questions the Court might have about this --

JUDGE RICHARDSON:  -- right.

MR. HINSHELWOOD:  -- or the remedy or anything else, otherwise I'd reserve my time.

JUDGE RICHARDSON:  Thank you.

MR. HINSHELWOOD:  Thank you.

JUDGE NIEMEYER:  All right.  Mr. Schoettes.

MR. SCHOETTES:  Good morning, Your Honors,

and may it please the Court.  Scott Schoettes on behalf of the Plaintiff Appellees.  I am going to address the merits of the case, and my colleague Ms. Coberly will address the relief.

Misconceptions and irrational fear.  They have surrounded HIV and the people living with it since the very beginning of the epidemic.  Some concerns, and even fears, were justified while others were not.  They all were a little more understandable when AIDS was an invariably fatal infectious disease with an unidentified cause and no available treatment, but 44 years later, we have not only identified HIV as the cause, but documented precisely how the virus operates and how it is and is not transmitted.

The first effective treatments became available nearly 30 years ago, and with adherence to those combination drug therapies came not only robust immune system and return to health, to full health, but also the ancillary benefit of a greatly reduced or zeroed out risk of transmission through any type of contact.

Today a person living with HIV who regularly takes their one pill once-a-day regimen, as do Isaiah Wilkins, the two synonymous Plaintiffs,

and 99.8 percent of service members living with HIV, is as capable and healthy as a person with a similar demographic profile and no chronic condition.

So that begs the question. Why is the military still acting like it's 1981. The answer --

JUDGE RICHARDSON: Can you help me understand -- I understand the -- the jury argument, but can you help me understand why your argument is limited? Right? So I -- you want to talk a lot about HIV, I understand, but I take your argument effectively to be that the military can't do any of these exclusions; high blood pressure, diabetes, hepatitis, right? Like all of the limitations that the government has.

I think the logic of your argument is that the government just can't do any of those. They're all irrational, because all of them are things that can be managed with medication, at -- at least, maybe not literally all of them, but many of them, the ones I just listed, can be managed with -- with appropriate medication.

They present in many cases no risk of

transmission, like blood pressure.  In the hepatitis context, limited risk if properly treated, and -- and so it seems like to me your attack here is

22

actually not about HIV at all, but it's about the ability for the government to limit who gets into the military at all.

Do you agree with that?  And do you agree that the logic of your argument will exclude many of these things?  Or do you think there's a distinction here that matters, that you can limit the logic of your argument?

I understand you're only presenting one claim, and maybe your colleague wants to talk about remedy.  Obviously the remedy would apply to one claim, but the logic here seems to like tie the government's hand in a variety of ways for admission to the military.

MR. SCHOETTES:  So, no, we do not agree that that is the argument we are making.  And I want to make this very clear, I -- our case should not have the effect that you are describing on any other condition, because what we're actually arguing is that the military has a set of criteria that they

apply to all conditions to decide whether or not, in this case, a person can join the military with a particular chronic condition.

They're laid out right there, four very specific criteria. We're saying people living with

23

HIV, if you act rationally, meet all of those criteria. So it is a very fact-bound determination that the Court found, in Roe 2, what we call Roe 2, which is the -- the case that was before this Court, as well as then in the District Court on, you know, the further proceedings in -- in that case, and then again in this case in Wilkins, that when you look at each of the justifications, they -- they do not apply to people living with HIV.

Those criteria that --

JUDGE RICHARDSON: They also don't apply -- I mean, if you're right, if all of that's irrational, the logic of that would apply to lots of the other exclusions too, right. You don't get to just say, no, no, no, no, just give me my relief, even though the logic of my argument will apply to lots of these other.

And maybe, I don't think that's the end of the world, right. Maybe -- it may be right that the Army doesn't get to pick who they admit, right, that it sort of like gets delegated to, you know, a bunch of folks in black dresses. We get to decide who goes in the Army.

I totally acknowledge that might be the right world to live in, but what I don't understand

24

is this like effort to sort of pick out this one disease and suggest that it is somehow different than high blood pressure or, you know, hepatitis, or many other diseases that are well managed by the medical profession and, you know, don't present risk, at least insofar as a given individual is working as an accountant at some, you know, rear facility in -- in Stuttgart that's any different than being in Atlanta.

MR. SCHOETTES: So we're not drawing that distinction either. We think that, you know, we have established that a person living with HIV can deploy anywhere and in any position. That is really the -- the crux of the whole thing.

It's not about in a -- in a certain

position within a deployment, but more importantly we are not asking or not saying that the Court -- that the Army, that the military should not be able to apply its criteria.

Those criteria are clear. They are in the statute. They're the reason actually that the Fourth Circuit said they have the ability, this Court has the ability to assess whether or not the defendants are acting rationally in this circumstance, because there's a manageable list of

25

criteria that you apply to each condition.

So no, those criteria, when you look at what they say, free of contagious diseases that will affect the health of other members, you know, able to deploy to any location basically without any effect or further effect on the treatment. Able to perform their duties.

So there could be, and the list of things --

JUDGE NIEMEYER: Let me -- let me ask you, just to follow up on that. Why blood pressure, you can take a single pill and reduce blood pressure

quite effectively.  Why is that justified under the list in your judgment?

MR. SCHOETTES:  So I can give you my, you know, sort of response to why I think that --

JUDGE NIEMEYER:  Well, you're applying those criteria, and I want to understand --

MR. SCHOETTES:  Well --

JUDGE NIEMEYER:  -- in other words, what I'm getting to is if you apply that criteria, you -- and reject blood pressure, it seems to me you would have to because HIV is an immune condition that is controllable with the taking of a pill a day, and as is blood pressure is controllable with taking a pill

26

a day.

And it seems to me there is a cost as well as some practicality at doing both, in both cases.  So tell me why you think blood pressure is justified?

MR. SCHOETTES:  So there are various reasons that we learned about during this litigation that the military uses, or that places things on that list of disqualifying conditions.  Some of them are things that directly effect, immediately, a

person's ability to perform their job.

If you were missing an arm, for instance --

JUDGE NIEMEYER:  Well --

MR. SCHOETTES:  -- then you can't accede.

JUDGE NIEMEYER:  I -- my hypothetical deals with high blood pressure

MR. SCHOETTES:  Right.  So with respect to high blood pressure, I think, it is their assessment of if they're taking someone who has high blood pressure now, what does that look like five years from now, what does that look like ten years from now, what does that look like across the career of that person joining the military.

This is my understanding.  As opposed to

27

HIV, like this person today is going to be, with respect to their HIV, the same that -- that they are five years from now.  The same that they are ten years from now.

JUDGE JONES RUSHING:  Isn't there evidence in the record that says that taking the pill doesn't -- may not change the fact that there are secondary

conditions that can develop five years from now, ten years from now, you're more susceptible to additional conditions?

I mean, that's just the argument you made with high blood pressure, it seems like it would apply equally to HIV, and here we are again with three judges trying to figure out the difference.

MR. SCHOETTES:  Yeah, so with respect to those what are claimed as co-morbidities or secondary conditions to HIV, there's not a lot of evidence to support them.  They were addressed by the Court below --

JUDGE JONES RUSHING:  There's not a lot of evidence either way, right?

MR. SCHOETTES:  With respect to?

JUDGE JONES RUSHING:  Whether the -- taking the pill daily will change your long term susceptibility to these secondary conditions.

28

MR. SCHOETTES:  No, I think the -- the question is whether having HIV -- not taking the medication, but whether having HIV leads to having further susceptibilities to other things, but the -- the science is not strong on that, and it has also

been over the past four years of the epidemic. We don't have a lot of evidence, right, about --

JUDGE JONES RUSHING: So that's how I draw the line. How do I draw the line as a legal matter between that science is not enough and that's legally forbidden, and the military cannot exclude someone because of that, but high blood pressure is because, in? How -- there's like more studies? What's -- what's the argument?

MR. SCHOETTES: Well, indeed, there has been, right. We've been studying high blood pressure for a long time, and we understand some of that stuff better than we do, say, HIV.

JUDGE JONES RUSHING: That might be a reason for them to be able to make the call, if we understand it less.

MR. SCHOETTES: I guess so, but I would say is that it is a speculative argument that, oh, there's going to be some other things that are going to affect people living with HIV as they get older

29

that do not, you know, that do not affect general population.

It's -- it's very speculative, whereas with respect to high blood pressure it is --

JUDGE RICHARDSON: You -- you were with us --

MR. SCHOETTES: -- known risks.

JUDGE RICHARDSON: You were with us in the last argument, I assume, and --

MR. SCHOETTES: I was.

JUDGE RICHARDSON: -- one of the challenges that we have, right, is the Supreme Court tells us over and over that which logic ought to be obvious, and that is where there is uncertainty, like the elected branches, not the judicial branch, gets to make those calls, right?

Whether sex change surgeries are effective or not, the lack of information and the uncertainty, right, gives the elected branch the authority to decide what to cover or not cover.

And why isn't the same point applicable here, right? The executive branch here has some uncertainty, as you say we -- we haven't been studying HIV but 44 years, is that what you -- I don't remember exactly the number you said, but

30

we've only been studying it for 44 years.  We don't have perfect data with respect to co-morbidity or the like.

And so it seems like to me the executive gets to make the judgment call given that uncertainty.  Why isn't that like just like the same idea that we've just applied in Skrmetti?

MR. SCHOETTES:  So, one, I think, you know, the uncertainty is about what happens to someone as they get to, you know, 50 or 60 living with HIV.  We know kind of like short term effects what kinds of things are happening and don't happen, and -- and, how healthy a person is in terms of once they're on these medications, they have returned, they've gotten rid of basically the problem, which was that their immune system wasn't operating, and they are returned to pretty much the -- the same life expectancy --

JUDGE RICHARDSON:  Wait, wait, but --

MR. SCHOETTES:  -- the same --

JUDGE RICHARDSON:  -- "pretty much" seems like a big word there, right?  So like you -- this is the challenge here, like "pretty much" is doing a lot of work in the sentence that you're giving us.

And I don't know whether "pretty much"

means like the same or "pretty much" means like not the same, right? I mean, that's a big difference, and you're asking me, who is not a doctor and does not do like public health work in any sense of the phrase, right, to tell the executive branch and all of their doctors and experts that like they can't possibly think that -- that there's -- that "pretty much" means something more than you want it to mean.

I mean, now, your own argument --

MR. SCHOETTES: So I --

JUDGE RICHARDSON: -- seems to make this point.

MR. SCHOETTES: So I wanted to clarify. When I said pretty much, I was referring to life expectancy, which we haven't -- they haven't quite established is exactly the same, but everything else, there is just no difference in the capability.

As a matter of fact, there is --

JUDGE NIEMEYER: Well, I'm sure it's a -- they -- we can't take blood donations from an HIV person, can we? And soldiers often have to provide blood to each other, don't they?

MR. SCHOETTES: That is correct, and on that front, the -- the Roe court at Roe 2 said that that was not a sufficient -- that does not provide a

32

rational basis for excluding service members from deployments.

JUDGE NIEMEYER: Well, he thought that, you know, service members that are already members of the service. It seems to me the military has an underlying obligation to take care of its own, and that's played out in just tons of ways in the military.

That's a part of the doctrine to take care of our own, and when somebody contracts a disease while serving in the military, it seems to me Roe instructs that you have to take care of them unless there's some significant aspect.

But here, we're talking about the initial decision whether to engage somebody in the military, and -- and there, it seems to me they could almost turn down anybody for no reason unless it's an unconstitutional classification, race or whatever.

MR. SCHOETTES: Well, and that is the point, Your Honor, is that they do have criteria

that they use to determine, they don't just say, hey we're going to exclude these people, not exclude these people.

They have criteria by which they are determining this, and we have shown that those --

33

the way they're applying those criteria to people living with HIV is irrational, arbitrary, and capricious. That is what -- and I think this is really --

JUDGE RICHARDSON: Can I ask a -- can I ask a question about --

MR. SCHOETTES: Yes.

JUDGE RICHARDSON: -- Roe because you -- you keep coming back to it. Your colleague describes Roe as effectively a categorical ruling, right, that -- that says the military can't categorically exclude existing HIV soldiers from deployment.

Do you agree that that was what Roe did?

MR. SCHOETTES: No, Your Honor.

JUDGE RICHARDSON: I didn't think so. And so do you -- do you believe that Roe commands that

the Army must send HIV-positive soldiers to front line military engagements?

MR. SCHOETTES:  I do not think that Roe commands that in particular, but on all of these issues the Roe court was examining the

JUDGE RICHARDSON:  Tell me -- tell me why -- why that is if.  If it's not like a prohibition on the categorical decision, then I -- I thought

34

what you were going to say is no, no, no, they can't make this decision at all, right.  So they must, if -- if otherwise qualified, they must send an HIV Ranger to the very front lines to engage with his -- with his comrades.

MR. SCHOETTES:  So I would definitely say that that is what the District Court did in Harrison and did again here, as you know --

JUDGE RICHARDSON:  I'm -- I'm not -- I'm not terribly interested about what the District Court did, right.  I'm -- I'm sort of interested in what binds me, and that's Roe --

MR. SCHOETTES:  Right.

JUDGE RICHARDSON:  -- not the District Court.

MR. SCHOETTES:  So what I think is binding from Roe is the specific determinations that they made about the various justifications being offered by the defendants as to why they wouldn't send this, you know --

JUDGE RICHARDSON:  But the justification --

MR. SCHOETTES:  -- how this person doesn't --

JUDGE RICHARDSON:  -- is connected to the

35

categorical rule, right?  That like you cannot deploy, period, and so that this justification doesn't -- or this reason doesn't justify a categorical rule.  You can't disconnect the reason from the rule, right?

MR. SCHOETTES:  No, I -- I do think that they have misinterpreted Roe.  Roe talks about two scenarios; one, if there's a categorical bar, and then also if we're just talking about individual determinations.  It's -- it examines both those criteria, and it says that these reasons that are being provided by the defendants are contrary to the

science.

I think that is the chief piece --

JUDGE JONES RUSHING:  With the individual determinations part, the -- so the Court did, the Court said if they're -- if the policy is to make individual determinations, the military didn't do that, right, so that itself is reason enough, the Court said.

And then they moved on to everything we've been talking about today from Roe, which is, or, alternatively if this is a categorical ban, here's why we think that's not acceptable, right.

So, you know, you're right that they

36

raised the idea of case by case determinations, but that was separate from everything we're talking about today when it comes to what Roe thinks is medically provable.

MR. SCHOETTES:  So I think the holdings of the -- of the Court in Roe are actually applicable either whether you're talking about a categorical determination or whether you're -- whether you're doing this on an individual basis.

Because they are about HIV and the effect

of HIV on all of these questions, and the Court said that basically the -- the -- the core of the justifications being provided by the military do not -- they contradict the science.  They are incompatible with the science, so at their very core these justifications, these reasons why they won't deploy these people fail rational basis review.

JUDGE JONES RUSHING:  Did the District Court fail to consider the evidence that was in front of it in this case?  The District Court seemed to mostly be looking at Roe and the record that she had before her in -- in those prior cases, but there's a different record here which matters, at least for arbitrary and capricious review.

Obviously the record does not restrain the

37

government when it comes to equal protection.

MR. SCHOETTES:  So the -- the District Court was definitely looking at the evidence. You're right that I think the District Court said that there was nothing presented that was new.  So based on the fact that there was nothing of significance that was presented --

JUDGE JONES RUSHING: Well, that's just -- that's just wrong, right? Like I mean, there's -- the cost argument wasn't presented before.

MR. SCHOETTES: I'm sorry --

JUDGE JONES RUSHING: This evidence about particular countries who have a diplomacy issue wasn't presented before. So what's your response to those arguments?

MR. SCHOETTES: So let me clarify. She was -- the Court actually at that time was talking about the medical justifications, that there was nothing new on the medical justifications.

Obviously, yes, the costs of care and the -- the so-called diplomatic deference to these discriminatory host nation laws were two separate issues. The latter had actually been addressed previously in the Roe case, and in the Harrison case it hadn't been resolved. It had been left open.

38

The Court basically said, okay, I don't know if there's really these restrictions, but I'm going to -- I can provide relief here without addressing whether or not people living with HIV can go to these particular few countries.

The Court left it open there. In this case, I think the Court closed that loophole and said no, now I have looked at it, this case has brought this -- has made this a ripe issue. I looked at it and have decided that indeed it cannot -- the military can no longer say you can't go to this country or you can't go to that country because the diplomatic deference policy was irrational because they didn't apply it to anybody except people living with HIV.

With respect to costs --

JUDGE NIEMEYER: Go ahead. You've got 30 seconds for cost.

MR. SCHOETTES: Okay. With respect to cost, there are several reasons why. Obviously, you know, the -- just saying that they're reducing costs does not automatically provide a rational basis.

The -- the District Court appropriately excluded an unqualified witness, offered to present untrustworthy evidence of cost, and the cost savings

39

is arbitrarily and capriciously applied only to people living with HIV. It's the only condition.

And finally they accept and pay for dependents who need HIV related care of service members.  They let those people come in to the military, pay for their care regarding -- with respect to HIV.

And finally --

JUDGE NIEMEYER:  All right.

MR. SCHOETTES:  -- they accept smokers even though that is a much more expensive condition to treat over time.

JUDGE NIEMEYER:  All right.  Thank you, Mr. Schoettes.

MR. SCHOETTES:  Thank you, Your Honor.

JUDGE NIEMEYER:  All right.  We'll hear from Mrs. -- Ms. Coberly.

MS. COBERLY:  Good morning, and may it please the Court.  I'm Linda Coberly, also for Plaintiffs, and I'd like to spend just a moment on the remedy issue.

Judge Brinkema entered her injunction and reliance on Fourth Circuit case law that is no longer good law in light of Trump versus CASA.  And we've argued that the Court could affirm on alternative grounds that CASA left open, including

40

the APA 7062, but it would make just as much sense to address the remedy through a remand.

Every case I'm aware of in the Court --

JUDGE RICHARDSON:  Can you tell me today what the, like, state of the world is?  Is the Army required under this injunction to be allowing HIV-positive individuals to join the Army?  Like today?  So if I --

MS. COBERLY:  Yes.

JUDGE RICHARDSON:  If -- if Bob shows up at the recruiting center and says, I'm HIV positive but I promise you I'm doing everything I'm supposed to do and I'm clean, that the Army today is required in -- in Kansas and Alaska and South Carolina, to admit that person.

MS. COBERLY:  Yeah, because --

JUDGE RICHARDSON:  And you agree that that is -- is like wildly overbroad in light of CASA.

MS. COBERLY:  I don't agree that it's overbroad if you understand the relief through the lens of the APA.  So I do agree --

JUDGE RICHARDSON:  Which is -- which is not what the Court did, right?

MS. COBERLY:  I agree with that.

JUDGE RICHARDSON:  Okay.

41

MS. COBERLY: So that's why I --

JUDGE RICHARDSON: So you -- you agree, at least as it currently stands --

MS. COBERLY: Yes.

JUDGE RICHARDSON: -- it's wrong. Either we've got to provide another foundation for it --

MS. COBERLY: Mm-hmm.

JUDGE RICHARDSON: -- that was not addressed by anybody, or we've got to vacate it and send it back.

MS. COBERLY: I agree, and I think the simplest thing for the Court to do would be to vacate it except for the part that applies to the three named -- to the three individual named Plaintiffs, and send it back for further consideration. We're fine with that.

And in fact, I think a remand makes a particularly --

JUDGE RICHARDSON: And -- and so we should probably -- regardless of what we're going to do, if we were going to do that, we should issue a stay today to eliminate the illegal order on the Army

with respect to at least everybody except for the three named Plaintiffs.

MS. COBERLY: I can't argue against that,

42

Your Honor.

JUDGE RICHARDSON: Yeah, okay.

MS. COBERLY: I --

JUDGE RICHARDSON: No, and I -- I appreciate it. I'm -- I'm just trying to understand it.

MS. COBERLY: Yes.

JUDGE RICHARDSON: I'm not trying to push it. I appreciate you being straightforward with the Court.

MS. COBERLY: And I think, one of the reasons I'm suggesting a remand, I'm going to suggest it for a couple of reasons. First of all, every case I'm aware of has held that it's the District Court in the first instance that should assess the -- the implications of CASA for the remedy, which is something that falls within the discretion of the District Court.

Secondly, it may make sense to remand here when there may be other grounds for remand as well

including for factual findings on a number of the topics that were discussed this morning with my colleague, for which there is currently no factual finding in the government's favor by the District Court, and including that there was a -- there was

43

an expert who was excluded and presumably if the expert were allowed to testify there would be some additional fact-finding required, so a remand may be appropriate on that basis.

JUDGE NIEMEYER:  But that doesn't make sense if the -- if this injunction, it's an interlocutory appeal --

MS. COBERLY:  It's not, Your Honor.

JUDGE RICHARDSON:  No.

MS. COBERLY:  It's a final --

JUDGE NIEMEYER:  This is a final injunction, it's a final injunction.

JUDGE RICHARDSON:  Correct.

FEMALE SPEAKER:  And the scope of the injunction is too broad.  Your argument is it would have to vacate that and give the Court the opportunity to fashion the relief that is

appropriate.

MS. COBERLY: Correct.

JUDGE NIEMEYER: But you also think that the Court should be given the opportunity to make other findings?

MS. COBERLY: I think based on the argument that was made below, there is a basis for that relief as well. A remand for additional

44

findings on the merits as well, and it would make a lot of sense to send the whole thing back for that reason.

But, I want to --

JUDGE RICHARDSON: I mean, if the other things weren't addressed, it's -- it's like saying, I mean, you try a case and you try A and B, but you don't try C, D, and E, and then the Appellate Court says the relief is wrong but we'll let you do C, D, and E also. I mean, that's a little --

MS. COBERLY: Well, the -- this appeal came to this Court with cross motions for summary judgment.

JUDGE RICHARDSON: Yeah.

MS. COBERLY: Right? And one, the Court

could affirm, the Court -- on the merits.  The Court could reverse on the merits.  The Court could also vacate and send the case back for additional fact-finding on the merits, and that's something we think the Court should consider.

When it comes to the remedy, a -- if the Court were to find either that there was a basis for a remand on the merits or that it was going to affirm on the merits, it should still vacate and remand, at least not vacate as to the rest of the

45

relief, not to the three individuals, and send it back for findings and -- and proceedings in the first instance before the District Court.

The government argues that vacatur was not at issue in this case, and that's just not true. Our complaint from the very first day sought a declaration that the regulations are unconstitutional on their face and a violation of the APA on their face, and to bar their enforcement, and that includes DoD 6485.01 which provides that HIV is a per se disqualifying condition unlike things like high blood pressure which can be waived

by the military if the military concludes that the condition is not a barrier to service.

HIV is different.  That's why we filed this lawsuit.  That's why we sought to -- we filed it in the jurisdiction where the defendants live, not in any old jurisdiction like in many of these other cases.  We filed it in the district where the defendants promulgated the regulations, where they make their enforcement decisions, and we asked for those regulations to be declared invalid.

That is relief that can be justified under the APA, and the District Court should have the opportunity to reach that issue in the first

46

instance.

JUDGE NIEMEYER:  All right.  Thank you.

MS. COBERLY:  Thank you very much.

JUDGE NIEMEYER:  All right.  I guess Mr. Hinshelwood, would you have some response?

MR. HINSHELWOOD:  Yes, Your Honors, thank you.  Just a few quick points.  I mean, I appreciated my colleagues, their presentation.  My friend on the other side said that they believe they have shown that the record demonstrates that

individual -- and that the District Court held, this Court should hold, that individuals with HIV can deploy, quote, anywhere and in any position.

In other words, regardless of all the considerations the military has identified about pharmacy supply, about the ability to provide treatment, about the ability of those individuals to donate blood, all the things that everyone agrees, that were recognized in Roe itself as differences between individuals with well-managed HIV and healthy individuals, that this Court should disregard all of those considerations, even though again they weren't directly considered in Roe because Roe, as we've discussed, addressed a categorical ban on all deployments.

47

The Court's critical language on page 228 of that opinion emphasizes that the government had failed to explain a categorical ban on deploying HI-positive service members.  That is the crux of what the Court was focused on, so of course the rationales discussed in that case were different and were focused on that question, not on the question

of whether there are particular circumstances in which individuals cannot be deployed.

And the military has demonstrated that's plainly true here, even accepting all the things the Court said in Roe about the once-daily pill, the fact that it's not, you know, that it's resistant to comfortable and extreme conditions, that, you know, there might be ways to mitigate the facts that individuals can't donate blood, even accepting that all of that is true, there will still be circumstances where deployment is not appropriate.

And that's clear, just as clear after Roe as it was before Roe.  And it would be pretty extraordinary for the federal courts to be tasked --

JUDGE RICHARDSON:  So your -- your colleague says that the District Courts after Roe have said that you must send HIV soldiers to every possible deployment.  Is that -- is the Army

48

currently under an injunction that requires you to send them to whatever war zone you happen to be involved with at the time?

MR. HINSHELWOOD:  No.  The -- the injunctions that followed from Harrison and Roe at

final judgment, after the preliminary injunction appeal this Court decided in Roe, addressed this categorical deployment policy that was at issue in the first Roe opinion, and also addressed a separate question about moving from being an enlisted soldier to being an officer. That was the Harrison case.

So, but neither of those injunctions requires the military to deploy them everywhere. And in fact, as we point out in a footnote in our reply brief, at one point the Plaintiffs in that case filed a motion to enforce the injunction on the ground that they thought their deployments were being denied or -- or somehow altered by the fact that they, you know, had HIV, even well managed.

And the District Court said look, that's not this injunction. Maybe that's a different lawsuit, but that's not enforcing this injunction. That's something else.

So there is no injunction right now that requires the military to deploy those individuals to

49

all circumstances. And in fact, as we've explained in the brief, what the military does is it gives

individualized consideration to whether a particular deployment is appropriate.

But there would be no need for that type of individualized consideration, and there would have been no need for this Court to talk about that in Roe if it was in fact true, as my colleague suggests, that you just have to deploy them everywhere all the time regardless of any of the military's reasons for not wanting to do that.

And again, many of those reasons would apply to numerous other conditions, not -- not just HIV; to high blood pressure or any number of other things that are managed by medication. The military's ability to supply that medication to front line positions, the military's ability to --

JUDGE RICHARDSON: Can you --

MR. HINSHELWOOD: -- you know, provide that --

JUDGE RICHARDSON: Can you address briefly the -- the injunction point? Do you agree that currently, you know, Army recruiting stations all over the country are required by this injunction to accept HIV positive individuals?

50

MR. HINSHELWOOD: Yes, that is currently the rule.

JUDGE RICHARDSON: And -- and that's based on the injunction in this case.

MR. HINSHELWOOD: Yes.

JUDGE RICHARDSON: And you agree that even if we were to believe that the merits were correct here, that that injunction has to go.

MR. HINSHELWOOD: Correct, yes. Absolutely. Even if you affirm on the merits, you would have to narrow the injunction to apply only to the three individual Plaintiffs here regardless, and we don't think Plaintiffs now get to go back and try again for a vacatur.

They mentioned it before. It was not something -- they could have requested it in the alternative, they never did.

JUDGE NIEMEYER: What's -- what's your response to sending it back to have it be considered under the APA?

MR. HINSHELWOOD: Yeah, I mean, for exactly what I was just saying. Plaintiffs could have requested both remedies, an injunction and a vacatur. They could have requested those remedies in the alternative.

51

JUDGE NIEMEYER:  Well, they didn't.

JUDGE RICHARDSON:  Her -- her response is, we -- we sought a declaratory judgment, and -- and that that, the declaratory judgment act, I take her argument to be that the declaratory judgment act has a similar basis, and so maybe it's the same thing as 706.  I'm not sure.  Maybe that's --

MR. HINSHELWOOD:  I don't take that to be the argument.  I mean, I don't think that would be correct, but I don't take that to be the argument.

I take the point to be, well, we -- we mentioned the APA and therefore we -- by mentioning the APA, that encompassed a request for vacatur even though we never requested it.  They didn't even say set aside, and the language she quoted for you doesn't even include the relevant language from 706(2) that people rely on as the source for vacatur.

And, you know, obviously this Court shouldn't reach it for the first time here, and that we don't think that they get now to go back and try again just because they're not happy with the way

the law developed in the meantime.

So I -- I would just close by emphasizing that at the -- at the end of the day, it's the

52

military's judgment, and the Supreme Court has emphasized repeatedly that decisions about the composition of a military force are entrusted to the military's judgment, and those principles of, you know, respect for the military's decisions about how to --

JUDGE NIEMEYER:  Let me ask you a question --

MR. HINSHELWOOD:  -- address each --

JUDGE NIEMEYER:  -- on that.  I know we're over time, but I'm interested in this standard for review.  What -- both the Supreme Court and our Court has recognized that we should defer to military judgments.  What does that do to our standard for review, and what is our standard for review?

MR. HINSHELWOOD:  Right, so I mean, your -- the District Court addresses this as a rational basis case, and certainly the question here is just whether the military's decision is rational.  I

think the same basic --

JUDGE NIEMEYER:  And does the military deferment add any other layer on that?

MR. HINSHELWOOD:  Certainly what this Court should do in -- should hesitate before second

53

guessing the military's judgments about the composition of the military force.

I think that's the force of Supreme Court's cases on military deference is to say, look, you know, we have our standards review, but when you're talking about poor military decisions like who can be deployed, where can they be deployed, you know, what individuals should make up a fighting force, those are core military decisions for which the military is uniquely competent and the judiciary is relatively less equipped to make.

And so those particular decisions, we think absolutely it should influence the way the Court thinks about it.  I mean, I think under any standard of rationality, rational basis review, arbitrating capricious review, whatever, what the military has said here is perfectly sensible, but

certainly where this is arises in a military context and we're talking about those core decisions the military has specifically singled out as entrusted to military judgment, it seems extra plain that the District Court erred here.

JUDGE NIEMEYER:  All right.  Thank you.

MR. HINSHELWOOD:  Thank you.

JUDGE NIEMEYER:  We'll come down and greet

54

Counsel and take a short recess.

THE CLERK:  This Honorable Court will take a brief recess.

(WHEREUPON, the proceedings adjourned.)

55

CERTIFICATE

I, Michelle Breezee, do hereby certify that the proceeding named herein was professionally transcribed on the date set forth in the certificate herein; that I transcribed all testimony adduced and other oral proceedings had in the foregoing matter; and that the foregoing transcript pages constitute a full, true, and correct record of such testimony adduced and oral proceeding had and of the whole thereof.

IN WITNESS HEREOF, I have hereunto set my hand this 24th day of June, 2026.

Michelle Breezee